Brian M. O'Connor who was properly appointed by the Court for purposes of bringing this litigation.

3. Amoah Gyimah died as a result of the injuries suffered in the collision on April 29, 2019, on the George Washington Parkway and Evelyn Kenin was appointed by the Court, Administrator of his estate and for purposes of this litigation.

4. Sung-Chul Jung and Hyo Jung Kim were then passengers in a Ford Fusion Hybrid Red Top Cab then owned and operated at the time by Amoah Gyimah.

5. At said time and place the vehicles involved in the collision were the Ford Fusion Red Top Cab owned and operated by Amoah Gyimah and a Volkswagen owned and operated by Eric Jewett.

6. At all times relevant hereto, Amoah Gyimah was operating the Red Top taxicab pursuant to a validly issued hackers license.

7. The only occupants of the Ford Fusion Red Top Cab at said time and place were Sun-Chul Jung, sitting in the back seat on the passenger side of the vehicle, Hyo Jung Kim, sitting in the back seat on the drivers side of the vehicle, and Amoah Gyimah who was in the drivers seat and operating the vehicle.

8. Amoah Gyimah had picked up Sung-Chul Jung and Hyo Jung Kim at Mt. Vernon where they had come to visit while taking a break from a professional conference they were attending in Washington, D.C., pursuant to a call Sung-Chul Jung had made to Red Top Cab requesting a ride back to Washington, D.C.

9. The medical records (Ex 25a) of Hyo Jung Kim from MedStar Washington Hospital Center are true and accurate copies and provide information regarding

JA167

the medical care she received upon admission to Washington Hospital Center after the collision on April 29, 2019, and until her death on April 30, 2019.

10. Hyo Jung Kim's medical records from MedStar Washington Hospital Center Ex 25a accurately reflects treatment for the injuries sustained by Hyo Jung Kim during the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

11. The Death Certificate (EX 25b) of Hyo Jung Kim is true and accurate and accurately reflects that Hyo Jung Kim died as a result of collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

12. The External Examination Report from the Office of the Chief Medical Examiner of the District of Columbia (Ex 25c) is a true and accurate copy and accurately reflects that Hyo Jung Kim died as a result of the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

13. Hyo Jung Kim died as a result of the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

14. Hyo Jung Kim's medical records from MedStar Washington Hospital Center EX 25a accurately depict the treatment necessary to treat the injuries sustained by Hyo Jung Kim during the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

15. Hyo Jung Kim's medical records from Medstar Washington Hospital Center EX 25a depict reasonable treatment for the injuries sustained by Hyo Jung Kim

3

JA168

during the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

16. The billing records from MedStar Washington Hospital Center (EX 15, 25d) for the care and treatment of Hyo Jung Kim is a true and accurate copy and reflect reasonable costs incurred for the care and treatment of Hyo Jung Kim for injuries sustained as result of the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

17. The medical records (EX 25e) of Sung-Chul Jung from INOVA Fairfax Hospital are true and accurate copies and that those medical records for Sung-Chul Jung's accurately reflects treatment for the injuries sustained by Sung-Chul Jung during the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation and that said medical treatment was reasonable and necessary as a result of his injuries sustained in the said collision.

18. The medical records (EX 25f) of Sung-Chul Jung from EWHA Womans' University, Mokdong Hospital are true and accurate copies and accurately reflect the reasonable treatment for the injuries sustained by Sung-Chul Jung during the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

19. Sung-Chul Jung sustained injuries and damages as a result of the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation and Sung-Chul Jung's medical records from INOVA Fairfax Hospital attached as EX 25e accurately depict the treatment reasonably

4

JA169

necessary to treat the injuries sustained by Sung-Chul Jung during the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

20. Sung-Chul Jung's medical records from Ewha Womans' University, Mokdong Hospital attached as EX 25f accurately depict the treatment necessary to treat the injuries sustained by Sung-Chul Jung during the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation and depict reasonable treatment for the injuries sustained by Sung-Chul Jung during the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

21. The billing records from Fairfax County for Fairfax County Fire and Rescue (Ex 25g) for the care and treatment of Sung-Chul Jung is a true and accurate copy and reflect the reasonable costs incurred in the for the care and treatment of Sung-Chul Jung for injuries sustained as result of the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

22. The billing records from INOVA Fairfax Hospital (EX 25h) for the care and treatment of Sung-Chul Jung is a true and accurate copy, reflect reasonable and necessary costs and expenses incurred for the care and treatment of Sung-Chul Jung for injuries sustained as result of the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

23. The billing records from Ewha Womans' University, Mokdong Hospital (Ex 25i) for the care and treatment of Sung-Chul Jung is a true and accurate copy and

5

JA170

reflect reasonable and necessary expenses and costs incurred in the for the care and treatment of Sung-Chul Jung for injuries sustained as result of the collision which occurred on the George Washington Parkway on April 29, 2019 and is the subject of this litigation.

6

JA171

Brian M. O'Connor, Administrator
    of the Estate of Hyo Jung Kim, and
Sung-Chul Jung,
By Counsel

GARVER LAW OFFICES, P.C.

_____
Steven M. Garver, Esquire, VSB#15145
Deborah E. Mayer, Esquire, VSB #51072
GARVER LAW OFFICES, P.C.
11702 Bowman Green Drive, Suite 100
P.O. Box 2430
Reston, Virginia 20190-2430
(703)471-1090
(703)471-1095 (Facsimile)
garver@garverlaw.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I, on this 19th day of February, 2025, did cause a true copy of the foregoing *Pleading* to be delivered to:

| | |
|---|---|
| John D. McGavin, Esq. | ____ By First Class Mail |
| Gifford Hampshire, Esq | ____ By Federal Express |
| McGavin, Boyce, Bardot, Thorsen & Katz, P.C. | ____ By Hand Delivery |
| 9990 Fairfax Blvd, Suite 400 | _x__ By Electronic Means |
| Fairfax, VA 22030 | ____ By Facsimile |
| 703-385-1000 | |
| 703-385-1555 (fax) | |
| jmcgavin@mbbtklaw.com | |
| ghampshire@mbbtklaw.com | |

Counsel for Defendants, Fairfax Taxi, Inc., Evelyn Kenin,
Administrator of the Estate of Amoah Gyimah, Deceased

_____

7

JA172

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **BRIAN M. O'CONNOR** ) | |
| **Administrator for the Estate of** ) | |
| **Hyo Jung Kim, deceased** ) | |
| ) | |
| **Plaintiff** ) | |
| **v.** ) | **Case No. 1:23-cv-01756-CMH-WEF** |
| ) | |
| **FAIRFAX TAXI, INC.,** *et al* ) | |
| ) | |
| **Defendants.** ) | |

| | |
|---|---|
| **SUNG-CHUL JUNG** ) | |
| ) | |
| **v.** ) | **Case No. 1:23-cv-01758-CMH-WEF** |
| ) | |
| **FAIRFAX TAXI, INC.,** *et. al.* ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFFS' WITNESS AND EXHIBIT LIST PURSUANT TO FRCP 26(a)(3)**

**COMES NOW** the Plaintiffs, Brian M. O'Connor, Administrator of the Estate of Hyo

Jung Kim, and Sung-Chul Jung by counsel, pursuant to FRCP Rule 26(a)(3) and this Court's

Orders files their Witness and Exhibit List.

Plaintiffs reserve the right to supplement this disclosure as more information becomes

available.

**WITNESSES**

1.  Sung-Chul Jung

2.  Eric Jewett

3.  Timothy Bracken via videotaped deposition

4.  John McDonald via videotaped deposition

JA173

5.  Roger Daven Oswalt via videotaped deposition

6.  Raymond Bombac

7.  Roger Wayne Ahlers

8.  Min Ho Shim

9.  U.S. Park Police Detective Robert Freeman

10. U.S. Park Police Detective Humberson

11. U.S. Park Police Detective C Lawston

12. U.S. Park Police Detective Nguyen

13.  Hyun Sung Kim possibly by videotaped deposition

14. DongJoo Lee possibly by videotaped deposition

15. Kyo Jo via videotaped deposition

16. YeunJeung Kim possibly by videotaped deposition

17. Michael Miller

18. Irv Epperson, MD

19. The Plaintiff reserves the right to call any witness necessary to authenticate any document.

20. The Plaintiff reserves the right to call any witness named by the Defendants in the above captioned case.

## TESTIMONY TO BE PROFFERED FOR PURPOSES OF APPEAL ON THE QUESTION OF VICARIOUS LIABLITY

1.  Kyle Summers

2.  Carl Newcomb

JA174

**PLAINTIFFS' EXHIBIT LIST**

| Exhibit # | Item Description | I.D. | ADM. |
|---|---|---|---|
| 1. | Pictures of HyoJung Kim prior to collision | | |
| 2. | Picture of HyoJung Kim at the hospital | | |
| 3. | Pictures from funeral of HyoJung Kim | | |
| 4. | Excerpts from Videos from funeral of HyoJung Kim | | |
| 5. | First page of Instagram post of HyoJung Kim's Memorial | | |
| 6. | List of Shareholders from Technovations Partners | | |
| 7. | Profit and Loss Statements from Technovations Partners 2016 | | |
| 8. | Profit and Loss Statements from Technovations Partners 2017 | | |
| 9. | Balance Sheet from Technovations Partners 2018 | | |
| 10. | Tax Returns of HyoJung Kim redacted | | |
| 11. | Flight invoices for HyoJung Kim's family to travel to US following collision | | |
| 12. | Hotel invoice for HyoJung Kim's family following collision | | |
| 13. | Credit card statement with expenses related to HyoJung Kim's family trip to the United States following collision and HyoJung Kim's funerals | | |
| 14. | Receipt from funeral in Korea | | |
| 15. | Billing Records from Medstar Washington Hospital Center  for The Care and Treatment of Hyo Jung Kim | | |
| 16. | Chart of Support HyoJung Kim's Support of statutory beneficiaries | | |
| 17. | Demonstrative Evidence: Chart of damages suffered by the beneficiaries of the Estate of HyoJung Kim | | |
| 18. | Screen shots of KaKao Talk Messages between Sung-Chul Jung and family | | |
| 19. | Pictures of Sung-Chul Jung | | |
| a. | Prior to Collision | | |

3

JA175

| | | | | |
|---|---|---|---|---|
| | **b.** | Post Collision | | |
| | **c.** | Post Collision | | |
| | **d.** | Post Surgery | | |
| | **e.** | Post Surgery | | |
| | **f.** | Recovery period December 2019 | | |
| **20.** | | Registration of Ford Fusion Hybrid | | |
| **21.** | | Amoah Gyimah's Hacker's License | | |
| **22.** | | Dispatch records from Fairfax Taxi, Inc. | | |
| **23.** | | Report of US. Park Police (redacted by police) | | |
| **24.** | | Pictures from collision from Report of US Park Police | | |
| **25.** | | Defendant's Responses to Plaintiffs' First Request for Admissions (case No. 1:23-cv-1756 and 1758) and Exhibits attached to Plaintiff's First Request for Admissions | | |
| | **a.** | Excerpts of Medical Records of Hyo Jung Kim from Medstar Washington Hospital Center | | |
| | **b.** | Death Certificate of Hyo Jung Kim | | |
| | **c.** | External Examination Report from the Office of the Chief Medical Examiner of the District of Columbia | | |
| | **d.** | Intentionally left blank see Exhibit 15 | | |
| | **e.** | Excerpts of Medical Records of Sung-Chul Jung from INOVA Fairfax Hospital | | |
| | **f.** | Excerpts of Medical Records of Sung-Chul Jung from EWHA Womans' University, Mokdong Hospital | | |
| | **g.** | Billing Records from Fairfax County for Fairfax County Fire and Rescue for The Care and Treatment of Sung-Chul Jung | | |
| | **h.** | Billing Records from INOVA Fairfax Hospital for The Care and Treatment of Sung-Chul Jung | | |
| | **i.** | Billing Records from Ewha Womans' University, Mokdong Hospital for The Care and Treatment of Sung-Chul Jung | | |
| **26.** | | Dr. Jung's emails regarding missing conferences | | |
| **27.** | | Receipt from Korean Airlines for return ticket change | | |

JA176

| | | | |
|---|---|---|---|
| **28.** | Demonstrative Evidence: Chart of Damages suffered by Sung-Chul Jung | | |
| **29.** | Life Expectancy Chart | | |
| **30.** | CV of Michael Miller | | |
| **31.** | CV of Irv Epperson, MD | | |
| **32.** | Demonstrative Evidence of Diagrams of Roadway George Washington Parkway in 2019 | | |
| **33.** | Demonstrative Evidence Drawing of Roadway | | |
| **34.** | Demonstrative Evidence | | |

## <u>EXHIBITS TO BE PROFFERED FOR PURPOSES OF APPEAL ON THE QUESTION OF VICARIOUS LIABILITY</u>

| Exhibit # | Item Description |
|---|---|
| **35.** | Defendants' Response to Plaintiff's 2nd Request for Admissions (case No. 1:23-cv-1756 and 1758) and Exhibits attached to Plaintiff's First Request for Admissions |
| **36.** | Operator Agreement between Fairfax Taxi, Inc and Gyimah with Addendum |
| **37.** | Fairfax Taxi, Inc.'s Operator Permit from Commonwealth of VA |
| **38.** | Operator's Certificate from Fairfax County for Fairfax Taxi, Inc. Car 72 |

## <u>DEPOSITIONS INTENDED TO BE USED AS TESTIMONY AT TRIAL PURSUANT TO FRCP</u>

1. The Plaintiff may use the following depositions in their entirety via videotape

    a. Timothy Bracken

    b. John McDonald

    **c.** Roger Daven Oswalt

    d. Hyun Sung Kim

    e. DongJoo Lee

JA177

f.   Kyo Jo

g.   YeunJeung Kim

Brian M. O'Connor, Administrator
of the Estate of Hyo Jung Kim, and
Sul-Chung Jung
By Counsel

_____
Steven M. Garver, Esquire, VSB#15145
Deborah E. Mayer, Esquire, VSB#51072
GarverLaw, P.L.L.C.
11702 Bowman Green Drive, Suite 100
P.O. Box 2430
Reston, Virginia 20190-2430
(703)471-1090
(703)471-1095 (Facsimile)
steve@garverlaw.com
demayer@garverlaw.com
Counsel for Plaintiff


**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that I, on this 19th day of February, 2025 did cause a true copy of
the foregoing *Pleading* to be delivered to:

| John D. McGavin, Esq. | ____ | By First Class Mail |
|---|---|---|
| Gifford Hampshire, Esq | ____ | By Federal Express |
| McGavin, Boyce, Bardot, Thorsen & Katz, P.C. | ____ | By Hand Delivery |
| 9990 Fairfax Blvd, Suite 400 | _x__ | By Electronic Means |
| Fairfax, VA 22030 | ____ | By Facsimile |
| 703-385-1000 | | |
| 703-385-1555 (fax) | | |
| jmcgavin@mbbtklaw.com | | |
| ghampshire@mbbtklaw.com | | |

Counsel for Fairfax Taxi, Inc., Evelyn Kenin,
Administrator of the Estate of Amoah Gyimah,
Deceased

6

JA178

VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | |
|---|---|
| BRIAN M. O'CONNOR, Administrator for the Estate of HYO JUNG KIM, deceased, | * * * |
| Plaintiff, | * * |
| v. | * * Case No. 2020 13315 * |
| RED TOP CAB, LLC, et al. | * * |
| Defendants. | * |

### ANSWERS TO SECOND REQUESTS FOR ADMISSION

COME NOW, the Defendants, Fairfax Taxi, Inc., Red Top Cab, LLC, Evelyn Kenin Administrator of the Estate of Amoah Gyimah, by counsel, and pursuant to the Rules of the Supreme Court of Virginia, respond to the following Requests for Admission:

1.  The Operator's Agreement with the Equipment Rental Agreement attached as Exhibit A is a true and accurate copy of the Operator's Agreement with the Equipment Rental Agreement between Fairfax Taxi, Inc. and Amoah Gyimah that was in effect on April 29, 2019.

**RESPONSE:** Admitted.

2.  The Red Top taxicab vehicle driven by Amoah Gyimah on April 29,2019 was the vehicle referred to in Paragraph 3 on page 3 of the Operator's Agreement.

**RESPONSE:** Admitted

3.  The Virginia Motor Vehicle Registration attached as Exhibit B is a true and exact copy of the registration for Ford Fusion Hybrid with Vehicle Identification Number ("VIN") 3FA6P0UU4ER394408 registered to Amoah Gyimah.

**RESPONSE:** Admitted.

4.  The Ford Fusion Hybrid with VIN 3FA6P0UU4ER394408 was the taxicab vehicle

JA179

driven by Amoah Gyimah on April 29, 2019.

**RESPONSE:** Admitted.

5. On April 29, 2019, Amoah Gyimah had a valid hacker's license issued by Fairfax County.

**RESPONSE:** Admitted.

6. The permit attached as Exhibit C is a true and accurate copy of Fairfax Taxi, Inc.'s permit to operate taxicabs issued by the Commonwealth of Virginia's Department of Motor Vehicles.

**RESPONSE:** Admitted.

7. The Taxicab Operator's Certificate attached as Exhibit D is a true and accurate copy of the Taxicab Operator's Certificate issued by Fairfax County to Fairfax Taxi, Inc. dba Red Top Cab of Fairfax for the taxicab with VIN 3FA6P0UU4ER394408.

**RESPONSE:** Admitted.

8. The Taxicab Operator's Certificate attached as Exhibit D is the Certificate of Public Convenience and Necessity referred to on page 1 of the Operator's Agreement (attached as part of Exhibit A).

**RESPONSE:** Admitted.

9. The Taxicab Operator's Certificate attached as Exhibit D is the Certificate of Public Convenience and Necessity referred to on page 1 of the Equipment Rental Agreement (attached as part of Exhibit A).

**RESPONSE:** Admitted.

10. The taxicab driven by Amoah Gyimah on April 29, 2019 was painted Black and Red as authorized by the Taxicab Operator's Certificate attached as Exhibit D.

**RESPONSE:** Admitted.

2

JA180

11. The taxicab driven by Amoah Gyimah on April 29, 2019 was numbered 72 as authorized by the Taxicab Operator's Certificate attached as Exhibit D.

**RESPONSE**: Admitted.

12. In April 2019, Fairfax County through its agents had the ability to limit the number of Taxicab Operator's Certificates issued in Fairfax County.

**RESPONSE:** Admitted.

13. In April 2019, Fairfax County issued a limited number of Taxicab Operator's Certificates to Fairfax Taxi, Inc.

**RESPONSE**: Admitted.

14. In April 2019, there were only three companies authorized by Fairfax County to be taxicab operators in Fairfax County.

**RESPONSE**: Denied.

**RED TOP CAB, LLC, FAIRFAX TAXI, LLC, and EVELYN KENIN, ADMINISTRATOR OF THE ESTATE OF AMOAH GYIMAH, DECEASED**
By Counsel

McGAVIN, BOYCE, BARDOT,
 THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, VA 22030
Telephone:    (703) 385-1000
Facsimile:    (703) 385-1555

John D. McGavin (VSB 21794)
jmcgavin@mbbtklaw.com
Gifford V .Hampshire (VSB 97006)
ghampshire@mbbtklaw.com
*Counsel for Defendants*

JA181

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **Answers to Requests for Admission** was emailed and mailed and mailed, postage prepaid, on this _10th_ day of May 2023 to:

Steven M. Garver
Deborah E. Mayer
Garver Law Offices, PC
11702 Bowman Green Drive, Suite 100
P.O. Box 2430
Reston, Virginia 20190-2430
steve@garverlaw.com
debmayer@garverlaw.com
*Counsel for Plaintiff*

_____
Gifford V. Hampshire

4

JA182

# EXHIBIT A

JA183

_B-5707_

# TAXICAB OPERATOR AGREEMENT

THIS TAXICAB OPERATOR AGREEMENT (the "Agreement"), is made and entered into this _30_ day of _MARCH_, 20_15_ (the "Effective Date") by and between **FAIRFAX TAXI, INCORPORATED, T/A: RED TOP CAB OF FAIRFAX**, a Virginia corporation, (the "Company") and _AMOAH GHWAH_ (the "Operator").

WHEREAS, the Company is engaged in the performance of a taxicab business pursuant to a Certificate of Public Convenience and Necessity (the "Certificate") issued by Fairfax County, Virginia (the "County"), authorizing the Company to operate taxicabs; and

WHEREAS, the Operator has obtained and currently maintains a valid County Hacker's License issued by the appropriate governmental authorities of the County; and

WHEREAS, the Operator owns and intends to operate a passenger motor vehicle (the "Motor Vehicle") suitable for the transportation of passengers in accordance with all requirements of Chapter 84.1 of the Fairfax County Code (the "Taxicab Ordinance"), and desires to operate the Motor Vehicle as a taxicab for hire under the Company's authority, and in accordance with all requirements of the Taxicab Ordinance.

NOW THEREFORE, in consideration of the mutual independent covenants and conditions contained herein, including the above recitals, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by both the Operator and the Company, it is hereby agreed by and between the Operator and the Company as follows:

## 1. Commencement and Termination.

A. This Agreement shall be in force for thirty (30) days, commencing on the Effective Date; and shall be automatically renewed and continued on the same terms and conditions as contained in this Agreement, for successive thirty (30) day periods thereafter unless terminated as follows (the "Term"):

(i) Either party may terminate this Agreement without cause upon not less than seven (7) days prior written notice to the other party; or

(ii) In addition to the other grounds for termination as set forth in this Agreement, the Company may terminate this Agreement immediately, and without the necessity of further notice:

(a) Should the Operator become insolvent or make a general assignment for the benefit of creditors, or should a receiver be appointed for the Operator, or should the Operator seek relief under any bankruptcy or similar statute, or be deemed financially insecure respecting the Operator's finances or operations hereunder; or

(b) Should the Operator's motor vehicle driver's license issued by any state or governmental body or Hacker's License issued by the County be revoked or suspended; or

1

rev. 10/2014

JA184

(c)     Upon any attempted assignment of this Agreement by the Operator, whether voluntary, by operation of law, or otherwise, without the prior express written consent of the Company; or

(d)     The Operator's breach or violation of the Taxicab Ordinance; or

(e)     A drug test of the Operator which returns a "positive" result for any illegal drug or controlled substance; or

(f)     Operation of a motor vehicle by the Operator while under the influence of alcohol, drugs or other intoxicants, or like offense; or

(g)     The Operator's breach of any of the terms, conditions, provisions, or requirements of this Agreement, including failure to pay Stand Dues or any other sums due the Company pursuant to this Agreement; or

(h)     The Operator's breach of the Equipment Use Agreement; or

(i)     Receipt by the Company of repeated or egregious passenger complaints as to the Operator; or

(j)     Overcharging by the Operator of any passenger; or

(k)     A violation by Operator of the motor vehicle laws and regulations of any jurisdiction which may result in the suspension of the Hacker's License pursuant to the Taxicab Ordinance; or

(l)     The occurrence of any reason(s) for revocation of the Hacker's License as set forth in § 84.1-3-7 of the Taxicab Ordinance.

B.     Throughout the Term of this Agreement, the Operator agrees that he/she shall not make defamatory statements of any kind, whether verbal, in writing, electronically transferred or otherwise about the Company, its officers and management. Violation of this provision may result in immediate termination of this Agreement without further notice to the Operator.

C.     Termination of this Agreement shall not relieve either party of their respective rights and obligations, as expressly provided in this Agreement, following such termination.

D.     Upon notice of termination of this Agreement from the Company, the Operator shall immediately discontinue all operation of the Motor Vehicle as a taxicab; and shall immediately return the Equipment and any other equipment covered hereunder or listed in the Equipment Use Agreement between the Operator and the Company, including but not limited to, taximeter, Mobile Data Terminal (MDT), receipt printer, electronic credit card processing equipment including Passenger Information Monitor (PIM) and cruising light assembly (top light) of the Company, all documents containing the Company name and any documents furnished by the Company (collectively the "Equipment") to the Company's premises, or to such other location as may be designated by the Company. The Operator shall further, upon termination, immediately cease use of the Equipment, markings, telephone number, logo and insignia and shall immediately remove from the Motor Vehicle, at the Operator's sole risk and expense, all Equipment, symbols, insignias, logos, cruising light, and trade identification colors, which may have been affixed to the Motor Vehicle by or upon the authorization of the Company.

**rev. 10/2014**

JA185

Should the Operator fail or refuse to make the delivery of the Equipment and/or remove from the Motor Vehicle all Equipment, symbols, insignias, logos, cruising light, and trade identification colors, which may have been affixed to the Motor Vehicle by or upon the authorization of the Company, as required by paragraph 1(D) to the Company's premises or other designated location, or should the Operator otherwise fail to comply with the provisions of paragraph 1(D), the Operator shall pay to the Company immediately upon written demand, all costs and expenses (including reasonable attorney's fees) of the Company in effecting the return of the Equipment to the Company.

Following termination of this Agreement, and upon Operator's failure to comply with Operator's obligations as set forth in paragraph 1(D) within twenty four (24) hours after notice of termination, time being of the essence, the Operator hereby expressly and irrevocably authorizes the Company and/or the Company's authorized agents, contractors and/or employees to take possession of the Motor Vehicle and cause the Motor Vehicle to be towed or otherwise driven or transported to the offices of the Company or such other location as the Company may designate, to allow the Company to remove those items set forth in paragraph 1(D). The Operator hereby releases and forever discharges the Company, its agents, servants, and employees and contractors from any claims, loss, damage, expense, attorney's fees, and costs arising out of the exercise by the Company of the rights contained in this paragraph 1(D).

**2. Relationship.** The parties intend to create by this Agreement the relationship of an independent contractor and not an employer-employee relationship. Any doubt as to the construction of this Agreement shall be resolved in order to maintain the Operator's status as an independent contractor. Neither the Operator nor any of the Operator's employees, agents, or subcontractors shall be considered to be employees of the Company insofar as the subject matter of this Agreement is concerned, operating the Motor Vehicle and/or in performing service under this Agreement for any purpose whatsoever. Nothing contained in this Agreement shall be deemed to create an agency, joint venture, partnership, franchise or any other legal relationship except that of principal and independent contractor. The Operator shall not be treated as or deemed to be an employee with respect to this Agreement for purposes of the Federal Insurance Contribution Act, the Social Security Act, the Federal Unemployment Tax Act, and the applicable income tax withholding and Workmen's Compensation laws, or in any other respect. The Operator is not authorized to act as an agent or employee of the Company and shall not represent the Company or act on behalf of the Company under any circumstances.

**3. License of Vehicle Number.** For the Term of this Agreement and any extensions thereof, the Company; subject to and in accordance with the terms and provisions of the Taxicab Ordinance, grants a license to the Operator to utilize vehicle number _____. The Operator acknowledges that this number is the property of the County and the Company, and that the assignment of a vehicle number under this Agreement is a license for the Operator to use said vehicle number during the Term of this Agreement and subject to all provisions of this Agreement. The license shall terminate and shall be of no further force and effect upon the termination or other expiration of this Agreement. The license granted herein has no value and shall not be sold, assigned or transferred by the Operator under any circumstances. Any such attempted sale, assignment or transfer shall be void and of no force and effect.

rev. 10/2014

JA186

**4. Dispatching Service.** The Company shall make its best, commercially reasonable efforts to provide the Operator with dispatching service three hundred sixty five (365) days per year, twenty four (24) hours per day (excluding maintenance and repair time and other interruptions beyond the reasonable control of the Company); however in no event shall the Company be liable to the Operator for any loss or damage (including consequential damages) arising out of or related to any failure to provide such dispatch service or an interruption in such dispatching service.

**5. Use of Company Name, Trademark, Insignia and Equipment.** Subject to the terms and conditions of the authority granted to the Company by the County, and the terms and conditions of this Agreement, the Company hereby grants to the Operator a license to use the Company trademark, trade name, insignia, colors/color combination, cruising light, and all Equipment for use in or on the Motor Vehicle during the Term of this Agreement or any renewals and extensions thereof. The license granted herein shall terminate and be of no further force and effect upon termination of this Agreement.

**6. Deposit Required.** The Operator agrees with the Company that the aggregate value of the Equipment installed in the Motor Vehicle is One Thousand and 00/100 Dollars ($1,000.00). The Operator shall deposit **One Thousand and 00/100 Dollars ($ 1,000.00)** (the "Deposit") with the Company, upon execution of this Agreement to insure the Operator's performance under the terms of this Agreement and the Equipment Agreement, together with and any and all other obligations owed by the Operator to the Company of any kind or nature whatsoever, which such Deposit shall not bear interest. The Company may, in the Company's sole and absolute discretion, allow the Deposit to be paid in weekly payments of _____00/100 Dollars ($_____) per week until the entire Deposit has been received by the Company. Provided all Equipment has been timely returned by the Operator to the Company, and in good working order, the Deposit shall be returned to the Operator within forty five (45) days following termination or other expiration of this Agreement and receipt by the Company of the Operator's written request for such return, less any expenses incurred by the Company in obtaining or regaining possession of the Equipment; the costs of removing the symbols, insignias, logos, cruising light, and trade identification colors belonging to the Company from the Motor Vehicle; the expenses incurred by the Company in the exercise of the Company's rights upon termination of this Agreement; the costs of repairing or replacing any Equipment; and the amount of Stand Dues or other costs or fees due and unpaid by the Operator pursuant to this Agreement and/or pursuant to the Equipment Use Agreement. Additionally, during the Term of this Agreement, the Company shall be entitled to deduct from the Deposit Stand Dues which remain unpaid for a period of _____ (____) days or more, late fees, the costs of repairing or replacing any Equipment and other costs or fees due by the Operator pursuant to this Agreement and/or pursuant to the Equipment Use Agreement. In the event the Company makes such deductions from the Deposit the Operator shall deposit additional funds with the Company within _____ (____) days following notice thereof so that the Deposit remains no less than One Thousand and 00/100 Dollars ($1,000.00) at all times.

**7. Substitute/Second Driver Operator.** Upon the prior written consent of the Company, which such consent may be withheld or conditioned in the sole and absolute discretion of the Company, the Operator may engage a substitute driver ("Substitute Driver") or utilize a second driver

4

JA187

("Second Driver") to operate the Motor Vehicle, subject and pursuant to the terms of this Agreement and, in the event the Company consents to Operator's engagement of a Substitute Driver or Second Driver, all references in this Agreement to the Operator shall include any such Substitute Driver and/or Second Driver. Any Substitute Driver or Second Driver and/or other operator of the Motor Vehicle shall be required to possess a valid driver's license issued by the state of residence of such Substitute Driver or Second Driver and a valid Hacker's License issued by the County. In the event such consent is granted by the Company, the Substitute Driver and/or Second Driver shall execute and deliver such documents as may be required, from time to time, by the Company, including, but not limited to an acknowledgement and agreement whereby the Substitute Driver and/or Second Driver expressly agree to comply with each and every provision contained in this Agreement and all addenda thereto, together with such additional conditions as may be interposed by the Company in granting its consent under this paragraph 7. The Company may, at any time and from time to time, with or without cause, terminate its consent to allow the Operator to engage a Substitute Driver and/or Second Driver.

8. **Fees.** As consideration for the provision by the Company of management and dispatching services, use of the Company's trademark, trade name, insignia, colors, and color combinations, Equipment, and assignment to the Operator of the vehicle number in paragraph 3, the Operator shall pay to the Company a weekly fee of $_____ no later than 9pm on Sunday of each week ("Stand Dues"). In the event the Company has granted its consent to allow the Operator to engage a Substitute Driver, the Operator shall pay to the Company a weekly fee of $_____ no later than 9pm on Sunday of each week ("Substitute Driver Fee").

In the event the Company has granted its consent to allow the Operator to engage a Second Driver to share operation of his/her taxicab, the Operator shall pay to the Company a weekly fee of $_____ no later than 9pm on Sunday of each week ("Second Driver Fee").

The Operator agrees that Stand Dues may be increased upon seven (7) days' prior notice to the Operator. In the event the weekly Stand Dues are not paid on or before the day of the week on which such weekly Stand Dues are due, the Operator shall pay a late fee of $_____ per week for each week or portion thereof Stand Dues have not been received by the Company.

9. **Maintenance and Operation of the Motor Vehicle.**

   A.      The Operator represents and warrants that the Motor Vehicle is now, and throughout the Term shall be, in good mechanical condition and repair, and meets the requirements of the applicable federal and state statutes and regulations, County ordinances, including, but not limited to the Taxicab Ordinance, and any other applicable governmental agencies or regulatory bodies, as the same now exist and as they may be amended from time to time hereafter.

   B.      The Operator agrees to display on the Motor Vehicle the Company's trademark, colors, trade name and cruising light when performing for-hire taxicab operations during the Term of this Agreement and any extensions thereof. The Operator agrees that all such items now and hereafter used by Operator are solely and exclusively the property of the Company and that the same may be affixed on the Motor Vehicle only in accordance with standards set by the Company and the Taxicab Ordinance. The Operator agrees to maintain and keep the Motor Vehicle, the Equipment and all other equipment and accessories in good operating condition, as

5

JA188

may be required by applicable state, and local laws and regulations, including, but not limited to the requirements of the Taxicab Ordinance. Upon request by Company, but not less than once per calendar quarter, Operator shall present the Motor Vehicle for a routine quality inspection at the Company facility located at 11 Hillwood Avenue, Falls Church, VA 22046.

C.      Prior to the execution of this Agreement by the Company, the Operator shall provide the Company with a copy of the Operator's current Hacker's License; driving record as maintained by the state or other jurisdiction issuing the Operator's driver's license; current vehicle registration; evidence of title; and satisfaction of State safety and emission inspection requirements for the Motor Vehicle.

D.      Prior to the execution of this Agreement by the Company, Operator shall also complete pre-contracting drug and alcohol screening, and shall authorize the Company to receive the results. The Company reserves the right to refuse to execute this Agreement for failure by the Operator to supply any of the documents, information and/or results as required in paragraphs 9(C) and 9(D) to the Company or if the Company, in the Company's sole and absolute discretion, deems the same unsatisfactory. The Operator shall pay to the Company, on demand, any fees, costs and expenses incurred by the Company in obtaining such information. The Operator agrees that if he/she qualifies and elects to provide services under public agency contracts requiring participation in a random pool, drug and/or alcohol testing may be required at any time without notice and that the failure to submit to such drug and/or alcohol testing shall be grounds for immediate termination of this Agreement.

E.      The Operator shall immediately provide to the Company any changes, renewals or amendments to the information required in paragraph (9)(C). If the Company deems any change, renewal, or amendment unsatisfactory, in the Company's sole and absolute discretion, the Company shall have the right to terminate this Agreement without further notice. The Operator further agrees that he/she shall report or cause to be reported to the Company all pertinent information immediately after receiving a summons, ticket, warrant, or other citation, or upon being arrested, on account of any alleged violation of law.

F.      In accordance with § 84.1-3-7(d) of the Taxicab Ordinance, the Operator shall immediately report in writing to the Company and/or the Fairfax County Taxicab Inspector any automobile accidents (whether or not resulting in any apparent personal injury or property damage), and shall cooperate fully with the Company in the investigation thereof.

G.      The Operator shall maintain daily trip manifests on forms approved by the Company. The Operator shall complete all information required on said manifest for each trip in accordance with § 84.1-5-1(c) of the Taxicab Ordinance, and shall deliver said manifests to the Company upon request.

H.      In compliance with the Taxicab Ordinance, once the Operator has accepted a dispatched trip offer, the Operator is obligated to complete said trip.

I.      The Operator shall accept payment for any fares or other income generated by use of the Motor Vehicle pursuant to the terms of this Agreement by means of any approved, Company accepted credit or debit card, or by means of any other Company accepted credit or payment voucher, including but not limited to a voucher issued by the Company. The Operator

6                                              rev. 10/2014

JA189

acknowledges and agrees that the Company does not guarantee payment from the use of such credit or debit cards or payment of such vouchers to the Operator. The Operator shall process all credit and/or debit card transactions using equipment provided by the Company and installed in the Motor Vehicle.

J.    The Operator shall not offer nor pay a bribe or other consideration, or in any other way attempt to influence, a Company manager, dispatcher or mechanic, for any purpose, including, but not limited to the purpose of obtaining preferred fares or treatment. Violation of this provision shall result in immediate termination of this Agreement.

K.    The Operator acknowledges that the Operator's failure to comply with this Agreement and/or with federal, state, county, statutes, ordinances, rules, regulations and requirements, and/or Company rules, regulations and requirements, as amended from time to time, may result in curtailment of the Operator's privilege to operate the Motor Vehicle as a taxicab under this Agreement until any such failure is corrected, to the satisfaction of the Company, or that such failure may result in the immediate termination of this Agreement.

## 10. Motor Vehicle Operating Expenses and Requirements.

A.    The Operator shall assume sole responsibility for and shall pay all operating costs and expenses incident to the operation of the Motor Vehicle, including but not limited to, all maintenance costs, fuel costs, and all taxes, licensing fees and other fees assessed by the applicable governmental authority, such as personal property taxes and Virginia or other applicable state for-hire tags. The Operator shall further pay any fines or penalties assessed against the Motor Vehicle, its driver, or its operation.

B.    The Operator shall replace the Motor Vehicle in accordance with the age/mileage requirements of the Taxicab Ordinance. All replacement vehicles are subject to the Company's approval prior to such replacement vehicle being placed into service.

**11. Insurance.** During the Term of this Agreement, the Operator shall obtain and maintain at his/her sole and absolute expense, automobile and/or public liability and property damage insurance covering the Operator and the Motor Vehicle in the minimum amount of coverage that complies with the requirements in § 84.1-2-11(a) of the Fairfax County Taxicab Ordinance as then in force. The Operator shall supply the Company with certificates of this insurance, with the Company being named as additional insured, and all such policies of insurance shall require that the insurer providing such insurance coverage shall give the Company and County Manager (or designee) no less than thirty (30) days written notice prior to cancellation. Upon cancellation of any such insurance policy, this Agreement shall automatically terminate.

Prior to engaging any Substitute Driver or Second Driver, for which the Company has granted its prior written consent, or prior to permitting anyone other than the Operator to operate the Motor Vehicle under the terms of this Agreement, the Operator shall supply the Company with certificates of insurance in the amount specified above, evidencing dual-driver coverage. The Operator shall report or cause to be reported to his/her insurance carrier and the Company all pertinent information immediately after the occurrence of (or when accused of being involved in, or contributing to) any accident, injury, or property damage of any nature, and the Operator shall, at all times, fully cooperate with the carrier and the Company in the investigation thereof. The

JA190

Operator shall indemnify and forever hold harmless the Company, its agents, officers, directors and employees, from any loss or damage, including, but not limited to the Company's reasonable attorney's fees, resulting from, arising out of or related to the Operator's failure to maintain the insurance required by this paragraph 11 and/or report or to cooperate as required by this paragraph 11.

## 12. Workmen's Compensation and Taxes.

A. The Operator shall assume responsibility for, and to purchase, maintain, and keep in force, Workmen's Compensation and employer's liability insurance at his/her own expense, for his/her own benefit and for the benefit of his/her subcontractors, drivers, and/or helpers employed by him/her, in such scope, amount, and form of coverage as will satisfy applicable federal and state requirements, and to provide the Company with evidence of said protection.

B. The Operator shall comply with all laws relating to employment of personnel, including (but not limited to) those relating to social security, unemployment insurance, withholding taxes, disability benefits, employment discrimination and payment of wages, and shall indemnify the Company against all liability and expenses, including, but not limited to, the Company's reasonable attorney's fees, arising out of, or related to the Operator's failure to so comply.

C. The Operator shall assume sole responsibility for and to pay as to any subcontractors, helpers, or drivers, any and all Social Security, income tax withholding, and other like taxes and liabilities, where applicable.

## 13. Operation of Motor Vehicle.
The Operator shall personally drive and operate the Motor Vehicle or, subject to limitations placed by the Company, to have the same driven and operated by a Substitute Driver or Second Driver approved by the Company as provided in section 7 of this Agreement. .

## 14. Direction and Control of the Operator.
The Operator, except as may be required by applicable law and regulations, shall direct the operation of the Motor Vehicle in all respects and shall determine the method, means, and manner of performance, including but not limited to, such matters as the supervision, pay, and termination of the Operator's subcontractors and/or drivers.

## 15. Performance.
The Operator shall operate the Motor Vehicle in a safe and workmanlike manner with due regard to the safety, comfort, and convenience of passengers and the general public. In the event that any person shall assert any claim arising from the alleged failure of the Operator or its agents, servants, or employees to properly perform pursuant to this Agreement, then the Operator shall save the Company harmless from such claim. In the event that a suit arising from such claim naming the Company as a defendant is brought, the Operator shall, at Operator's sole risk and expense, defend Company in said action. However, the Company shall have the right to associate its counsel with counsel for the Operator at the expense of the Operator. In the event the Operator shall not defend such action as agreed, and such failure to defend could result in a judgment being rendered against the Company, the Company shall have the right to have its own attorney defend said action, and the Operator shall reimburse the

**rev. 10/2014**

JA191

Company for all damages, liability, costs, and expenses, including all reasonable attorneys' fees, incurred by the Company or for which the Company is responsible.

16. **Compliance with Laws and Ordinances.** The Operator and any Substitute Drivers, Second Drivers and/or other drivers engaged by the Operator shall operate the Motor Vehicle in accordance with the laws of the Commonwealth of Virginia, the provisions of the Fairfax County Taxicab Ordinance, and any other jurisdiction in which the Motor Vehicle is operated.

17. **Indemnification.** The Operator shall assume complete responsibility for the operation of the Motor Vehicle in performing taxicab services hereunder, and for any other purpose, and shall indemnify and forever hold harmless the Company from and against all claims, demands, liabilities, suits, judgments, awards, damages, losses, expenses, causes of action at law or in equity which are occasioned by or arise out of the operation of the Motor Vehicle under this Agreement or renewal thereof, or for any other purpose, including, but not limited to: (i) Operator's attorney's fees and costs and expenses of litigation; (ii) Injury or damage to or loss of any property, including the Operator's equipment; (iii) Injury, disease, or death of any person; (iv) Damage to third parties arising out of the theft, destruction, or vandalism of the Motor Vehicle; and (v) Violations of any statutes, laws, ordinances, rules, requirements or regulations.

18. **Notice of Claim or Suit.** If claim is made or suit is brought against the Operator arising out of the Operator's operation of the Motor Vehicle and/or other operations under this Agreement, the Operator shall immediately forward each and every demand, notice, summons, or other process, motion or other paper related to the claim or suit received by the Operator or the Operator's insurers or other representatives to the Company.

19. **Assistance and Cooperation of Operator.** The Operator shall cooperate with the Company in the event of a claim or suit with reference to attendance at hearing and trials and assisting in effecting settlement, securing evidence, obtaining the attendance of witnesses and in the conduct of suits.

20. **Attorney's Fees.** In the event that the Company shall be required to institute or defend any action at law or equity, or in any arbitration, brought against or by the Operator and/or the Company and arising out of this Agreement or otherwise, the Operator shall pay to the Company such amounts as the court or arbitrator shall determine as and for reasonable attorney's fees for the Company in commencing or defending such action, suit and/or arbitration, in addition to any and all costs, expenses, fees and damages as may be awarded by the court and/or arbitrator.

21. **Pronouns.** The pronouns used herein when referring to the Operator shall be lawful and binding regardless of whether the Operator is a partnership, firm, corporation, or individual.

22. **Final Understanding.** This Agreement, including those rules, regulations and other requirements incorporated by reference herein or by addendum hereto, contains the full and final understanding of the parties. Any modification of, or additions to, this Agreement will be null and void unless in writing and signed by both parties. Time shall be deemed of the essence as to the construction and performance of all matters contained in this Agreement.

23. **Assignment.** This Agreement, and the rights and remedies contained herein, shall not be assigned by the Operator without the prior express written consent of the Company, such consent to withheld or conditioned as the Company, in its sole and absolute discretion, deems appropriate. The Company may its assign its rights and remedies under this Agreement at any

JA192

time, and in the event of such assignment by the Company, the Operator shall attorn to such assignee.

**24. Laws of Virginia.** This Agreement shall, in all events, be governed and interpreted pursuant to the laws of the Commonwealth of Virginia, without regard to its conflict of law provisions.

**25. Informal Dispute Resolution.**

All disputes, controversies or claims arising out of this Agreement, shall, prior to submission to arbitration pursuant to section 26 of this Agreement, be subject to an informal dispute resolution process, to be conducted as follows:

(i) The aggrieved party shall submit a complaint in writing to the Company containing a written statement of the matter in dispute and the names, addresses and telephone numbers of each party to the dispute within thirty (30) days from the date of the action which is the subject of such grievance.

(ii) Within fifteen (15) days following receipt of such written statement, the Company shall appoint a representative from within the Company (the "Representative") to hear the dispute. The Representative shall be impartial, and shall have had no direct involvement in the dispute.

(iii) Within thirty (30) days following the appointment of the Representative, the Representative shall conduct an informal hearing concerning the dispute, during which informal hearing both parties shall use reasonable efforts to attempt to resolve the dispute. To the extent the dispute is resolved at such informal hearing, the Representative shall memorialize, in writing, any such resolution; said memorialization to be signed by both parties to the dispute.

(iv) In the event the dispute is not resolved at such informal hearing, then, within thirty (30) days after such informal hearing has been concluded, the Representative shall render a written decision. In no event shall such Representative be empowered to award costs and/or any monetary damages, including any actual or consequential damages.

(v) In the event that either party to the dispute is not satisfied with the decision of the Representative, or if the dispute is not otherwise resolved at or following such informal hearing, then, within thirty (30) days following the written decision of the Representative, either party may proceed to arbitration pursuant to section 26 of this Agreement, or otherwise exercise any other rights such party may expressly have under this Agreement.

(vi) The following rules and procedures shall apply to any and all such informal hearings and/or the informal dispute resolution process:

(a) The proceedings conducted pursuant to this section 25 shall be informal in nature, and neither party shall be entitled to record any such proceedings; nor shall any party be entitled to be represented by counsel at such informal hearing or during the informal dispute resolution process. The conduct and procedure of the informal hearing, including the presentation of evidence and the presence of third parties at such informal hearing, shall, in all events, be subject to the control and discretion of the Representative.

JA193

(b)     All statements, documents and other matters generated in connection with the informal hearing process are confidential, as are all memoranda, work product and other materials contained in the case files of the Representative.

(c)     Any communications made in or in connection with the informal hearing and/or the informal dispute resolution process which relate to the dispute which is the subject of the informal dispute resolution process, whether made to the Representative or to any other person, are confidential.

(d)     Any agreement reached between the parties at such informal hearing, or as a result of such informal hearing or the informal dispute resolution process and signed by the parties shall not be confidential, unless the parties otherwise agree in writing.

(e)     The parties expressly agree that the Representative may not be compelled to appear or to give testimony in any arbitration or any judicial, regulatory or administrative proceeding arising out of or related to the informal hearing.

(f)     No documents or materials belonging to or in the custody of the Representative may be subpoenaed or in any other way sought to be used (including, but not limited to discovery) in any arbitration or any judicial, regulatory or administrative proceeding unless pursuant to the Order of an arbitrator or of a court of competent jurisdiction.

(g)     The informal dispute resolution process shall be conducted and resolved on an individual basis only and not on a class-wide, multiple party, consolidated, collective or similar basis and neither the Representative nor any party to such informal dispute resolution process shall be entitled to join, consolidate, coordinate the claims of more than one person for any purpose during or as a part of such informal dispute resolution process.

(h)     The Company reserves the right to modify or amend the informal dispute resolution process at any time and from time to time.

## 26. Arbitration.

A.     Except as provided in paragraph 26(C), any and all disputes, controversies or claims arising out of this Agreement, including without limitation, the validity, interpretation and enforcement of this Agreement, and the status of the Operator as an independent contractor under this Agreement, and any statutory and/or administrative claims (whether local, State or Federal) shall be submitted to the American Arbitration Association at its offices in or nearest to Fairfax County, Virginia, for final and binding arbitration in accordance with its commercial rules and procedures that are in effect at the time the arbitration is filed. The party bringing the arbitration shall first submit a notice containing: (i) a full and specific description of the claim under this Agreement including, without limitation, an identification of the specific provisions of this Agreement that the other party is claimed to have breached; and (ii) documentary evidence of the facts alleged by the complaining party and a declaration, under penalty of perjury, that all facts stated in the claim and the documentation submitted are true and correct and do not fail to state facts known to the complaining party that are material to the determination of the dispute. If the parties are unable to reach an agreement to resolve the dispute within thirty (30) days

11                                             rev. 10/2014

JA194

following receipt of such notice, then the parties shall proceed to arbitration in accordance with the terms of this Agreement.

B.      The party bringing the arbitration shall be solely responsible for the initial filing fees for such arbitration. Thereafter, except as otherwise provided in this Agreement, the parties shall bear their own costs and expenses in such arbitration, and each shall timely pay one-half (1/2) of all arbitration fees and costs, including the fees of the arbitrator. The results of such arbitration shall be binding on the parties and shall be entered in any court having jurisdiction thereof. Both the Operator and the Company hereby irrevocably waive any constitutional and/or statutory right to have any dispute decided by a court of law and/or by a jury in a court proceeding. Each party waives the right to appeal the decision of the arbitrator.

C.      Any such arbitration shall be conducted before a single arbitrator selected from a list of potential arbitrators provided by the American Arbitration Association. The arbitrator shall be a former judge or have at least five (5) years of experience in either commercial business legal practice or representation of clients in the transportation industry. Nothing in this Agreement shall be construed as limiting or precluding either party from bringing an action in any court of competent jurisdiction for injunctive or other extraordinary relief and either of the parties shall have the right to seek such injunctive or other extraordinary relief at any time.

D.      Neither party to this Agreement shall assert against the other party in any arbitration (or otherwise) any claim for special, exemplary or punitive damages arising out of the relationship created in this Agreement, the formation or performance of this Agreement, any breach of this Agreement, the operation of the Operator's business or any other matter arising out of or related to this Agreement.

E.      The parties recognize that their relationship is unique and that is the Operator is situated differently from all operators contracting with the Company, and that no one operator franchisee can adequately represent the interest of others. Therefore, the parties agree that any arbitration, suit, action or other legal proceeding shall be conducted and resolved on an individual basis only and not on a class-wide, multiple plaintiff, consolidated, collective or similar basis. Accordingly, the parties also agree that the arbitrator of any such controversies may not join, consolidate, coordinate or jointly manage the claims of more than one person for any purpose (i.e. prehearing, discovery, hearing or otherwise), and may not otherwise preside over any form of class, collective or representative hearing.

27. **Severability.** In the event that any section, sentence, or clause of this Agreement is found to be invalid or unenforceable, such provision shall be deemed modified to the extent necessary to render the same valid, or as not applicable to the given circumstances, or to be stricken from the Agreement, as the circumstances may require, and this Agreement shall be construed and enforced as if such provision had been included herein as so modified in scope or application, or had not been included herein (in which case all remaining provisions shall remain in full force and effect as if the stricken provision had never been a part of this Agreement), as the case may be; it being the stated intent of the parties that had they known of such invalidity or unenforceability at the time of entering into this Agreement, they would have nevertheless contracted upon the terms contained herein, either excluding such provisions, or including such provisions only to the maximum scope and application permitted by law, as the case may be. In

12                                                    **rev. 10/2014**

JA195

the event such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this paragraph will operate upon such provision only to the extent that the laws of such jurisdiction are applicable to such provision.

**28. Statute of Limitation.** The parties hereby acknowledge and agree that any arbitration, suit, action or other proceeding relating to this Agreement must be brought within one (1) year after the occurrence of the act or omission that is the subject of the arbitration, suit, action or other legal proceedings.

**29. Waiver.** No delay in or omission of the exercise of a right, power, or remedy accruing to the Company for breach or default of the Operator under this Agreement shall impair any such right, power or remedy of the Company, and it shall not be construed to be a waiver of any such breach or default or acquiescence therein of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed waiver of any breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of Company of any provision or condition of this Agreement must be in writing and shall be effective only to the extent specifically allowed by such writing. All remedies, either under this Agreement or by law, or otherwise afforded to the Company shall be cumulative and not alternative.

**30. Notices.** Any notice required or permitted to be given to a party under this Agreement shall be in writing and shall be deemed given (i) when delivered in person, or (ii) three (3) business days if sent by registered or certified United States (U.S.) mail, return receipt requested and postage prepaid, or (iii) the next business day if sent by national overnight courier similar to Federal Express. Either party may change its address for notice by giving written notice thereof to the other party. The address of each party for notice initially is as follows:

A.　　　　　　　　To the Company at:
　　　　　　　　　Fairfax Taxi, Incorporated
　　　　　　　　　3251 Washington Boulevard
　　　　　　　　Arlington, Virginia 22201
　　　　　　　　　Attn.: _____

B.　　　　　　　　To the Operator at:
　　　　　　　　　_____
　　　　　　　　　_____

**31. Binding Effect.** This Agreement shall be binding on the parties, their heirs, executors, administrators, successors, and assigns. The Operator's obligations under this Agreement shall survive the termination or expiration of this Agreement.

**32. Addenda.** The following addenda are attached hereto and are a part hereof and the Operator acknowledges receipt thereof by the execution of this Agreement: Addendum No. 1 Equipment Use Agreement

13                                                    rev. 10/2014

JA196

**33. No Representations.** The Operator acknowledges that neither the Company, nor any agent or employee of the Company has made any representations or warranties to the Operator with respect to income which may be realized by the Operator in conjunction with the operation of the Motor Vehicle pursuant to the terms of this Agreement.

IN WITNESS HEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

Signed:

FAIRFAX TAXI, INCORPORATED
T/A: RED TOP CAB OF FAIRFAX

By: _____

SAM EBIASAH-MANAGER
Printed Name/Title

Date: MARCH 30, 2015

OPERATOR

_____

Amoah Gyimah
Printed Name

Date: 03/30/15

**Addendum No. 1: Equipment Use Agreement**

14

rev. 10/2014

JA197

B-5707

FR72

## EQUIPMENT RENTAL AGREEMENT

THIS EQUIPMENT RENTAL AGREEMENT (the "Agreement") is made and entered into on the date listed below by and between Fairfax Taxi, Inc d/b/a Fairfax Red Top Cab, a Virginia Corporation, hereinafter called "Lessor" and ___Amoah Gyimah___ residing at ___7013 Solomon Seal Ct, Springfield VA 22152___ hereinafter called "Lessee";

WHEREAS, Lessee is licensed by the appropriate governmental authorities to operate a taxicab within the jurisdiction governed by such authorities and pursuant to the ordinances of such jurisdiction;

WHEREAS, Lessee, in consideration of the payment to Lessor of weekly "stand-dues" and other charges, is entitled to operate, as an independent contractor, a taxicab within such jurisdiction under Lessor's Certificate of Public Convenience and Necessity ("Certificate");

WHEREAS the Lessor is the owner of certain communications equipment as more fully described herein, including the taximeter, credit card processing equipment and computer dispatch terminal or similar device, along with mounting brackets, cables and other peripheral equipment ("The Equipment") used in conjunction with our dispatch system and the operation of a taxicab business under Lessor's Certificate; and

WHEREAS Lessee desires to lease the Equipment from the Lessor for use by Lessee in conjunction with Lessee's operation of a taxicab and Lessor has agreed to lease the Equipment to the Lessee subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and good and valuable consideration, the receipt and sufficiency which are hereby acknowledged, the parties agree as follows:

1.     That the above recitals are incorporated and made a part of this Agreement as if fully set forth in this Paragraph 1.

2.     That Lessee hereby leases from Lessor, pursuant to the terms of this Agreement, the following Equipment:

___meter___ ; Serial Number ___78268___

___tablet___ , Serial Number ___391___

___pim___ , Serial Number ___3507___

**The Equipment is delivered to the Lessee "AS IS", with all faults and without warranty, either express or implied.** Lessor shall provide routine maintenance of the Equipment while this Agreement remains in effect and Lessee shall make the Equipment available for such routine maintenance as may be requested by Lessor.

3.     Lessor agrees to lease to the Lessee the above described Equipment on a weekly basis at the rate of $(Included in Stand Dues) per week (the "Rent"), in advance, as rental for such Equipment; which Rent shall be paid by the Lessee to the Lessor on a weekly basis at Falls Church, Virginia. In addition to payment of the weekly Rent, Lessee shall deposit with Lessor, a security deposit in the amount of $ 1,000.00, (the "Security Deposit") payable in weekly installments of $30.00, to insure Lessee's performance under the terms of this Agreement and any and all other obligations owed by the Lessee to the Lessor of any kind or nature whatsoever. In the event the Security Deposit is reduced below $1,000.00, Lessee shall immediately deposit with Lessor sums sufficient to bring the Security Deposit up to the sum of $1,000.00.

1

JA198

4. The Equipment shall always be and remain sole personal property of the Lessor even if such Equipment is affixed the Lessee's taxicab and in no event shall the Equipment be deemed "Fixtures" as that term is defined in VA Code §8.9A-102(a)(41). Lessor shall, in all events, retain title to the Equipment and Lessor does hereby reserve a security interest in and to the Equipment and all proceeds therefrom and no title or right in the Equipment shall pass to the Lessee under the terms of this Agreement, or otherwise, excepting only the rights in such Equipment as expressly granted by this Agreement. Nameplates or other marking may be affixed on the equipment indicating that Lessor is the owner of such Equipment. Lessor may make appropriate UCC filings to reflect Lessor's continued security interest in and to the Equipment and Lessee expressly agrees, throughout the term of this Agreement, to execute and deliver any such UCC filings to Lessor at Lessor's request. The costs of any such filings shall be the responsibility of the Lessee and shall be due and payable by the Lessee to Lessor upon demand. Upon termination of this Agreement, Lessee shall immediately return the Equipment, at Lessee's expense, to the Lessor in as good or better condition as when received by Lessee, normal wear and tear excepted.

5. Lessee shall comply with all laws, regulations and/or orders relating to the possession and/or use of the Equipment and Lessee does hereby indemnify and forever hold harmless Lessor and/or its successors and/or assigns, from and against any and all damages, liabilities and claims for death or injury to persons or loss or damage to property, including, without limitation, Lessor's costs and reasonable attorney's fees, damages and liabilities resulting from or pertaining to the use or operation of the Equipment.

6. Lessee shall not assign or sublease, by operation of law or otherwise, any interest in the Equipment or this Agreement without Lessor's prior written consent; which consent may be withheld by Lessor and Lessor's sole and absolute discretion. Any unauthorized assignment of this Agreement and/or the Equipment shall be deemed void and of no force and affect and shall constitute a default by Lessee under this Agreement.

7. Lessee agrees as a condition of this Agreement, that if any proceeding under the U.S. Bankruptcy Code, as amended, is commenced by or against Lessee, or if the Lessee is adjudged insolvent, or Lessee makes any assignment to the benefit of creditors, or if a writ of attachment is levied on any of the Equipment and such levy is not released or satisfied within five (5) days thereafter, or if a receiver is appointed in any proceeding or action in which the Lessee is a party with authority to take possession or control of any item(s) of the Equipment, Lessor and/or its assignee shall have the right to exercise any one or more of the remedies available to it, including but not limited to those remedies set forth in this Agreement, including requiring the immediate return of the Equipment; whereafter this Agreement shall, at the option of the Lessor, without notice, immediately terminate and thereafter this Agreement shall not be treated as an asset of the Lessee.

8. If any weekly installment of Rent due under this Agreement remains overdue and unpaid, or if Lessee is otherwise in default under this Agreement, Lessor may, at its option, at any time thereafter and prior to such default being cured, declare this Agreement terminated; take immediate possession of the Equipment; and/or deduct from the Security Deposit all sums due Lessor from Lessee, or Lessor, at Lessor's option (and without terminating this Agreement), may deduct from the Security Deposit all sums due Lessor from Lessee whereupon this Agreement shall otherwise remain in full force and effect.

9. Each of the following shall be deemed in default under this Agreement:

(a) Lessee fails to pay any installment of Rent on or before the due date;
(b) Lessee fails to perform any of Lessee's obligations under this Agreement;
(c) Lessee assigns Lessee's assets to the benefit of the creditors or enters voluntarily or involuntarily into bankruptcy or reorganization proceedings, or becomes insolvent;
(d) Lessee attempts to assign this Agreement or any interest of Lessee in the Equipment to any third party; and
(e) Lessee fails to otherwise comply with Lessee's obligations under this Agreement.

2

JA199

10. In addition to any other remedies available to the Lessor under this Agreement, in the event of default of this Agreement, Lessor may do one or more of the following:

(a) Lessor may unilaterally cancel and terminate this Agreement;

(b) Lessor may require Lessee to deliver the Equipment to Lessor at Lessee's expense;

(c) Lessor or Lessor's agent repossess the Equipment, by force if necessary, and without the necessity of a court order, and Lessee does hereby release and forever discharge Lessor for damages, trespass or for any other claim arising out of or related to such repossession; and

(d) Lessor may, in the event of such default, exercise any and all rights and remedies available to it in law or in equity.

11. In the event of a default by Lessee under this Agreement, Lessee shall pay, in addition to any other sums due Lessor hereunder, any and all of Lessor's costs in enforcing Lessor's rights under this Agreement, including, but not limited to, Lessor's reasonable attorney's fees.

12. This Agreement supersedes and cancels all prior contracts, if any, between Lessor and Lessee for lease of the Equipment and constitutes the entire contract between the parties as to the lease of such Equipment. Lessee agrees that no representations or warranties have been made by Lessor or its agent respecting this Agreement, unless specifically expressed herein. Any waiver by the Lessor of any rights arising from breach or default of any provisions of this Agreement shall not be construed as a continuing waiver of other breaches or default under the same or other provisions of this Agreement.

13. All notices required to be given to Lessor under this Agreement shall be in writing and shall be delivered or sent to the Safety and Claims Manager, 1200 North Hudson Street, Arlington, Virginia 22201; or to such other persons designated by Lessor with written notice mailed to Lessee. All notices to the Lessee under this Agreement shall be deemed given when hand delivered to the Lessee or when mailed to the Lessee at the address of Lessee set forth in this Agreement.

14. Lessor and Lessee acknowledges that there does not exist between them a relationship of employer/employee; principal/agent or master servant, either expressed or implied, but that the relationship of the parties is strictly that of Lessor/Lessee being free from interference or control of the part of Lessor in the operation of the Equipment.

15. This Agreement may be modified or altered only by a writing signed by the parties hereto. If any provision or part of this Agreement is deemed unenforceable, invalid or void by a court of competent jurisdiction, the remaining provisions of this Agreement shall remain in full force and effect. This Agreement is binding upon and shall inure to the benefit of the parties hereto, their agents, employees, successors and assigns.

Date: 03/30/15                      _____ [SEAL]
                                 Lessee

**Fairfax Taxi Inc.**        **Lessor**

Date: 03|30|2015                 By: _____ [SEAL]

3

JA200

# EXHIBIT B

JA201

**DMV**

## VIRGINIA MOTOR VEHICLE REGISTRATION

VSA-0 (REV 07/12)

| Title Number 92062623 | Veh. Identification Number (VIN) 3FA6P0UU4ER394408 | | Date Issued 03/18/19 | Plate Number H126429 | Plate Type TAXI | Sticker | Expiration Date 03/31/21 | |
|---|---|---|---|---|---|---|---|---|
| Vehicle Make FORD | Model FUSION | | Body 4D SDN | Year 2014 | Color RED/BLK | Fuel HYBR | Vehicle Use FOR HIRE | Axles 2 |
| Purchase Date 03/24/15 | Odometer at Titling 100 ACTUAL | Lien at Reg Y | EW 3427 GW | GVWR | GCWR Unit # | | | |

GYIMAH, AMOAH
7013 SOLOMON SEAL CT
SPRINGFIELD VA 22152-3152

TAXI

TAXICAB # 25437

FAIRFAX COUNTY

CMA 381
381RGG

This card must be carried in the motor vehicle when in ~~~~~~~~~~~~~

GYIMAM1    DS

8⁴ʲ
* 2

# EXHIBIT C

JA203



# COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF MOTOR VEHICLES

OA424 (02/10)
250SRT

**RENEWAL OF:** TAXI CAB – PASSENGER PERMIT

This is to certify that the carrier named herein has renewed its Virginia operating authority. The authority remains in effect until the expiration date shown below unless it is suspended or revoked and provided the carrier's operations are in compliance with Chapter 20, Title 46.2 of the Code of Virginia and the requirements and restrictions listed on the carrier's Virginia operating authority (certificate/license/permit).

FAIRFAX TAXI INC
11 HILLWOOD AVE
FALLS CHURCH, VA 22046

BY:

**Number:** 11373     **EXPIRATION DATE:** 09/30/2019

Commissioner
Richard D. Holcomb

Bates Number: 2

JA204

# EXHIBIT D

JA205

## TAXICAB OPERATOR'S CERTIFICATE

**20** **19**

### COUNTY OF FAIRFAX, VIRGINIA
DEPARTMENT OF CABLE AND CONSUMER SERVICES

## THIS CARD IS THE PROPERTY OF FAIRFAX COUNTY

Date Issued: **Jan 1, 2019**          Expired Date: **Dec 31, 2019**

Cab #: **72**          Cab Capacity: **4**

Holder Colors: **Black & Red**          Make/Model: **Ford Fusion Hybrid**

Certificate Holder: **Fairfax Taxi, Inc.**

Holder Address: **11 Hillwood Avenue**          Cab Year: **2014**

Holder City: **Falls Church, VA 22046**          VIN #: **3FA6P0UU4ER394408**

**NOT TRANSFERABLE**

Issued subject to the provisions of Chapter 84.1 of the Code of the County of Fairfax, Virginia and may be revoked or suspended for violations

FORM CA 61/19          Chief, Regulation and Licensing Branch          Cert # 436

---

### INSPECTION RECORD          Fairfax Taxi, Inc.          Cab # 72

| DATE | | INSPECTOR | COMMENTS |
|---|---|---|---|
| 4/23/2019 | ☑ PASS | Carl Newcomb | Meter due 4/2020 |
| | ☐ FAILED | | |
| | ☐ PASS | | |
| | ☐ FAILED | | |
| | ☐ PASS | | |
| | ☐ FAILED | | |
| | ☐ PASS | | |
| | ☐ FAILED | | |
| | ☐ PASS | | |
| | ☐ FAILED | | |
| | ☐ PASS | | |
| | ☐ FAILED | | |

JA206



# COMMONWEALTH OF VIRGINIA
## DEPARTMENT OF MOTOR VEHICLES

OA424 (02/10)
250SRT

**RENEWAL OF:** TAXI CAB – PASSENGER PERMIT

This is to certify that the carrier named herein has renewed its Virginia operating authority. The authority remains in effect until the expiration date shown below unless it is suspended or revoked and provided the carrier's operations are in compliance with Chapter 20, Title 46.2 of the Code of Virginia and the requirements and restrictions listed on the carrier's Virginia operating authority (certificate/license/permit).

FAIRFAX TAXI INC
11 HILLWOOD AVE
FALLS CHURCH, VA 22046

BY:

**Number:** 11373          **EXPIRATION DATE:** 09/30/2019

Commissioner
Richard D. Holcomb

Bates Number: 2

JA207

**20 TAXICAB OPERATOR'S CERTIFICATE 19**

## COUNTY OF FAIRFAX, VIRGINIA
DEPARTMENT OF CABLE AND CONSUMER SERVICES

## THIS CARD IS THE PROPERTY OF FAIRFAX COUNTY

Date Issued: **Jan 1, 2019**  Expired Date: **Dec 31, 2019**

Cab #: **72**  Cab Capacity: **4**

Holder Colors: **Black & Red**  Make/Model: **Ford Fusion Hybrid**

Certificate Holder: **Fairfax Taxi, Inc.**

Holder Address: **11 Hillwood Avenue**  Cab Year: **2014**

Holder City: **Falls Church, VA 22046**  VIN #: **3FA6P0UU4ER394408**

**NOT TRANSFERABLE**  Issued subject to the provisions of Chapter 84.1 of the Code of the County of Fairfax, Virginia and may be revoked or suspended for violations

FORM CA 61/19  Chief, Regulation and Licensing Branch  Cert # 436

---

**INSPECTION RECORD**  **Fairfax Taxi, Inc.**  **Cab # 72**

| DATE | | | INSPECTOR | COMMENTS |
|---|---|---|---|---|
| 4/23/2019 | ☑ | PASS | Carl Newcomb | Meter due 4/2020 |
| | ☐ | FAILED | | |
| | ☐ | PASS | | |
| | ☐ | FAILED | | |
| | ☐ | PASS | | |
| | ☐ | FAILED | | |
| | ☐ | PASS | | |
| | ☐ | FAILED | | |
| | ☐ | PASS | | |
| | ☐ | FAILED | | |
| | ☐ | PASS | | |
| | ☐ | FAILED | | |



**COUNTY OF FAIRFAX**
**DEPARTMENT OF CABLE AND**
**CONSUMER SERVICES**

# HACKER'S LICENSE

License Number

 **H18-409**

Date License Expires

**7/20/2019**

**Amoah Gyimah**

Issue Date
**7/20/2018**

Company
**Murphy Brothers, Inc.**

This card must be displayed in vehicle at all times in full view of passengers. VALID ONLY WHILE OPERATING A TAXICAB CERTIFIED IN FAIRFAX COUNTY. This permit is the property of Fairfax County, it is not transferable, and may be revoked or suspended at any time.

*Rebecca L. Makely*
Chief, Regulation and Licensing Branch



**COUNTY OF FAIRFAX**
**DEPARTMENT OF CABLE AND**
**CONSUMER SERVICES**

# HACKER'S LICENSE

License Number

 **H16-639**

Date License Expires

**7/13/2017**

**Amoah Gyimah**

Issue Date
**7/13/2016**

Company
**Murphy Brothers, Inc.**

This card must be displayed in vehicle at all times in full view of passengers. VALID ONLY WHILE OPERATING A TAXICAB CERTIFIED IN FAIRFAX COUNTY. This permit is the property of Fairfax County, it is not transferable, and may be revoked or suspended at any time.

*John Glen McCarthy*
Chief, Regulation and Licensing Branch

Plaintiffs' EX 21

Bates Number: 1

## FINAL PRETRIAL CONFERENCE

CIVIL ACTION NO. __1:23cv1756__                    DATE: __02/20/25__

JUDGE:__Hilton__

Start Time: __10:07 am__

End Time: __10:26 am__

__Brian O'Connor__        vs. __Fairfax Taxi, Inc. et al__

APPEARANCES:    Counsel for: Plaintiff (X ) Defendant ( X)      Pro Se (    )

( X) Case set for trial by **JURY** on__06/23/25 at 10:00 am__   (4 days)

(   ) Case set for trial by **COURT** on _____

| | |
|---|---|
| Plaintiff's Witness List filed | x ECF _ In Open Court |
| Plaintiff's Exhibit List filed | x ECF _ In Open Court |
| Dft's Witness List filed | x ECF _ In Open Court |
| Dft's Exhibit List filed | x ECF _ In Open Court |

Notes:

__Summary Judgment hearing – 3/21/25 at 10:00 am__

__Plaintiff's oral request to use witness depositions in court for trial is Granted__

JA210

EX B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| **BRIAN M. O'CONNOR** | ) | |
| **Administrator for the Estate of** | ) | |
| **Hyo Jung Kim, deceased** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| v. | ) | Case No. 1:23-cv-01756-CMH-WEF |
| | ) | |
| **FAIRFAX TAXI, INC.,** *et al* | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **SUNG-CHUL JUNG** | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-01758-CMH-WEF |
| | ) | |
| **FAIRFAX TAXI, INC.,** *et. al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

**AFFIRMATION**

In RE:  <u>O'Connor, Administrator for Estate of Kim v. Fairfax Taxi, Inc. et. al</u>, Case No. 1:23-cv-01756-CMH-WEF;
      <u>Jung v. Fairfax Taxi, Inc. et.al,</u> Case No. 1:23-cv-01758-CMH-WEF

**Collision on George Washington Parkway on April 29, 2019**

Dear Mr. Garver:

I am experienced in accident reconstruction. For over 26 years, I was employed with the Metropolitan Police Department in Washington D.C.  After being assigned as an officer to the Sixth District Patrol Area, I was accepted to the Traffic Enforcement Branch (renamed the Major Crash Investigations Unit). In 1999, I was promoted to Detective within the unit. As part of my duties conducting in-depth and thorough crash reconstructions at the Major Crash Unit, I reenacted multiple collisions involving passenger vehicles, pedestrians, bicycles, and commercial motor vehicles. I have received extensive training and certification within the realm of crash investigation and reconstruction and has investigated over 4500 crashes, of which 475 were fatalities. I have been ACTAR certified since 2006. As a certified instructor at the police department's training academy, I served as the instructor of crash investigation to the recruits. I also has been a guest lecturer at American University and Georgetown University in Washington, D.C. and a secret reader for Trial Magazine.

JA211

I have reviewed the documents in this case, including but not limited to, the U.S. Park Police Investigator's crash report and the depositions of the fact witnesses, including but not limited to Dr. Sung-Chul Jung, John McDonald, Ray Bombac, Robert Wayne Ahlers, Roger Daven Oswalt, and Timothy Bracken. I reserve the right to amend and/or supplement this report if and when new information and/or documents became available.

Based on my education, background training, and experience and my review of the documents and depositions in this case, it is more probable than not that had the cab driver Amoah Gyimah been paying full time and attention just before and at the time of the collision on George Washington Parkway on April 29, 2019, that the collision would not have occurred, or at a minimum, would have been less severe. It is clear from the documents in this case that the two vehicles collided head on—with the left driver's side of each vehicle sustaining significant damage. Based on the location of the damage to the vehicles and the skid marks that were left on the roadway, either or both vehicles could have crossed the double yellow line.

Even if only the VW crossed the double yellow line, had Mr. Gyimah been paying full time and attention he could have avoided the collision. It appears that there were not any vehicles to the right of the Red Top Cab being driven by Gyimah. Thus, more probably than not Mr. Gyimah could have swerved to the right to avoid the collision. Even if there was a vehicle in the right lane, more probably than not, if he had swerved to the right the collision with the vehicle would have been less severe (more probably than not it would have merely side-swiped a vehicle in the right lane and injuries would have been less severe). Accordingly, based on my education, training, background and experience, and based on my review of the documents in these cases, more probably than not Mr. Gyimah could have avoided this collision, or had collision with less severe consequences if he had been paying full time and attention by swerving or moving into the right hand northbound lane.

In addition, based on my education, training, background and experience, and based on my review of the documents in these cases, if Mr. Gyimah had been paying full time and attention, more probably than not, he could avoided the collision or made the consequences less sever if he had attempted to avoid the collision by braking. The documentation shows that Mr. Gyimah did not attempt to brake or slow down in the seconds prior to the collision. Had he attempted to use his brakes, more probably than not he could have avoided the collision or the impact of the collision would have been less severe.

I hereby also understand that further discovery is still pending and I reserve the right to amend my opinions based upon newly received information.

I also attach hereto a copy of my fee schedule for testifying in cases of this nature. My initial fees to prepare this report are $3000.00, (invoicing ongoing). I have also attached a list of cases in which I have testified in the past four years. I have considered documents in this case, including but not limited to, the U.S. Park Police Investigator's crash report and the depositions of the fact witnesses, including but not limited to Dr. Sung-Chul Jung, John McDonald, Ray Bombac, Robert Wayne Ahlers, Roger Daven Oswalt, and Timothy Bracken. I have also attached my cv which sets forth my qualifications.

JA212

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE COMMONWEALTH OF VIRGINIA, AND THE UNITED STATES OF AMERICA, THAT THE FOREGOING AFFIRMATION IS TRUE AND CORRECT.

Executed this ___12___ day of September, 2024

_____
Michael Miller

JA213



ARL CRASH INVESTIGATIONS, LLC    P.O. BOX ███    WOODBRIDGE, VIRGINIA 22195-2188
OFFICE: 571-552 ███    FAX: 571-552 ███    WWW.ARLCRASHINVESTIGATIONS.COM
**ARL CRASH INVESTIGATIONS -- *Simply the Higher Standard*.**

# MICHAEL MILLER

## PROFESSIONAL EXPERIENCE:

| | |
|---|---|
| 2016 to present: | President/Owner ARL Crash Investigations, LLC. Provide expert experience during the investigation and reconstruction of motor vehicle collisions involving pedestrians, motorcycles, and passenger vehicles.  As well as the inspection and regulation of commercial motor vehicles.  Offer expert opinion to attorneys, insurance companies, and prosecutors during civil and criminal proceedings. |
| 2015 to present: | Associate Accident Investigator/Reconstructionist/Forensic Video Analyst, Comprehensive Motor Vehicle Services & Consulting. Assist with on-scene crash investigations and reconstructions of motor vehicle collisions, inspection and analysis of mechanical and electronic motor vehicle systems. |
| 1999 to 2016 | Police Detective, Major Crash Investigations Unit, Special Operations Division, Metropolitan Police Department, Washington, D.C.  Investigated and reconstructed critical injury and fatal collisions, assisted with large demonstrations, dignitary protection and escorts.  Simultaneously, assigned to the police department's Special Threat Action Team (STAT) to handle chemical, biological, radiological, nuclear, and/or explosive (CBRNE) material.  Also, instructed traffic crash investigation to recruits at the police department's training academy |
| 1992 to 1999 | Police Officer, Traffic Enforcement Branch, Metropolitan Police Department, Washington, D.C.  Assisted with the investigation of critical and fatal collisions, investigated police department vehicle collisions, alcohol and speed enforcement, assisted with large demonstrations, dignitary protection and escorts. |

1

JA214

1990 to 1992                Police Officer, Sixth District Patrol Area, Metropolitan Police Department, Washington, D.C.  Assigned to street patrol duties including enforcement of criminal offenses.

1986 to 1994                Volunteer Firefighter, Berwyn Heights Fire Department, Prince George's County, Maryland.  Fire suppression, vehicle extrication, rendering medical aid to injured parties, and operation of fire department apparatus duties.

EDUCATION:

University of Maryland, College Park, Maryland
Criminal Justice Program 1984-1986 and 1996-1997 (89 credits)

PROFESSIONAL ASSOCIATIONS:

The Accreditation Commission for Traffic Accident Reconstruction (ACTAR) #1728 (Recertified in 2011, 2016, and 2021)

National Association of Professional Accident Reconstruction Specialists (NAPARS)

New Jersey Association of Accident Reconstructionists (NJAAR)

Texas Association of Accident Reconstruction Specialists (TAARS)

SPECIALIZED TRAINING COURSES:

1993    At Scene/Vehicular Homicide Accident Investigation (IPTM, University of North Florida) Learn procedures to measure, photograph and document collision scenes; obtain the mathematical knowledge to explain and determine the pre- and post-crash events, as well as what occurred during the collision.

1994    Occupant Kinematics (Maryland State Police) Understand and identify vehicle restraining devices in automobiles and vehicle occupant injuries when involved in motor vehicle collisions.

1995    Advanced Accident Investigation (IPTM, University of North Florida) Obtain the necessary skills and mathematic knowledge to determine and analyze vehicle lamp operation, tire damage, and vehicle dynamics, as well as utilizing photogrammetry in analyzing and investigating motor vehicle collisions and determining the Principle Direction of Force (PDOF) in collisions.

2

JA215

1995    Reconstruction Accident Investigation (IPTM, University of North Florida) Learn and apply proper reconstruction mathematics to include conservation of momentum, vehicle dynamics, critical speed, and weight shift; investigate and reconstruct motor vehicle collisions involving pedestrians, commercial motor vehicles, and automobiles.

1995    Pedestrian/Human Factors Accident Investigation (IPTM, University of North Florida) Obtain techniques to investigate and reconstruct motor vehicle collisions involving pedestrians, learn and understand the injuries consistent with pedestrian collisions; issues related to the investigation of pedestrian accidents; determine and analyze perception and reaction times involved in crash investigation and reconstruction.

1996    Gun Recovery and Interdiction (D.C. Police Department) Learn and identify techniques of individuals carrying weapons and understand characteristics of individuals in possession of concealed guns.

1996    Department of State Protection Course (U.S. State Department) Identify and understand applications and designs of dignitary protection protocol, operate motorcade vehicles involved in the safety and security of high-risk threat principles; participate in real world attacks on principle individuals under dignitary protection.

1997    Commercial Motor Vehicle Accident Investigation (IPTM, University of North Florida) Instructed and obtained knowledge concerning the investigation and reconstruction of collisions involving commercial motor vehicles; gear reduction ratio speed, weight shift and roller over dynamics of commercial motor vehicles.

1998    Emergency Medical Technician (EMT) re-certification (D.C. Fire Department) Re-certify national EMT training and certification.

1999    Motorcycle Accident Investigation (IPTM, University of North Florida) Identify the operation and components of motorcycles, obtain knowledge concerning roadway evidence, turning and braking of motorcycles; use the appropriate mathematical formulas to complete an investigation and reconstruction of a motorcycle collision.

1999    Special Problems in Accident Investigation (IPTM, University of North Florida) Pedestrian/Bicycle accident investigation updates, tractor trailer braking systems, investigation of low speed collisions, obtain knowledge and use of DNA and trace evidence as it relates to collision investigations. Observed and investigated live crash testing.

1999    Vehicle Damage and Energy Relationships in Collision Investigations (Texas Engineering Extension Service, Texas A & M) Work theories and energy concepts in motor vehicle collisions; understand restrictions involving energy

3

JA216

based analysis, calculations of vehicle stiffness, coefficients, and energy displacements; proper application of mathematical formulas in the calculation of energy related concepts in accident investigations.

1999    Total Mapping Station Training Course (MJC & Associates) Introduction to the Total Station realm of accident scene documentation; obtained knowledge of the Total Station nomenclature, operation, and software associated with diagramming and mapping of a collision or crime scene.

1999    Basic Investigator School (D.C. Police Department) Obtain the skills needed to thoroughly investigate crimes and incidents in the District of Columbia. Participated in mock trials and surveillance of persons under investigation; refresher on new laws and codes as it relates to investigations.

2001    Map Scenes Software Training for Total Station (MJC & Associates) Instructed on the theories behind the mapping software of the Sokkia Total Station; forensic diagramming and mapping of crime and accident scenes. Application of the MapScenes program software in accident investigation.

2002    CDR (Crash Data Retrieval) Systems Operator Certification Course (IPTM, University of North Florida) Certified on the CDR System; identify vehicle systems captured by the CDR equipment and understand CDR download limitations.

2002    14th Annual Traffic Safety Conference (Traffic Institute for Police Services, Pennsylvania) Pedestrian accident reconstruction update, CMV brake and engine forensic investigations, driver visibility and response times; crush analysis in vehicle collision reconstructions.

2002    North American Standard Level 3, (Part A, Driver) Motor Carrier Inspection (United States Department of Transportation, Federal Motor Carrier Safety Administration)) Inspection of commercial motor vehicles and drivers; utilize North American Standard Inspection procedures and application of those standards towards the driver and vehicle of motor carriers.

2002    Advanced Traffic Crash Reconstruction with WinCrash (IPTM, University of North Florida) Understand the theories behind the program WinCrash and obtain the skills and knowledge to effectively utilize the program to reconstruct the collision dynamics.

2003    Vehicle Damage and Energy Relationships (CRUSH) (Collision Safety Institute) Understand the concepts and relationships between damage, energy, delta-V, and barrier equivalencies as well as understand the relationship between kinetic energy and "crush" damage.

4

JA217

2004   Chemical Protective Clothing Team (CPC) STAT Training (Louisiana State University) Learn, identify, and use special personal protective equipment in real world chemical, biological, radioactive, and nuclear attacks.

2004   Chemical Sampling Techniques and Guidelines STAT Training (Louisiana State University) Learn, identify and use equipment associated with the collection and testing of equipment in real world chemical, biological, radioactive, and nuclear attacks.

2004   Vericom Training (Vericom Computers) Understand and utilize the Vericom equipment relating to motor vehicle collisions; acceleration, deceleration and brake testing using the Vericom system.

2004   North American Standard Level 3, (Part B, Vehicle) Motor Carrier Inspection (United States Department of Transportation, Federal Motor Carrier Safety Administration) Application of roadside and place of business inspections and documentation of CMV drivers and vehicles.

2004   Bendix Brake Systems (Bendix Brake Corporation) Understand the nomenclature of Bendix brake systems as it relates to commercial motor vehicles; airbrake applications as well as brake and air system inspection on CMV's.

2004   Traffic Crash Reconstruction Update (IPTM, University of North Florida) Learn the latest theories and methodologies of crash reconstruction, review of mathematical equations used with crash data and analyzing crash data utilizing energy-based methods.

2005   Emergency Traffic Control for Emergency Responders (Incident Management, American Traffic Safety Services Association, ATSSA) Awareness to Emergency Traffic Control (ETC) standards and guidelines, increase personnel safety as it relates to Traffic Accident Incident Management (TIMA).

2005   Applied Physics for the Traffic Crash Investigator (IPTM, University of North Florida) Learn Uniform projectile and circular motions as it pertains to vehicles involved in crashes, energy loss and rotational mechanics.

2005   General Hazardous Materials, Motor Carrier Inspection (United States Department of Transportation, Federal Motor Carrier Safety Administration) Inspection hazardous material shipments for compliance and regulations either at roadside or the motor carrier's place of business; inspection of cargo loads and vehicles that transport hazardous materials.

2005   Cargo Tanker Inspection, Motor Carrier Inspection (United States Department of Transportation, Federal Motor Carrier Safety Administration) Inspection of cargo

5

JA218

tanks used to transport hazardous materials for compliance of federal regulations either at roadside or at the motor carrier's place of business.

2005    Passenger Vehicle Inspection, Motor Carrier Inspection (United States Department of Transportation, Federal Motor Carrier Safety Administration) Inspection of motor coach drivers and buses relating to federal regulations as well motor coach bus nomenclature and systems.

2006    Methodologies & Principles of Crash Data Techniques (IPTM, University of North Florida) Learn and understand the nomenclature and systems associated with the CDR system as it relates to vehicle manufactures; understand the data obtained from commercial motor vehicle electronic control units.

2006    Crash Data Retrieval System Operator's Course, (Vetronix Corporation) Provide CDR operators the understanding of the vehicle systems captured by the CDR program and how to properly download, collect, and interpret the CDR data.

2006    Special Problems in Traffic Crash Reconstruction, (IPTM, University of North Florida)  Crush damage measuring techniques and investigation pole strikes involving automobiles; crush analysis with trailer underrides relating to coefficient of restitution and validation of low speed off-tracking for commercial motor vehicles; observed and documented live staged collisions involving commercial vehicles.

2006    ACTAR (Accreditation Commission for Traffic Crash Reconstructionists) Certified #1728

2007    Weapons of Mass Destruction, Hazardous Martials Technical Training (U.S. Department of Homeland Security, Center for Domestic Preparedness, Anniston, Georgia) Identify, detect, and categorize biological, chemical, radiological, and explosive materials, as well as operate detection equipment and participate in a live biological atmosphere.

2007    Heavy Vehicle Crash Reconstruction (Northwestern University) Analysis of tires, brakes and CMV nomenclature; off tracking and rollover dynamics. Determination of collision behavior involving momentum damage and field testing and analysis.

2008    Fatal Accident Crash Team (FACT) Seminar (Indianapolis, Indiana) Utilize and understand the kinematics and dynamics of basic collision methodologies; participate in direct and cross examination of crash reconstruction expert witnesses in court proceedings and determine the proper visual technique for use in court room trials.

2009    Roadway Safety Audit (RSA) Workshop, (DDOT/FHWA, Washington, D.C.) Application of roadway risk and safety issues; examples of government issues

6

JA219

relating to roadway safety audits and shared challenges involving roadway safety audits.

2009    Leica Geosystem Scan Station II Training (Washington, D.C.) Learn the nomenclature of the Leica Scan Station system; obtain certification on the use of the Scan Station System.

2009    Heavy Vehicle Crash Reconstruction, NAPARS Conference (Ocean City, Maryland) Understand commercial vehicle electronic data; combine aerial photography and forensic mapping data in motor vehicle collisions; review DDEC reports relating to hours of service; CDR updates.  Live crash testing of commercial motor vehicles.

2010    Crash Data Retrieval (CDR) Technician Course (Collision Safety Institute, Fairfax, Virginia) Updated software and hardware usage; applications when downloading data from vehicles.

2010    Crash Data Retrieval (CDR) Analyst Course (Collision Safety Institute, Fairfax, Virginia) Applications and analyzation of data obtained from the CDR system; imaging and the preservation of CDR data; CDR trouble shooting, and anomalous data with downloading SDM's (sensing diagnostic modules), PCM's (power control modules), and ACM's (airbag control modules).

2010    Traffic Control Technician (TCT) (District of Columbia, American Traffic Safety Services Association) Understand and learn skills associated with Traffic Control Systems relating to the MUTCD.

2010    Accident Reconstruction Workshop, Center for Transportation Studies at University of Virginia, Gainesville, Virginia) Accident investigation; liabilities associated with collisions on roadways.

2010    Interview and Interrogation, Southeastern Public Safety Institute (SPSI), (Solomons Island, Maryland) Application and analysis of physical and environmental interviewing techniques; human body effects during the interviewing and the analyzation of verbal and written statements.

2010    Vehicle Frontal Crash Occupant Safety and CAE, (Society of Automotive Engineers-SAE, Troy, Michigan) Understand the mechanics of frontal crashes and restraint systems; understand vehicle structures as it relates to occupant injuries.

2010    Death Notification for Family Members, MADD (Maryland State Police, Maryland) Obtain and determine the proper technique in notifying family members of traffic related fatalities; offer the appropriate information and support systems with the death of a family member.

JA220

2010    Basic Instructor Certification School, (Metropolitan Police Academy, Washington, D.C.) Obtain the necessary skills associated with proper instruction of police recruits; complete course outline and proper use of class visual aids.

2011    Crash Reconstruction Conference, (Maryland Crash Reconstruction Committee), Linthicum, Maryland) Occupant issues, electric vehicles nomenclature, CDR updates, video analysis, witness reliability involving collisions, and vehicle examination and documentation.

2011    Special Problems in Traffic Crash Reconstruction, (IPTM, University of North Florida) Traffic signal timing issues, basic physics for crash reconstructions, bicycle crash investigations, CDR updates; momentum solutions between motorcycle to car crashes.

2011    Witness Identification and Verification, (United States Attorney's Office, Washington, D.C.) Understand and identify the dynamics of witness identification and reliability.

2011    Crash Data Retrieval (CDR) Analysis and Applications Update, (Crash Data Specialists, LLC, Anne Arundel County, Maryland) CDR updates and analysis of CDR applications; new vehicle coverage and hardware; application of CDR data in real world collisions.

2011    Pedestrian and Bicyclist Safety Enforcement Seminar, (Metropolitan Washington Council of Governments, Transportation Planning Board, Washington, D.C.) Bicycle and pedestrian safety and enforcement in real world environments.

2011    Initial Law Enforcement Response to Suicide Bombing Attacks, (New Mexico Tech, Homeland Security, Washington, D.C.) Understand and identify IED making materials and post bomb blast scenes; evidence recovery at blast scenes; characteristics of suicide bombers.

2012    Total Station Measuring Device for Collision Scenes with Crash Zone, (Institute for Law Enforcement Education, Berwyn, Pennsylvania) Updates on the Sokkia Total Station system; use of the Crash Zone software to forensically diagram crash scenes.

2012    Nighttime Visibility Issues, (Institute for Law Enforcement Education, Doylestown, Pennsylvania) Nighttime visibility and reaction times for drivers and pedestrians.

2012    Computer Aided Crash Diagramming with Crash Zone, (Florida Public Safety Institute, Havana, Florida) Learn, use, and obtain certification in the CadZone computer program; apply knowledge to scale and import pictures into the program.

JA221

2012    Traffic Signal Timing Course, (University of Maryland/Center for Advanced Transportation Technology, On-Line) Understand traffic light signalization at intersections; read and interpret traffic light timing sequence reports.

2013    Crash Reconstruction Conference, (Maryland Crash Reconstruction Committee), Linthicum, Maryland) Tire failures involving collisions, understanding critical speed and slip angle involving collisions; CDR updates. Understand and analyze speed determination from video analysis.

2013    Tennessee Traffic Crash Investigation and Safety Symposium, (Tennessee Highway Patrol & Nissan North America, Nashville, Tennessee) Adjustment of drag factors for spins and hills; damage profile measuring techniques; occupant kinematics and an in-depth look at restraint system components of modern motor vehicles.

2014    Tennessee Traffic Crash Investigation and Safety Symposium, (Tennessee Highway Patrol & Nissan North America, Franklin, Tennessee) Kinematic action of vehicle occupants during rollover collisions; restraint system components of modern motor vehicles with emphasis on designed performance; overview of the electric and hybrid electrical vehicle (HEV) systems in Nissan/Infinity vehicles; advanced technologies of crash avoidance systems.

2014    Methamphetamine Laboratory Training Program: First Responder Awareness and Operations/Train the Trainer (United States Environmental Protection Agency-EPA, Washington, D.C.)  First responder training and techniques for handling methamphetamine drug labs, identify equipment, chemicals, and procedures used in meth labs; learn roles and responsibilities of first responders as it relates to meth labs.

2015    Construction Zone Safety Inspection, (National Highway Institute, Federal Highway Administration, Montgomery County, Maryland) Learn and Identify proper traffic roadway work zone set up and breakdown relating to the safety of on-scene personnel and roadway issues.

2015    Advanced Work Zone Traffic Control, (Transportation Training Academy, University of Virginia, Roanoke, Virginia) Instruction and certification of Virginia State Code of the MUTCD; inspection of traffic roadway construction zones.

2015    Advanced Collision Reconstruction with CDR Applications, (Accident Analysis & Reconstruction, Inc., North Las Vegas Police Department, North Las Vegas, Nevada) Calculate the change of velocity from acceleration data; PDOF in collisions from the vehicle's X/Y axis; impact and post impact velocities from CDR data and adjust the X axis velocity from the vehicle's crash impulse velocity.

9

JA222

2015    National Traffic Incident Management Responder Training, (National Highway Institute, Federal Highway Administration, On-Line) Understand the National Traffic Incident Management Responder program and learn the stages of incident management at roadway traffic incidents involving collisions.

2015    National Traffic Incident Management Responder Training-Train the Trainer (National Highway Institute, Federal Highway Administration, Washington, D.C.) Certification for instruction of students in the realm of Traffic Incident Management; the dangers associated with first responders working at or near collision scenes and the proper placement of emergency apparatus to ensure the maximum safe working environment for first responders.

2016    Work Zone Design, (Maryland Transportation Technology Transfer Center, University of Maryland, College Park, Maryland) Certification of Maryland State Code of the MUTCD; proper set up of traffic work zones and signage of roadway areas.

2016    Flagger Certification (Maryland Transportation Technology Transfer Center, University of Maryland, College Park, Maryland) Certification and protocols of roadway flagger operations at roadway construction zones.

2019    Video Analysis from Traffic, Dash and Witness Cameras, (New Jersey Association of Accident Reconstructionists-NJAARS, Sayreville, New Jersey) Application of the data needed to complete speed analysis from video cameras (BWC, Traffic Enforcement, Private)

2019    Inspecting High-Voltage Electric-Drive Commercial Motor Vehicles, (Department of Transportation, Federal Motor Carrier Safety Administration, On-Line) Recognize CMV high-voltage electric-drive systems, identify major components of high-voltage electric drive systems on CMV's and understand the hazards of inspecting CMV's with high-voltage electric-drive systems.

2019    Crash Investigations Joint Conference, (NJAAR, NAPARS, NATARI, NYSTARS, and MdATAI, Atlantic City, New Jersey) Distracted Driving, Driver Fatigue, Effects of Emergency Vehicle Audible Devices on Civilian Drivers, and Intoxication Due to Drugs.

2020    Video Evidence Training Symposium, (iNPUT-ACE) Calculating Accurate Timing from Video, Legal Issues Related to Video Admissibility, Conducting a Video-Centric Investigation and Video Evidence and Photogrammetry.

2020    Crash Investigations Joint Conference (NJAAR, NAPARS, NATARI, NYSTARS, and MdATAI) Online via Zoom: Motorcycle turning and swerving, investigating rollover crashes, PRT for various crash types, analyzing GoPro GPS data in collision reconstruction and ECM data for crash reconstruction.

JA223

2020    Nighttime Accidents and Applied Human Factors Concepts for Accident Reconstruction, (Texas Association of Accident Reconstruction Specialists (TAARS) Online via Zoom: Investigating autonomous crashes, lighting and colors involving crash reconstruction, object detection, and vehicle condition with regards to crash reconstruction.

2021    Tire Forensics, (NAPARS, Chattanooga, Tennessee) Tire construction and components, tire and rim load capacity and failure analysis.

2022    Advanced HVEDR Systems, (TAARS, Austin, Texas) Examination and investigation of multiple data systems involved in heavy commercial motor vehicle crash investigations. These systems include Bendix Data Recorders ADAS systems, Wabco data, and multiple transmission data systems.

2023    Bosch Crash Data Retrieval Hyundai-Kia-Tesla Tool Technician, (NYSTARS, Valhalla, New York) Refresher CDR Technician course-Hyundai-Kia & Tesla equipment and procedures for downloading EDR data.

2024    Human Factors and Response, (NJAARS, Sayreville, New Jersey) Perceptions and Response Time (PRT), Driver Decision making time, and Visual Attention time.

2024    Industry Roadside Inspection, Driver Requirements Training Course, (Commercial Vehicle Safety Alliance, CVSA, Washington, D.C.) Compliance regulations for commercial motor vehicle drivers and motor carriers in commerce.

## INSTRUCTOR CERTIFICATION:

1998    Adjunct Police Academy Driver Training Instructor

2010    Police Academy Instructor Training

## INSTRUCTOR EXPERIENCE:

January 1999          Recruit Class Driver Training Instructor

April 1999            Recruit Class Driver Training Instructor

October 1999          Recruit Class Driver Training Instructor

11

JA224

2011    Maryland Crash Reconstruction Committee, Advance Crash Investigation, Time/Distance/Velocity, (Prince George's County, Maryland)

2014    Basic Crash Investigation (Metropolitan Police Academy Recruit Training, Washington, D.C.)

2015    Basic Crash Investigation (Metropolitan Police Academy Recruit Training, Washington, D.C.)

2016    Basic Crash Investigation (Metropolitan Police Academy Recruit Training, Washington, D.C.)


LECTURE EXPERIENCE:

American University (Vehicle Pursuit Fatalities)

United States Attorney's Office, Washington, D.C. (Accident Investigation and Reconstruction)

D.C. Corporation Counsel's Office, Civil Division, District of Columbia

Secret Reader for "Trial Magazine" (Accident Reconstruction)

Metropolitan Police Department, Forensic Sciences Division, Mobile Crime Unit

United States Secret Service, Crime Scene Search Training

Metropolitan Police Department, In-Service Detectives Training, 2007

Metropolitan Police Department, Sergeant Promotion Training, 2008

Metropolitan Police Department, Forensic Services Division, Mobile Crime Unit, 2009

Metropolitan Police Department, Metropolitan Police Academy, Recruit Training, 2010

D.C. Office of the Attorney General, Criminal Division, District of Columbia, 2010

Metropolitan Police Department, Forensic Services Division, Mobile Crime Unit, 2010

Georgetown University, Forensic Science Institute, (Accident Investigation and Reconstruction) 2011

Georgetown University, Forensic Science Institute, (Accident Investigation and Reconstruction) 2012

12

JA225

District of Columbia Department of Forensic Services, Forensic Sciences Laboratory, 2014

District of Columbia Department of Forensic Services, Forensic Sciences Laboratory, 2015

District of Columbia Office of the Attorney General, Criminal Division, 2015

District of Columbia Department of Forensic Services, Forensic Sciences Laboratory, 2016

13

JA226



ARL CRASH INVESTIGATIONS, LLC
P.O. BOX ███
WOODBRIDGE, VIRGINIA 22195-2188
OFFICE: 571-552 ███
FAX: 571-552 ███
EMAIL ███@ARLCRASHINVESTIGATIONS.COM
WEB: WWW.ARLCRASHINVESTIGATIONS.COM

# MICHAEL MILLER

ACCEPTED EXPERT (TRIALS):

## District of Columbia Superior Court:

Criminal (Prosecution)
D.C. v. Avery Eccles 2001-FEL007797
D.C. v. Timothy Robinson 2002-FEL006691
D.C. v. Antoine Starks 2002-FEL003621
D.C. v. Omie Gladden 2003-FEL007663
D.C. v. Marl Browner 2004-CTF-002105
D.C. v. (Juvenile) J-0142104
D.C. v. Deandre Davis 2006-CF2-026180
D.C. v. Kamal Nasserree 2006-CF2-04212
D.C. v. Demarkus Henry 2008-CF1-014290
D.C. v. Juan Bowie 2009-CTF-006079
D.C. v. Jorida Davidson 2010-CF1-018988 (2011)
D.C. v. Jamil Jackson 2011-CF2-018592
D.C. v. Jorida Davidson 2010-CF1-018988 (2014)
D.C. v. Cynthia Duckett 2011-CF3-000435
D.C. v. Darnell Tate 2012-CMD-00957
D.C. v. Alfred Onyemaechi 2012-CTF-014267
D.C. v. Kevin Burno 2013-CF3-03525 (2015)
D.C. v. Kevin Burno 2013-CF3-03525 (Re-Trial 2015)
D.C. v. Anthony Faltz 2006-CF1-004490 (Appeal 2023)

Criminal (Defense)
D.C. v. Anita Staton (2006CTF026918)

Civil (Defense)
Mary Duggan et al v. D.C. (94-11686)
Tracy v. D.C. (2008 CA 02340)
David Riggs et al v. D.C. (2008 CA 007074)
Melinda Jelbaoui et al v. D.C. (2011 CA 008199)

JA227

Civil (Plaintiff)
T'Anita Coles-Green v District of Columbia et al 2019 CA 002633


# District of Columbia Federal District Court
Civil (Defense)
Greer Hodges v. District of Columbia (CA07-02091)

Criminal (Defense)
United States v. Terence Sutton & Andrew Zabavsky (21-0598)

# Commonwealth of Virginia
Criminal (Defense)
Loudon County Circuit Court
Commonwealth of Virginia v. Cameron Prince CR00035126-00

Prince William County Circuit Court
Commonwealth of Virginia v. Marvin Cabrera Martinez CR22002472-00

# Commonwealth of Pennsylvania
Criminal (Defense)
York County
Commonwealth of Pennsylvania v. Richard Starks CP-67-CR-2961-22

# State of Maryland
Prince Georges County, Maryland, District Court
Civil (Defense)
Demarkus Mease v. Arthur Leech (05020025668-2004)


DEPOSITIONS:

Myron Harley v. Washington Metropolitan Area Transit Authority CA-94-7005
Demetrius Plowden v. Jason Munson 96-CA-00661
Mary Dugan et al v. District of Columbia CA-94-11686
Rochelle Reid v. Candice Tarrington CA-97-8930
Cleveland Aultmon v. District of Columbia et al 00-CA-00524
James Thomas Morris v. Colonial Insurance Co. of Wisconsin 00-CA-008269
Schnell Francis et al v. Mary Mitchell et al 01-CA-9367
Theresa McDonald et al v. District of Columbia 03-CA-009005
Anne Thomas Paxson v. Bobby Shonnan & Fort Myer Construction 04-CV-0004
Parris v. D.C. et al 05-CA-009012
Robert Fenichel v. Washington Metropolitan Area Transit Authority 07-CV-00768JR
David Riggs et al v. District of Columbia 2008-CA-007074
Julie Casselberry v. Washington Metropolitan Area Transit Authority 2009-CA-00515

JA228

3

Andrea Williams v. District of Columbia et al 2009-CA-000763
Kathi Ngyen Estate of Joshua Stoll et al v. Goldlines, Inc. et al 2009-CV-1220
Amanda Mahnke v. Washington Metropolitan Area Transit Authority 2010-CV-00021
Rebecca Scott et al v. John Soon Lee 2010-CV-00155
Jeeneht Bey v. District of Columbia 2010-CA-001461
Joyce Peterbark et al v. Russell Edwards et al 2010-CAL-21401
Melinda Jelbaoui v. District of Columbia 2011-CA-008199
Jamie Stewart v. Jon Stickman 2012-CV-01275
Fanta Davies v. Robert Twyman et al 2012-CA-001880
Jacqueline Wilson Estate of Ciera Wilson v. Corrine Johnson 2014-CA-004766
James Gary Jr. et al v. Fort Myer Construction Corporation 2015-CA-007170
Gerald Gangaram et al v. District of Columbia 2017 CA 004517
Richard Dudley v. Washington Metropolitan Area Transit Authority 2018 CA 005671
T'Anita Coles-Green v District of Columbia et al 2019 CA 002633
Francisco Flores Santamaria v. Crane Service Company et. al. (2022-CA-004587-V)
Cortney Bascombe v. Uber Technologies, Inc., et al 2022 CA 000236 V
Denise Price et. al. v. District of Columbia et. al. 2020 CA-00614
Teara Jenkins v. District of Columbia et al. 2020 CA 003763



**ARL CRASH INVESTIGATIONS, LLC**
P.O. BOX ███
WOODBRIDGE, VIRGINIA 22195-2188
OFFICE: 571-552 ███
FAX: 571-552 ███
EMAIL: ███@ARLCRASHINVESTIGATIONS.COM
WEB: WWW.ARLCRASHINVESTIGATIONS.COM

# MICHAEL MILLER

ACCEPTED EXPERT (TRIALS):

## District of Columbia Superior Court:

Criminal (Prosecution)
D.C. v. Avery Eccles 2001-FEL007797
D.C. v. Timothy Robinson 2002-FEL006691
D.C. v. Antoine Starks 2002-FEL003621
D.C. v. Omie Gladden 2003-FEL007663
D.C. v. Marl Browner 2004-CTF-002105
D.C. v. (Juvenile) J-0142104
D.C. v. Deandre Davis 2006-CF2-026180
D.C. v. Kamal Nasserree 2006-CF2-04212
D.C. v. Demarkus Henry 2008-CF1-014290
D.C. v. Juan Bowie 2009-CTF-006079
D.C. v. Jorida Davidson 2010-CF1-018988 (2011)
D.C. v. Jamil Jackson 2011-CF2-018592
D.C. v. Jorida Davidson 2010-CF1-018988 (2014)
D.C. v. Cynthia Duckett 2011-CF3-000435
D.C. v. Darnell Tate 2012-CMD-00957
D.C. v. Alfred Onyemaechi 2012-CTF-014267
D.C. v. Kevin Burno 2013-CF3-03525 (2015)
D.C. v. Kevin Burno 2013-CF3-03525 (Re-Trial 2015)
D.C. v. Anthony Faltz 2006-CF1-004490 (Appeal 2023)

Criminal (Defense)
D.C. v. Anita Staton (2006CTF026918)

Civil (Defense)
Mary Duggan et al v. D.C. (94-11686)
Tracy v. D.C. (2008 CA 02340)
David Riggs et al v. D.C. (2008 CA 007074)
Melinda Jelbaoui et al v. D.C. (2011 CA 008199)

JA230

2

Civil (Plaintiff)
T'Anita Coles-Green v District of Columbia et al 2019 CA 002633


# District of Columbia Federal District Court
Civil (Defense)
Greer Hodges v. District of Columbia (CA07-02091)

Criminal (Defense)
United States v. Terence Sutton & Andrew Zabavsky (21-0598)

# Commonwealth of Virginia
Criminal (Defense)
Loudon County Circuit Court
Commonwealth of Virginia v. Cameron Prince CR00035126-00

Prince William County Circuit Court
Commonwealth of Virginia v. Marvin Cabrera Martinez CR22002472-00

# Commonwealth of Pennsylvania
Criminal (Defense)
York County
Commonwealth of Pennsylvania v. Richard Starks CP-67-CR-2961-22

# State of Maryland
Prince Georges County, Maryland, District Court
Civil (Defense)
Demarkus Mease v. Arthur Leech (05020025668-2004)


DEPOSITIONS:

Myron Harley v. Washington Metropolitan Area Transit Authority CA-94-7005
Demetrius Plowden v. Jason Munson 96-CA-00661
Mary Dugan et al v. District of Columbia CA-94-11686
Rochelle Reid v. Candice Tarrington CA-97-8930
Cleveland Aultmon v. District of Columbia et al 00-CA-00524
James Thomas Morris v. Colonial Insurance Co. of Wisconsin 00-CA-008269
Schnell Francis et al v. Mary Mitchell et al 01-CA-9367
Theresa McDonald et al v. District of Columbia 03-CA-009005
Anne Thomas Paxson v. Bobby Shonnan & Fort Myer Construction 04-CV-0004
Parris v. D.C. et al 05-CA-009012
Robert Fenichel v. Washington Metropolitan Area Transit Authority 07-CV-00768JR
David Riggs et al v. District of Columbia 2008-CA-007074
Julie Casselberry v. Washington Metropolitan Area Transit Authority 2009-CA-00515

JA231

3

Andrea Williams v. District of Columbia et al 2009-CA-000763
Kathi Ngyen Estate of Joshua Stoll et al v. Goldlines, Inc. et al 2009-CV-1220
Amanda Mahnke v. Washington Metropolitan Area Transit Authority 2010-CV-00021
Rebecca Scott et al v. John Soon Lee 2010-CV-00155
Jeeneht Bey v. District of Columbia 2010-CA-001461
Joyce Peterbark et al v. Russell Edwards et al 2010-CAL-21401
Melinda Jelbaoui v. District of Columbia 2011-CA-008199
Jamie Stewart v. Jon Stickman 2012-CV-01275
Fanta Davies v. Robert Twyman et al 2012-CA-001880
Jacqueline Wilson Estate of Ciera Wilson v. Corrine Johnson 2014-CA-004766
James Gary Jr. et al v. Fort Myer Construction Corporation 2015-CA-007170
Gerald Gangaram et al v. District of Columbia 2017 CA 004517
Richard Dudley v. Washington Metropolitan Area Transit Authority 2018 CA 005671
T'Anita Coles-Green v District of Columbia et al 2019 CA 002633
Francisco Flores Santamaria v. Crane Service Company et. al. (2022-CA-004587-V)
Cortney Bascombe v. Uber Technologies, Inc., et al 2022 CA 000236 V
Denise Price et. al. v. District of Columbia et. al. 2020 CA-00614
Teara Jenkins v. District of Columbia et al. 2020 CA 003763

JA232



## ARL CRASH INVESTIGATIONS, LLC

P.O. BOX █████  WOODBRIDGE, VIRGINIA 22195-2188     OFFICE: 571-552-█████     FAX: 571-552-█████
EMAIL: █████@ARLCRASHINVESTIGATIONS.COM
WEB: WWW.ARLCRASHINVESTIGATIONS.COM

# RATE SCHEDULE
Rates are subject to change

| | |
|---|---|
| Consultation/Review/Analysis of Materials | $195/Hour |
| Services (Related to): Research/Investigation/Reconstruction/Consulting/ Scene Analysis/Testing /Speed Analysis/Failure Analysis Travel Time/Etc. | $195/Hour |
| Forensic Animation Series | Priced per case depending on camera views |
| Vehicle Autopsy/Vehicle Forensics and Component Analysis | $195/Hour |
| Commercial Motor Vehicle ECM Crash Data Download* | $495/Vehicle |
| Passenger Vehicle CDR (SDM/RCM) Crash Data Download* | $150/Vehicle |
| Passenger Vehicle ECM/ECU Crash Data Download* | $150/Vehicle |
| Specialized Equipment Usage Fee* (In addition to other applicable fees) | $150/Hour |
| Administrative/Assistance Time (Qualified Personnel) | $95/Hour |
| Court/Hearing Prep Time | $195/Hour |
| Court/Hearing Appearances | $250/Hour (4 Hour Minimum) |
| Depositions   (Full Payment Required in Advance) (Deposition will be reconvened in the event time exceeds five hours. The time period listed does not include travel time, review of transcripts, or prep time. All of which are billed in addition accordingly) | $1200 (4 Hour max) ($250/Hour thereafter) |
| Vehicle Travel Expense | $.75/Mile |
| Expenses (Related Flight/Rental Car/Meals/Tolls/Fuel/Etc.) | Actual |

**Note: Cases require a nonrefundable retainer of $3000.00, with monthly billing thereafter.  Overdue accounts are subject to finance charges of 1.5% per month, and revert to retainer requirement.  A signed contract is required.**

JA233

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BRIAN M. O'CONNOR | ) | |
| Administrator for the Estate of | ) | |
| Hyo Jung Kim, deceased | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. 1:23-cv-01756-CMH-WEF |
| | ) | |
| FAIRFAX TAXI, INC., *et al* | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| SUNG-CHUL JUNG | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-01758-CMH-WEF |
| | ) | |
| FAIRFAX TAXI, INC., *et. al.* | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIRMATION**

In RE:  O'Connor, Administrator for Estate of Kim v. Fairfax Taxi, Inc. et. al, Case No.
1:23-cv-01756-CMH-WEF;

Jung v. Fairfax Taxi, Inc. et.al, Case No. 1:23-cv-01758-CMH-WEF

Collision on George Washington Parkway on April 29, 2019

Dear Mr. Garver:

JA234

I am a physician licensed to practice medicine in the Commonwealth of Virginia and South Carolina, and am board certified in Family Medicine. Dr. Epperson has experience in emergent care, urgent care, trauma, and as a post-mortem medical examiner.

I have reviewed all of the medical records in this case and All of my testimony He will testify consistent with his testimony in any deposition he may give in this matter and the medical records and test results in this case regarding Ms. Kim and Dr. Jung, and the depositions in this case. All of my opinions are based on my education, training, skill, knowledge, and experience, as well as his knowledge of the professional literature on the issues of importance in the instant matter as well as my review of depositions, all test results regarding Ms. Kim and Dr. Jung and medical records herein and other documents and testimony. I will be able to explain the nature of the medicine as it relates generally and to the issues raised in this cause and in the treatment and evaluation of Ms. Kim and Dr. Jung.

### Ms. Kim

Based on my education, training, skill, knowledge, and experience, as well as his knowledge of the professional literature relevant to this matter and my review of medical records and the treatment by medical providers of Ms. Kim at Washington MedStar Hospital, , it is more probable than not that the Plaintiff's decedent's injuries and her death were proximately caused by the collision which is the subject of this action. Specifically, Ms. Kim was transported by emergency personnel to at MedStar Washington Hospital Center on April 29, 2019. Based on my education, training, skill, knowledge, and experience, and my review of the medical records that Ms. Kim arrested in route to the hospital, and CPR was begun with a return of spontaneous circulation. She was resuscitated in the trauma bay and brought emergently to the operating room for exploratory laparotomy/splenectomy with the trauma surgery team. Upon arrival at Washington MedStar Hospital, her injuries included, but were not limited to splenic lacerations, left midshaft femur fracture, left lateral femoral condyle fracture, left tibial plateau fracture, right distal femur fracture, right tibial shaft fracture multiple facial fractures. Further, a CT exam showed a left intraparenchymal hemorrhage and epidural hematoma. Upon arrival at Washington MedStar Hospital, Ms. Kim's prognosis was poor. Based on my education, training, skill, knowledge, and experience, and my review of the medical records, Ms. Kim's neurologic injuries were deemed devastating and non-operable by neurosurgery. Based on my education, training, skill, knowledge, and experience, and my review of the medical records of Ms. Kim's condition and the injuries she had, her prognosis meant that she was unable to maintain life without artificial life support. Medical personnel at Washington Hospital Center declared Ms. Kim declared brain dead on April 30, 2019; she was kept on artificial life support awaiting arrival of her family from South Korea. Following discussions with Ms. Kim's family who arrived from South Korea, on May 2, 2019, artificial life support was removed, and medical personnel declared Ms. Kim dead.

JA235

South Korea in the department of Otorhinolaryngology where he was diagnosed with the following injuries:

1. LeFort I fracture, closed

2. LeFort II fracture, closed

3. Fracture of zygomaticomaxillary complex, left, closed

4. Fracture of left orbital wall, lateral and inferior, closed; and

5. Fracture of nasal bone, closed

Based on my education, training, skill, knowledge, and experience, as well as my knowledge of the professional literature on the issues of importance in the instant matter as well as my review of depositions, all test results regarding the Plaintiff and medical records herein and other documents and testimony, that the motor vehicle collision that occurred on April 29, 2019 and is the subject of this litigation was the proximate cause of all of these conditions.

Based on my review of the medical records that on May 5, 2019, the Plaintiff was transferred to the department of Oral and Maxillofacial Surgery at Ewha Womans' University, Mokdong Hospital, South Korea, and then underwent on May 13, 2019, surgery performed by Dr. Jung Hyun Park, DDS, PhD and Dr. So-Jung Kim, MD, PhD. Dr. Park performed the following procedures: 1)Open reduction and internal fixation of LeFort I fracture, LeFort II fracture, and fracture of left zygomaticomaxillary complex; and 2)Inter-maxillary fixation with bone-anchored screws. Dr. Kim performed the following surgeries: 1 )Closed reduction of nasal bone; and 2)Septoplasty. Following discharge from the Ewha Womans' University, Mokdong Hospital, South Korea, Plaintiff had follow-up care and outpatient treatment with the Department of Oral and Maxillofacial Surgery at Ewha Womans' University, Mokdong Hospital, South Korea. Based on my education, training, skill, knowledge, and experience, and my review of the medical records at Ewha Womans' University, Mokdong Hospital, South Korea, including, but not limited to the diagnostic testing, surgeries, inpatient and outpatient care, all of the medical care and treatment at Ewha Womans' University Mokdong Hospital South Korea was necessary and proximately caused by the motor vehicle collision that occurred on April 29, 2019 that is the subject of this litigation, and the medical expenses arising from this testing and treatment were reasonable and necessary

Based on my education, training, skill, knowledge, and experience, as well as my knowledge of the professional literature on the issues of importance in the instant matter as well as my review of depositions, all test results regarding the Plaintiff and medical records herein and other documents and testimony that the Plaintiff continues to suffer from pain and has stiffness in his face. The motor vehicle collision that occurred on April 29, 2019 and the subject of this litigation is the proximate cause of this pain and stiffness and is permanent.

JA236

Based on my education, training, skill, knowledge, and experience, and my review of the medical records that diagnostic testing, surgeries, and treatment received at Washington MedStar Hospital Center was necessary and the medical expenses arising from this testing, surgery and treatment were reasonable. Further, it was reasonable to maintain Ms. Kim on artificial life support and the expenses related to these measures were reasonable.

Based on my education, training, skill, knowledge, and experience, and my review of the medical records, particularly my review of the District of Columbia's Office of the Chief Medical Examiner's report of the examination of Ms. Kim's body, it is more probable than not that the cause of Ms. Kim's death was multiple blunt force injuries. These blunt force injuries and Ms. Kim's death were proximately caused by the collision which is the subject of this action.

**Dr. Jung**

Based on my education, training, skill, knowledge, and experience, as well as his knowledge of the professional literature relevant to this matter and my review of medical records and the treatment by medical providers of Dr. Jung at INOVA Fairfax Hospital and at Ewha Womans' University, Mokdong Hospital, South Korea, it is more probable than not that the Plaintiff's injuries were proximately caused by the collision which is the subject of this action. Specifically, Dr. Jung was transported to the hospital by emergency personnel on April 29, 2019 and was admitted to the emergency room and subsequently the hospital floor at INOVA Fairfax Hospital. Following diagnostic tests, including but not limited to radiology imaging of the neck, chest/angiogram, face/maxillofacial bones, spine, abdomen/pelvis, head, knee, and fibula. The Plaintiff was diagnosed with a LeFort III fracture, LeFort II fracture, Zygomatic fracture, right side, an abrasion, left lower leg. Upon arrival at INOVA Fairfax Hospital, Dr. Jung had a Glasgow coma scale score of 13-15, which means he had a mild head injury. Further Based on my education, training, skill, knowledge, and experience, and my review of the medical records the diagnostic testing and treatment received at INOVA Fairfax Hospital was necessary and the medical expenses arising from this testing and treatment were reasonable and necessary.

Based on my education, training, skill, knowledge, and experience, and my review of the medical records, based on the extent of the fractures to Dr. Jung's face (LeFort III fracture, LeFort ii fracture, Zygomatic fracture), more probably than not surgery was required, but did not require emergent surgery, and Dr. Jung could be discharged for follow-up care with a surgeon. It was reasonable, therefore, for the Plaintiff to return to South Korea for this surgery.

I also reviewed Dr. Jung's medical records from the surgery performed in South Korea. Based on my education, training, skill, knowledge, and experience, and my review of Dr. Jung's medical records, that on May 3, 2019 the Plaintiff was admitted to the Emergency room of Ewha Womans' University, Mokdong Hospital, South Korea. The medical providers at Ewha Womans' University, Mokdong Hospital, South Korea performed clinical and radiographic evaluations. Subsequently, the Plaintiff was hospitalized in at Ewha Womans' University, Mokdong Hospital,

JA237

All of my opinions regarding both Ms. Kim and Dr. Jung is expected to be to a reasonable degree of medical certainty.

I also attach hereto a copy of my fee schedule for testifying in cases of this nature. My fees to prepare this report are $ ___250.⁰⁰___ . I have also attached a list of cases in which I have testified in the past four years. I have considered documents in this case, including but not limited to the medical records from Washington Hospital Center, The Report of the Chief Medical Examiner of the District of Columbia, medical records from INOVA Fairfax Hospital and Ewha Womans' University, Mokdong Hospital, South Korea,. I have also attached my cv which sets forth my qualifications.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE COMMONWEALTH OF VIRGINIA, AND THE UNITED STATES OF AMERICA, THAT THE FOREGOING AFFIRMATION IS TRUE AND CORRECT.

Executed this __15th__ day of September, 2024

_____, MD
Irv Epperson, MD

JA238

# Thomas Irving Epperson Jr. M.D.


Charleston, SC 29492
804-380-████
████@verizon.net

**EXPERIENCE**

**Physician, Health First Cares, North Charleston, SC — January 7, 2015 - March 31, 2021**

**Physician, Nelson Family Practice Clinic, Medical College of Virginia Physicians, Richmond, VA — August 1, 2011 - October 8, 2014**

**Physician, Midlothian Family Practice, Powhatan, VA — September 2005 - July 2011**

**Physician, Patient Care Urgent Care Centers, Richmond, VA — June 2004 - August 2005**

**Physician, Buckingham Family Practice, Dillwyn, VA — July 1981 - June 2004**

**EDUCATION**

University of Virginia, Charlottesville, VA — Bachelor's of Science
1965 - 1969

Southeastern Baptist Theological Seminary, Wake Forest, NC — Ordained Minister,
1969 - 1972

Medical College of Virginia, Richmond, VA — Master of Science in Pathology
1972 - 1975

Medical College of Virginia, Richmond, VA — Doctorate of Medicine Degree
1974 - 1978

Medical College of Virginia, Richmond, VA — Residence in Family Medicine
1978 - 1981

American Academy of Family Practice — Degree of Fellow
October 1986

JA239

American Board of Family Practice Certification — Board Certification 033770
July 10, 1981

American Board of Family Practice Recertification — Board Certification 033770
2009 - 2016 (current), extended until 2020 through Maintenance of Certification
Program

**PROFESSIONAL MEMBERSHIPS**

| | |
|---|---|
| American Academy Family Physicians | 1981 - Present |
| Christian Medical and Dental Society | 1981 - Present |
| Medical Society of Virginia | ended 2014 |
| Staff Privileges Johnston Willis Hospital | 2005 - 2011 |

**PROFESSIONAL ACTIVITIES**

Medical Director: Heritage Hall Nursing Home Dillwyn, VA
1982 - 2004

Medical Examiner, Buckingham, VA  mid 1980's - mid 1990's

Assistant Clinical Professor Family Medicine: University of Virginia, Charlottesville, VA
1995 - 2004

Operational Medical Director Buckingham County Volunteer Rescue Squad Dillwyn, VA
1997 - 2004

Emergency / Rescue Squad Medicine Local and State Levels
1997 - 2004

Assistant Clinical Professor Family Medicine: Medical College of Virginia Richmond, VA
1998 - 2014

Multiple Courses and Recertification: PALS, ACLS, ATLS, PETALS, PALS Instructor

International Lecture at San Salvador Medical School , El Salvador - Topic "Prehospital
and Emergency Care in Rural Virginia" March 14, 2013

**COMMUNITY ACTIVITIES**

Member of Mulberry Grove Baptist Church Buckingham, VA. Previous chairman of the
Deacons, Sunday School Teacher, Choir member, small group teacher and leader.

International Medical Mission Trips: Virginia Baptist Partnership Medical Mission -1998
Panama, Virginia Baptist Disaster Relief (Hurricane Mitch) - 1998 Honduras,
Samaritan's Purse Helicopter Medical Brigade (Hurricane Mitch) - 1999 Honduras,
Mulberry Grove Medical Missions -2001, 2002, 2003 Gualcinse Honduras

JA240

Founded and developed the Central America Medical Mission Fund. Organized, lead and participated in multiple Medical Mission trips to Central America since 1981.

Past involvement with the Buckingham County Volunteer Rescue Squad, provided direction, teaching and support. Also previous participation with the County Board related to the Rescue Squad. Served as Operational Medical Director for a number of years.

Active in Christian Medical and Dental Association, mentoring medical, dental and pharmacy students. Participated in group mission trips to El Salvador 2012, 2013, 2014, 2015, and 2016. Participated in teaching students from El Salvador, Germany and USA on these trips.

**AWARDS**
Volunteer of the Year for Community Service 2014, VCU Health Systems Medical

Center, Richmond, VA

JA241

Table 1

| DATE | CASE CAPTION | LAW FIRM | ATTORNEY |
|---|---|---|---|
| 9/21/2015 | Michael Blevins v. Mecy Health Springfield | Esquire Corp. Solutions | Larencia Bright |
| 10/15/2015 | Denise Hodgson, et al v. Freeman Health System | Hyde, Love & Overby | David Overby |
| 2/9/2016 | Felicia Hasty v. Noel Hunte, et al | Hancock Daniel Johnson & Nagle | Daniel Kincheloe |
| 2/26/2016 | David Stoker v. Boulware, MD | Planet Depos | Meredith Dattoli |
| 3/14/2016 | Tiffany McCann v. Seth Michael Whitaker | Paullin Law Firm | Mark Paullin |
| 6/21/2016 | Linda Person v. Novant Health, Inc. | Parker, Poe, Adams & Bernstein | Richard Rivera |
| 8/25/2017 | Kevin Carter v. Blue Ridge Medical Mgmt. Corp. | Hancock Daniel Johnson & Nagle | Annie Howard |
| 11/15/2017 | Sheila Johnson v. Virginia Campbell | Simpson Logback Lynch Norris | Larry Logback |
| 12/14/2017 | Felicia Hasty v. Noel Hunte, et al | Hancock Daniel Johnson & Nagle | Daniel Kincheloe |
| 3/5/2018 | Lori Hurt v. Carilion Medical Center | Woods Rogers | Elizabeth Perrow |
| 4/23/2018 | Donna Miville, et al. v. Jonathan Eddinger, MD | Sulloway & Hollis | Jay Surdukowski |
| 5/22/2018 | Irene McComb, et al. v. Carolina East Physicians, et al | Harris, Creech, Ward & Blackerby | Charles Simpson, Jr. |
| 10/30/2018 | Steven Cornelison v. Nextcase Missouri LLC | Gibbs Pool & Turner | Scott R. Pool |
| 11/12/2018 | Kathryn Cunningham v. Harron Hyder | Moran, Reeves & Conn, PC | Samuel T. Bernier |
| 11/28/2018 | Lori Graham v. Alegent Creighton Clinic | Sodoro, Daly, Shomaker & Selde | Thomas J. Shomaker |
| 1/14/2019 | Sharneal Griffin v Karen J. Washington, MD., et al | Hancock Daniel Johnson & Nagle | Sean P. Byrne |
| 1/30/2019 | Kathryn Cunningham v. Harron Hyder , MD, et al | Halasz Reporting | Matt Ridge |
| 4/19/2019 | James Ryan v. Primary Care Physicians, LLP, John Titus, MD, et al | Esquire Corp. Solutions | David D. Ernst |
| 1/17/2020 | Anthony Stanley v. Assoc. in Family Practice P.A., Akinlade MD et al | Wharton, Levin, Ehrmantraut & Klein | Karen Evans |
| 2/3/2020 | Ryan Frank Hubbard, Deceased v Carilion Medical Center and Carilion Clinic | Young, Haskins, Mann, Gregory & Wall | James W. Haskins |
| 3/17/2020 | Beverly Moore v Inova Health Care Services, et al | Williams Ford Law Firm | Cory Ford |
| 2/19/2021 | Kathleen Hall v Novant Medical Group, Inc., et al | Charles G. Monnett and Associates | Randall Phillips |
| 5/27/2021 | Ayda Alp v Sherry Cipriano, D.O. et al | William Artz Law Firm, PC | Thomas Wochok |
| 1/22/2022 | William Regan v Nova Health Medical Group, LLC, Thomas Colin MD | Johnson, Vorhees, and Martucci | Patrick Martucci |
| 6/22/2022 | Estate of Lichtenfels v White MD | Jones and Rostant | Donna Rostant |
| 2/27/2024 | Jalaila Hardy, et al v. Jefferson City Medical Group, P.C., et al | Eng and Woods Attorneys at Law | Drew Veatch |
| 8/28/2024 | Sally Jane Barry, Deceased v. Winchester Cardiology and Vascular Medicine, PC, et al | Williams Ford Law Firm | Cory Ford |
|  |  |  |  |
|  |  |  |  |

1

JA242

| DATE | | | |
|---|---|---|---|
| 9/21/2015 | | | |
| 10/15/2015 | | | |
| 2/9/2016 | | | |
| 2/26/2016 | | | |
| 3/14/2016 | | | |
| 6/21/2016 | | | |
| 8/25/2017 | | | |
| 11/15/2017 | | | |
| 12/14/2017 | | | |
| 3/5/2018 | | | |
| 4/23/2018 | | | |
| 5/22/2018 | | | |
| 10/30/2018 | | | |
| 11/12/2018 | | | |
| 11/28/2018 | | | |
| 1/14/2019 | | | |
| 1/30/2019 | | | |
| 4/19/2019 | | | |
| 1/17/2020 | | | |
| 2/3/2020 | | | |
| 3/17/2020 | | | |
| 2/19/2021 | | | |
| 5/27/2021 | | | |
| 1/22/2022 | | | |
| 6/22/2022 | | | |
| 2/27/2024 | Video | | |
| 8/28/2024 | Video | | |
| | | | |
| | | | |

2

JA243

**THOMAS I. EPPERSON JR., M.D.**

███████████

Charleston, S.C. 29492
Phone (804)-380-████
████@verizon.net

## Fee Schedule
## Thomas Irving Epperson Jr., M.D.

January 1, 2015

| | |
|---|---|
| *Review of Records:* | $500.00 per hour |
| *Letter on Review of Records:* | $250.00 |
| *Deposition:* | $2000.00 (up to 4 hours) then $500.00 per hour for time greater than 4 hours including travel time |
| *Testimony at Trial:* | $4000.00 In addition to above fees, all travel and expenses associated with trials shall be reimbursed. |
| *Retainer Fee:* | $1500.00 |

JA244

# EXHIBIT B

JA245

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| **BRIAN M. O'CONNOR** | ) | |
| **Administrator for the Estate of** | ) | |
| **Hyo Jung Kim, deceased** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **Case No. 1:23-cv-01756-CMH-WEF** |
| | ) | |
| **FAIRFAX TAXI, INC.,** *et al* | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **SUNG-CHUL JUNG** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:23-cv-01758-CMH-WEF** |
| | ) | |
| **FAIRFAX TAXI, INC.,** *et. al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST REQUESTS FOR ADMISSIONS TO PLAINTIFF**

Comes Now the Plaintiffs, Brian O'Connor, Administrator of the Estate of Hyo Jung Kim and Sung-Chul Jung, by counsel and file their Objections and Response to the Defendants First Request for Admissions.

1.    Please admit that the Vehicle operated by Eric Jewett crossed over the double yellow line separating the northbound and southbound lanes on The George Washington Memorial Parkway before colliding with the vehicle driven by Mr. Gyimah in the left northbound lane.

**OBJECTION AND RESPONSE:**   In accordance with this Court's Rule 16(b) Scheduling Order which adopted the portions of the proposed scheduling orders (including paragraph 2 of the proposed scheduling orders), adopts and incorporates Dr. Jung's objections and response to the Defendants' 2nd Request for Admission number 1 (objections and responses served on Defendants

1

JA246

on June 7, 2023) in <u>case Jung v. Red Top Cab, LLC et. al</u>, Fairfax Circuit Court Case No. 2020 133314.

2.     Please admit that Sung-Chul Jung told detectives from the United States Park Police that Mr. Gyimah was talking on his cellphone prior to the crash.

**OBJECTION AND RESPONSE:**    In accordance with this Court's Rule 16(b) Scheduling Order which adopted the portions of the proposed scheduling orders (including paragraph 2 of the proposed scheduling orders), adopts and incorporates Dr. Jung's objections and response to the Defendants' 2nd Request for Admission number 2 (objections and responses served on Defendants on June 7, 2023) in <u>case Jung v. Red Top Cab, LLC et. al</u>, Fairfax Circuit Court Case No. 2020 133314.

3.     Please admit that Sung-Chul Jung did not tell detectives from the United States Park Police that Mr. Gyimah was "typing into a device" prior to the crash.

**OBJECTION AND RESPONSE:**    In accordance with this Court's Rule 16(b) Scheduling Order which adopted the portions of the proposed scheduling orders (including paragraph 2 of the proposed scheduling orders), adopts and incorporates Dr. Jung's objections and response to the Defendants' 2nd Request for Admission number 3 (objections and responses served on Defendants on June 7, 2023) in <u>case Jung v. Red Top Cab, LLC et. al</u>, Fairfax Circuit Court Case No. 2020 133314.

4.     Please admit that Sung-Chul Jung told detectives from the United States Park Police that he does not remember anything about the crash and does not remember the collision or what happened following the collision.

**OBJECTION AND RESPONSE:**    In accordance with this Court's Rule 16(b) Scheduling Order which adopted the portions of the proposed scheduling orders (including paragraph 2 of the

JA247

proposed scheduling orders), adopts and incorporates Dr. Jung's objections and response to the Defendants' 2nd Request for Admission number 4 (objections and responses served on Defendants on June 7, 2023) in case Jung v. Red Top Cab, LLC et. al, Fairfax Circuit Court Case No. 2020 13314.

5.    Please admit that the deposition transcript of Sung-Chul Jung attached as **Exhibit A** accurately reflects the testimony of Sung-Chul Jung.

**RESPONSE:** Plaintiffs admit that the attached Exhibit A appears to be a true and accurate transcript of the deposition testimony taken of Dr. Sung-Chul Jung during a deposition, but deny that this deposition is complete as it does not contain the Errata sheet timely filed by Dr. Jung.. Further, Plaintiffs do not admit that this deposition consists of the entirety of the testimony of Dr. Jung as Plaintiffs did not conduct a full direct examination of Dr. Jung during this discovery deposition.

6.    Please admit that the deposition transcript of Sung-Chul Jung attached at **Exhibit A** can be adopted by Sung-Chul Jung for purposes of this lawsuit.

**OBJECTION:** Plaintiffs object to this request to the extent it requires legal conclusions and invades trial tactics.

**RESPONSE:** Plaintiffs admit that in accordance with this Court's Rule 16(b) Scheduling Order which adopted the portions of the proposed scheduling orders (including paragraph 2 of the proposed scheduling orders the attached Exhibit A has been adopted and incorporated into this case to the extent it also includes Dr. Jung's timely filed errata. Further, Plaintiffs do not admit that this deposition consists of the entirety of the testimony of Dr. Jung as Plaintiffs did not conduct a full direct examination of Dr. Jung during this discovery deposition.

JA248

7.      Please admit that the Park Police investigation file attached as **Exhibit B** is a true and accurate copy of a document that was recorded or filed in a public office as authorized by law.

**RESPONSE:** Plaintiffs admit that the document attached as Exhibit B is a true and accurate copy of the document received by Plaintiffs' counsel from the US Park Police in response to a request for the police or incident report from the collision which is the subject matter of this litigation. Plaintiffs, however, has insufficient information to admit or deny whether this document was recorded or filed in a public office as authorized by law.  Further, the Plaintiff cannot admit that this report is complete as portions have been redacted and it is unknown what else may have been omitted.

8.      Please admit that the Park Police investigation file attached as **Exhibit B** is a public record under Federal Rule of Evidence 803.

**OBJECTION:** Plaintiffs object to this request to the extent it requires legal conclusions and invades trial tactics.

**RESPONSE:** Plaintiffs admit that the document attached as Exhibit B is a true and accurate copy of the document received by Plaintiffs' counsel from the US Park Police in response to a request for the police or incident report from the collision which is the subject matter of this litigation. Plaintiffs however have insufficient information to admit or deny whether this document is a public document under Federal Rule of Evidence 803. Plaintiffs, however, has insufficient information to admit or deny whether this document was recorded or filed in a public office as authorized by law.  Further, the Plaintiff cannot admit that this report is complete as portions have been redacted and it is unknown what else may have been omitted.

> Brian M. O'Connor, Administrator
>    of the Estate of Hyo Jung Kim, and
> Sung-Chul Jung,
> By Counsel

4

JA249

_____
Steven M. Garver, Esquire, VSB#1514
Deborah E. Mayer, Esquire, VSB#51072
GarverLaw, P.L.L.C.
11702 Bowman Green Drive, Suite 100
P.O. Box 2430
Reston, Virginia 20190-2430
(703)471-1090
(703)471-1095 (Facsimile)
steve@garverlaw.com
demayer@garverlaw.com
Counsel for Plaintiffs

5

JA250

I declare under penalty of perjury under the laws of the Commonwealth of Virginia and the United States of America that the foregoing Response to Requests for Admissions is true and correct to the best of my knowledge.

Executed this <u>11th</u> day of  December, 2024

_____
Sung-Chul Jung

6

JA251

I declare under penalty of perjury under the laws of the Commonwealth of Virginia and the United States of America that the foregoing Response to Requests for Admissions is true and correct to the best of my knowledge.

Executed this __11ᵗʰ__ day of December, 2024

Brian M. O'Connor, Administrator  USB# 14027
Estate of Hyo Jung Kim

7

JA252

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I, on this 11th  day of December, 2024, did cause a true copy ofthe foregoing *Pleading* to be delivered to:

| | | |
|---|---|---|
| John D. McGavin, Esq. | ____ | By First Class Mail |
| Gifford Hampshire, Esq | _____ | By Federal Express |
| McGavin, Boyce, Bardot, Thorsen & Katz, P.C. | _____ | By Hand Delivery |
| 9990 Fairfax Blvd, Suite 400 | _x__ | By Electronic Means |
| Fairfax, VA 22030 | _____ | By Facsimile |
| 703-385-1000 | | |
| 703-385-1555 (fax) | | |
| jmcgavin@mbbtklaw.com | | |

Counsel for Defendants, Fairfax Taxi, Inc., Evelyn Kenin, Administrator of the Estate of Amoah Gyimah, Deceased

9

JA253

# EXHIBIT F

JA254

VIRGINIA

IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

- - - - - - - - - - - - x

SUNG CHUL JUNG,

Plaintiff,

- vs - CASE NO. CL2020-13314

RED TOP CAB, LLC, et al.,

Defendants.

- - - - - - - - - - - - - x

Warrenton, Virginia

Monday, May 22, 2023

Deposition of

KYLE HUELSMAN

a witness, was called for examination by counsel

on behalf of the Defendants, pursuant to notice,

taken in the offices of CASAMO & ASSOCIATES, 7

Hotel Street, Warrenton, Virginia, beginning at

10:02 o'clock a.m., before MICHELLE L. DONATH, a

Verbatim Reporter and Notary Public in and for

the State of Virginia, at large, when there were

present on behalf of the respective parties:

JA255

statement you made to the police?

A    Yes.

MR. HAMPSHIRE:  Okay.  I move to enter this as Defense 1.

(Huelsman Deposition Exhibit No. 1 was marked for examination.)

BY MR. HAMPSHIRE:

Q    In that statement, Mr. Huelsman, did you tell the police that the blue Volkswagen clipped the Red Top Cab?

A    Yes.

Q    Does your memory confirm that?

A    I can't remember the details.

Q    Okay.  Do you remember what happened after the accident?

A    Me and another guy went over to the blue Volkswagen and pried the door open, and he was unconscious.

Q    Okay.  Did you go and speak to anybody in the other cab?

A    No.

Q    Did you speak to anybody who was not

JA256

# EXHIBIT I

JA257

1

VIRGINIA:

        IN THE FAIRFAX COUNTY CIRCUIT COURT

--------------------------------------:
SUNG CHUL JUNG,                        :
                                       :
              Plaintiff,               :
                                       : Case No.:
          v.                           : CL2020-13314
                                       :
RED TOP CAB, LLC, et al.,              :
                                       :
              Defendants.              :
--------------------------------------:
BRIAN, M. O'CONNOR, Administrator      :
for the Estate of HYO-JUNG KIM,        :
Deceased,                              :
              Plaintiff,               :
                                       : Case No.:
          v.                           : CL2020-13315
                                       :
RED TOP CAB, LLC, et al.,              :
                                       :
              Defendants.              :
--------------------------------------:


                            Fairfax, Virginia

                         Thursday, May 18, 2023


Deposition of:


                RAYMOND BOMBAC,

called for examination by counsel on behalf of

defendants, pursuant to Notice, at McGavin, Boyce,

Bardot, Thorsen & Katz, PC, 9990 Fairfax Boulevard,

JA258

Ray Bombac                                                    5/18/2023

MR. GARVER:  Okay.

MR. HAMPSHIRE:  And you have no objection?

MR. GARVER:  I have no objection.

MR. HAMPSHIRE:  Okay.

(Bombac Exhibit Number 1 was marked for identification.)

BY MR. HAMPSHIRE:

Q    Okay.  You mentioned the Volkswagen was going over the speed limit?

A    (Nods.)

Q    Can you go through how you had the ability to recognize that?

A    I just -- I mean, I'm always cautious on that road, so I know I was going the speed limit and this car passed me.

Q    Okay.

A    Yeah.

Q    So you were going the speed limit and --

A    Yeah.

Q    -- it passed you?

A    Yeah.

JA259

Q   Okay.  Did it pass -- did it pass you in the right lane or in the left lane?

A   In the left lane.

Q   Okay.

A   Yeah.

Q   And what do you recall about the collision?

A   I just heard it, really, and pulled over immediately.  There was a couple of cars that pulled over.  And, you know, there's no shoulder. We just pulled up on the grass and then immediately called 911.  Yeah.

Q   You -- you mentioned there's no shoulder. What -- can you describe sort of what the size of the road looked like?

A   I mean, it's basically -- two lanes heading south, two lanes heading north.  No median. Just a yellow double line.

Q   How -- okay.

A   Yeah.

Q   And can you describe, sorry, the -- the outside of the -- the lanes, so to speak?

JA260

12
Ray Bombac                                          5/18/2023

A    I mean, basically just like a curve and grass, right.  You mean like -- there -- there was no sidewalk or --

Q    Okay.

A    -- a pullover area.  Yeah.

Q    Is it wooded?

A    Yeah.  I mean, most of that -- the parkway is wooded.  Yeah.

Q    Where did you specifically pull off?

A    There was -- I mean, just -- I just pulled off immediately.  It was some -- some -- it was an open grassy area just past Tulane.  Yeah.

Q    Was there a curb to get up onto that grassy area?

A    I believe so, but I'm not 100 percent sure.  Yeah.

Q    How was traffic that day?

A    Basically it was -- I mean, it was after work, so there's a lot of cars.

Q    Was it sunny out?

A    Sunny, nice out, yeah.

Q    Okay.  No -- no rain or anything like

JA261

13
Ray Bombac                                              5/18/2023

that?

    A    No.

    Q    Dry roads?

    A    Dry roads, yeah.

    Q    Okay.  You mentioned you heard the crash. Did you hear anything prior to the crash?

    A    No.

    Q    Did you hear any honking?

    A    I didn't, no.

    Q    Okay.  What -- I guess describe your vantage -- you -- you said you didn't see the crash.  Can you describe sort of your vantage point, based upon where you were sitting and where the crash occurred, why you were unable to see it if you were two to three car lengths back?

    A    Yeah, I mean, one, I wasn't looking for it, right?

    Q    Uh-huh.

    A    And then there were cars in front of me. So I was in the right lane and there were -- I -- I don't remember exactly how many cars, but I remember I couldn't see exactly where the crash

JA262

happened.

Q    Okay.

A    Yeah.

Q    Let me ask it this way:  Other than the cars in front of you --

A    Uh-huh.

Q    -- and you not looking for the crash --

A    Yeah.

Q    -- was there anything that obstructed your view?

MR. GARVER:  Objection as speculative.

MR. HAMPSHIRE:  Okay.  That's fine.

BY MR. HAMPSHIRE:

Q    Going back to when you pulled over to assist.

A    Uh-huh.

Q    Can you describe everything you remember?

A    Yeah.  I called 911 and the operator basically was instructing me what to do.  They said go to each car and then describe what you see, so I went to the Volkswagen first.  And there were already people like around helping.  I believe the

JA263

15

Ray Bombac                                                5/18/2023

car was upside down.  I'm trying to remember.  I think it was upside down.  And I don't remember exactly how the conversation went.  I don't know if there's a recording.  Maybe you guys can get that.  But they were -- they basically said, you know, "Is the person alive?  How bad are they hurt?  Is there somebody helping," right?  And I would -- I would answer the questions.  And then said, "Okay.  Now go to the Red Top Cab."  I went over to the Red Top Cab.  Same thing.  They wanted to know how many people, are they badly injured, and -- and questions like that.  I don't remember exactly, but yeah.

Q    Okay.  Let's start with when you went over to the Volkswagen that you said was flipped over.  What were your responses to those questions?

A    I don't really remember the questions, if I'm being completely honest.

Q    Okay.

A    Yeah.  I mean, I think it was something like, "Are they alive still?"  And the answer was, "Yes" --

Casamo & Associates            703 837 0076            www.casamo.com

JA264

# EXHIBIT J

JA265

Hearing
June 30, 2023                                                                          1

**V I R G I N I A:**

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

| | |
|---|---|
| SUNGH CHUL JUNG, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No.:  CL-2020-13314 |
| ) | CL-2020-13315 |
| AMOAH GYIMAH, ) | |
| ) | |
| Defendant. ) | |

Fairfax, Virginia

Friday, June 30, 2023

The above-entitled action came on to be heard before the HONORABLE MICHAEL F. DEVINE, Judge for the Circuit Court of Fairfax County, 4110 North Courthouse Road, Fairfax, Virginia, at 10:08 a.m., before GREGORY KOENIG, Court Reporter, when were present on behalf of the respective parties:

JA266

for the Boyd-Graves yesterday, and Justice Kelsey was there.  So no comment other than that.

THE COURT:  Yeah.  All right.

MR. MCGAVIN:  So simply stated, Your Honor, Plaintiff's motion for summary judgment should be denied.  It's premature, but more significantly -- I mean, that's where we are on that.

Then there's a motion -- and should I go ahead to the sanctions piece?

THE COURT:  Yeah.

MR. MCGAVIN:  Do you --

THE COURT:  Well, let -- no.  Actually, let's hold that, and let me have Mr. Garver respond, if you're -- if you've finished your presentation.

MR. MCGAVIN:  I'm done, Your Honor, I think.

THE COURT:  All right.

MR. GARVER:  What sanctions piece?

MR. MCGAVIN:  Pardon?

MR. GARVER:  What sanctions piece?

MR. MCGAVIN:  Spoliation.

MR. GARVER:  It's not on here.

MR. MCGAVIN:  Oh, I'm now getting confused.

JA267

I've been doing so many motions, Judge, so --

THE COURT:  Well, you're running out of Fridays.

MR. MCGAVIN:  We got one more, right?

MR. GARVER:  We got two more.

MS. MAYER:  The spoliation's next week and then whatever motion.

MR. MCGAVIN:  Well, I'm ready for a target on two.

Sorry, Your Honor.

THE COURT:  No trouble.

All right, Mr. Garver.

MR. GARVER:  Thank you, Your Honor.

I probably will jump around as well.  And for that, I will apologize.

You know, let me first deal with a couple of things that I would take some issue with what Mr. McGavin represented:  First of all, the mechanism of the accident.  I don't think there's any question from the witnesses that it was a head-on collision in the sense that it was the drivers head-on to each other.

The rest -- the passenger sides didn't hit, but

JA268

the head-on was not clear as who crossed the double yellow line.  Or did they both cross the double yellow line?

That part's not clear; there is no witness who can tell us that that we've been able to find.  But it's clear what happened in the collision, that it was a head-on collision.

As far as the operating agreement in the motion craving oyer, what Mr. McGavin ignores is all the requirements of the Fairfax County ordinance.  And the Fairfax County ordinance sets out what they need to do.

Essentially, they need each other.  If the cab company doesn't have drivers with a hack license, they've got no business.  The driver can get a hacker's license but only with a sponsorship of a company that has a franchise from the county or a certificate of operation, which is what Fairfax Taxi has.

Fairfax Taxi essentially has a mini-monopoly to have the rights to operate as a taxi cab company in the county.  Without that, the -- no driver can drive -- it's against the law -- without permission from them.  In addition to that --

Hearing
June 30, 2023                                                    22

THE COURT:  But does that make it a joint venture?

MR. GARVER:  Well, it -- I think if you hear more about it, and you hear more about the requirements, first of all, and what they do -- so there's a dispatch service -- dispatcher service that operates.  There's a facility for repairing the vehicles and maintaining them.  The ordinance requires that they be maintained in a certain way -- the vehicles be maintained in a certain way.

In this particular instance, the vehicle was purchased from another subsidiary of the -- or another company that's owned by the same group of people who own the taxi cab company.  The county permits a particular -- only a certain number of cabs and a cab number.  And that cab number has to be assigned to a particular driver that the county approves through the hack license.  And we intend to have at trial Mr. Newcomb (phonetic) from Fairfax County, who runs the taxi cab department, who'll explain to the jury what all those requirements are and how they work together.

THE COURT:  Is it ultimately a jury question,

JA270

# EXHIBIT A

# Extracted pages from Dr. Jung's Answers to Interrogatories

JA271

서울시 강서구 화곡로 301
[제41호서식] 원풍빌딩 501호

공증
인가  **법무법인 한 림**

전화 : (대표):(02)2696-2514
(FAX):(02)2696-2507

Registered No.   2021  -  01272

# NOTARIAL CERTIFICATE



## HANLIM LAW AND NOTARY OFFICE

#501 WonPoong B/D, 301 Hwagok-ro, Gangseo-gu, Seoul Korea

JA272

**COMMONWEALTH of VIRGINIA:**
　　　**IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX**

Sung-Chul Jung　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　 )
v.　　　　　　　　　　　　　　　　　　　 )　**Case No. CL-2020-13314**
　　　　　　　　　　　　　　　　　　　　 )
RED TOP CAB, LLC　et al.　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　 )
　　　Defendants.　　　　　　　　　　　　 )

## PLAINTIFF'S ANSWERS TO DEFENDANT FAIRFAX TAXI, INC.'S FIRST INTERROGATORIES TO PLAINTIFF

**COMES NOW** the Plaintiff, Sung-Chul Jung, by counsel, and files his

Objections to Defendant Fairfax Taxi, Inc.'s First Interrogatories to Plaintiff.

### General Objections

Plaintiff objects to the general instructions to the extent that they are

overly broad and unduly burdensome; to the extent that they exceed the

scope of the Rules of the Supreme Court of Virginia (Part IV); to the extent

that the instructions are inconsistent with said rules; and to that extent the

instructions shall be treated as mere surplusage. Any answers provided with

an objection are not to be deemed a waiver of the objection but are provided

to encourage resolution of any potential discovery dispute. Also, to the

extent any questions calls for information which is privileged as attorney-

client privilege or as to attorney work product, the Plaintiff objects, but will

1

JA273



17.    State the name of each expert witness who is expected to testify at trial, and provide a summary of the subject matter of the testimony of that expert, the opinions of the experts , the factual basis of the opinions and all other information identified by Virginia Rule of Court 4:1 regarding experts.

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent this Interrogatory invades attorney work product and invades trial tactic. Without waiving objection, Plaintiff will supplement her answers and identify such experts that will testify within the time frame set forth by statute, Court Rule and/or Scheduling Order when a decision is made about expert witnesses and such answers shall be answered consistent with the Rules of Court.

**ANSWER:**


18.    Please identify by full name and address all pharmacies where you have filled prescriptions for the past five years .

**OBJECTION:**  Objection as overly broad and burdensome.

**ANSWER:**  I had pain medications that I took home from INOVA Fairfax. In Korea, medication is provided by the National Health Insurance Service.


19.    State specifically each act or omission on the part of the defendant which either caused or contributed to cause the occurrence giving rise to this litigation and provide the names and addresses of the witnesses who have knowledge of such facts.

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent it is overly broad and burdensome and to the extent it exceeds the scope of the Rules of the Virginia Supreme Court and the statutes of the Commonwealth.  Too, it is objected to the extent it calls for legal conclusions, requires expertise and/or is work product and calls for disclosure of trial tactics.  Nevertheless, without waiving objection, the Plaintiff provides the following:

**ANSWER:**  At approximately the same time as the collision with the vehicle operated by Eric S. Jewett in the northbound left lane, Defendant's employee

20

JA274

and/or authorized agent, Amoah Gyimah, was driving the Red Top taxicab in which Ms Hyo Jung Kim and I were passengers in the back seat. Defendant's employee and/or authorized agent, Gyimah, had a telephone or telephone like device in his right hand at the time about the same time as the collision and typing into the device. He had another electronic device which appeared to be another larger phone, tablet attached to the dashboard to the right side of the driver's seat and facing the driver, Gyimah, to which he was also paying attention.

At the said time of the collision and immediately prior thereto, Gyimah was typing and looking at his electronic device (s) (phone or pad or other electronic device) and not at the road or the dangers on the roadway had Gyimah been paying attention to the roadway and particularly the vehicle driven by Jewett, he could have and should have avoided the collision by moving into the right lane headed northbound or otherwise.

At said time and place it was the duty of Defendant's employee and or authorized agent, Gyimah, to operate his vehicle with reasonable care and with due regard for others using the road, maintaining his vehicle under proper control, maintaining his vehicle in proper repair, keeping a proper lookout for other vehicles, maintaining a lawful and proper speed for the conditions then and there existing, maintaining a safe distance between his vehicle and others using the road, yielding the right of way where appropriate, slowing down and stopping as required by traffic conditions, taking reasonable action to avoid all dangerous situations and to avoid any collision obeying all traffic signs and traffic control devices (traffic lights), rules and regulations and giving full time and attention to his driving.

At said time and place and notwithstanding the aforesaid duties, Defendant's employee and/or authorized agent, Gyimah, breached his duty of care to Plaintiff in several ways, including, but not limited to: negligently, recklessly and carelessly failing to use ordinary care in the operation of his vehicle in that he exceeded the safe speed limit for the conditions then and there existing; failing to pay full time and attention; looking at and typing on an electronic cell phone or similar device just before the collision and looking at it as opposed to the road and the risks there posed; testing when driving; failing to recognize the risk of collision from a vehicle driven by Eric S. Jewett; failing to maintain his vehicle under proper control, failing to maintain a safe distance between his vehicle and others using the road and/or failing to keep a proper lookout for other vehicles and failure to stop in time to avoid a collision with the vehicle driven by Mr. Jewett and he did

21

JA275

the foregoing or other acts in violation of Federal, Virginia, and/or Local County ordinances, laws, and/or regulations

Defendant is vicariously liable for the acts and omissions of its employee and/or authorized agent, Gyimah, who at the time of the collision was acting within the scope of his employment.

20.    State, in detail, your observation as to how the occurrence giving rise to this litigation occurred; and what, in your opinion , caused the occurrence; and the basis for your opinion .

**OBJECTION:** Plaintiff objects to this Interrogatory to the extent it is overly broad and unduly burdensome, requires legal conclusions, is privileged as attorney-client communication, and/or attorney work-product and invades trial tactic.

**ANSWER**: On April 29, 2019, my colleague, Hyo Jung Kim, and I were in Washington DC for a professional meeting. After having lunch with some other Korean colleagues at a restaurant in Dupont Circle, Ms. Kim and I decided to visit Mt Vernon. We had tickets for Mt Vernon at 3:15 pm. After touring Mt Vernon, we found a taxi in front of gate and asked the cab driver, who I now know was named Amoah Gyimah, to take us to Dupont Circle. We had specifically wanted to ride in a taxicab rather than an Uber because we felt it was safer or more reliable means of transportation. Ms. Kim was sitting in the back seat behind the driver's seat. I was sitting in the back seat on the passenger side. I was wearing my seat belt. Ms. Kim fell asleep on the ride. We were heading north on the GW Parkway for about 10 minutes. I noticed that the cab driver had a tablet of set up to his right which the cab driver kept looking at while he was driving. The cab driver received a phone call, picked up his cell phone with his right hand and spoke to someone for about 30 seconds. About a minute or two later the cab driver began typing into this same handheld device with his right hand. I remember him texting for about 30 seconds and then I do not remember anything. My next memory was that I was at the hospital, which I now realize was INOVA Fairfax Hospital.

21.    State the nature, type, amount and time of consumption of any and all alcoholic beverages, medicines, tranquilizers, pills or any other drug, chemical or substance you drank, smoked or ingested during the twenty-four (24) hour period immediately preceding the occurrence giving rise to this litigation; and describe where any of the above were used or consumed , and the names and addresses of all those present.

22

JA276

fishing expedition and is not calculated to result in obtaining admissible evidence. Plaintiff also objects to the extent this Interrogatory is overly broad and unduly burdensome and may require legal or medical expert opinion.

**ANSWER:** I am not a U.S. citizen, and, therefore, am not a recipient of any of these benefits.

25.    What have you done to preserve email, Facebook postings, social media postings, photos, digital information, physical evidence since the occurrence which gives rise to this litigation.

**OBJECTION:** To the extent this Interrogatory seeks to invade attorney work-product and/or attorney-client privilege, Plaintiff objects. Notwithstanding this objection, the following is provided:

**ANSWER:** I have not removed any such posts relevant to this litigation.

Sung-Chul Jung
By Counsel

GARVER LAW OFFICES, P.C.

Steven M. Garver, Esquire, VSB#15145
Deborah E. Mayer, Esquire, VSB#51072
GARVER LAW OFFICES, P.C.
11702 Bowman Green Drive, Suite 100
P.O. Box 2430
Reston, Virginia 20190-2430
(703)471-1090
(703)471-1095 (Facsimile)
garver@garverlaw.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

24

JA277

**I HEREBY CERTIFY** that I, on this ⟨3⟩th day of ~~April~~ July 2021, did cause a true copy of the foregoing *Pleading* to be delivered to:

John D. McGavin, Esq.        __X__   By First Class Mail
BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C.    _____   By Federal Express
9990 Fairfax Blvd, Suite 400      _____   By Hand Delivery
Fairfax, VA 22030      __X_   By Electronic Means
703-385-1000
703-385-1555 (fax)
jmcgavin@bmhjlaw.com

Counsel for Defendants Red Top Cab, LLC, Fairfax Taxi, Inc., Evelyn Kenin, Administrator of the Estate of Amoah Gyimah, Deceased

Ralph E. Kipp, Esq.      __X__   By First Class Mail
The Law Offices of Ralph E. Kipp, P.L.C.    _____   By Federal Express
10615 Judicial Dr., Suite 501      _____   By Hand Delivery
Fairfax, VA 22030      __X_   By Electronic Means
703-352-8080
703-352-5225 (fax)
rkipp@kipp-law.com

Counsel for Defendants Transportation General, Inc., Old Dominion Transportation Group, Inc., and Transportation, Inc. (d/b/a Red Top Cab)



25

JA278

August W. Steinhilber, III, Esq.            __X__    By First Class Mail
3554 Chain Bridge Rd., Suite 100            _____    By Federal Express
Fairfax, VA 22030                           _____    By Hand Delivery
703-273-6400                                __X__    By Electronic Means
703-273-3514 (fax)

Counsel for Defendants Amoah Gyimah and Estate of Amoah Gyimah



26

JA279

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE

COMMONWEALTH OF VIRGINIA AND THE UNITED STATES OF AMERICA

THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY

KNOWLEDGE.

Executed this ___26th___ Day of __July__ 2021.

_____

Suog-Chul Jung

서울시 강서구 화곡로 301
[제42호서식] 원풍빌딩 501호

공증
인가 **법무법인 한 림**

전화 : (대표):(02)2696-2514
(FAX):(02)2696-2507

등부 2021년    제  01272 호

인     증

위 피고 FAIRRAX TAXI,INC 의
첫번째 질의에 대한 원고의 답변
에 기재된
정 성 철

은
본 공증인의 면전에서 위 사서증서에
자기가      서명한 것임을 자인하였다.

2021 년 7 월 26 일   이 사무소에서
위 인증한다

공증인가 법무법인 한림
소속 서울남부지방검찰청
서울시 강서구 화곡로 301 원풍빌딩 501호

공증인 공증담당변호사

Registered No. 2021 - 01272

# Notarial Certificate

Sung-Chul Jung

personally appeared before me and
admitted his(her) subscription to the
attached PLAINTIFF'S ANSWERS TO
DEFENDANT FAIRFAX TAXI, INC.'S
INTERROGATORIES TO PLAINTIFF

This is hereby attested on this 26 th
day of    Jul. , 2021   at this office.

**HANLIM LAW AND NOTARY OFFICE**

**BELONG TO SEOUL SOUTHERN
DISTRICT PROSECUTOR'S OFFICE**

#501 WonPoong B/D, 301 Hwagok-ro,
Gangseo-gu, Seoul Korea

HOON , OH

Attorney at law acting as Notary Public

This office has been authorized by the
Minister of Justice, the Republic of
Korea, to act as Notary Public since
February7, 2020 under Law No.

JA281

# EXHIBIT B

# Extracted pages US Park Police Crash Report

JA282



# United States Department of the Interior

NATIONAL PARK SERVICE
UNITED STATES PARK POLICE
Headquarters
1100 Ohio Drive, SW
Washington, DC 20024



RECEIVED

AUG 28 2019

BY:_____

AUG 23 2019

Mr. Steven M. Garver, Esq.
Garver Law Offices, P.C.
11702 Bowman Green Drive, Suite 100
Reston, VA 20190

Dear Mr. Garver:

The United States Park Police FOIA office received your Freedom of Information Act (FOIA) request dated June 12, 2019, that was received on July 11, 2019, and assigned it control number **NPS-2019-01263**. Please cite this number in any future communications with our office regarding your request.

In your request, you state that your law firm has been retained by Professor Sung Chul Jung, a Korean national who was a passenger in a taxi involved crash on the George Washington Parkway on April 29, 2019. Specifically, your request was for "a copy of the police report and/or incident report, and any report of the investigating Detective. You also provided us with a signed release authorization."

We are writing to respond to your request. We have located the investigator's traffic crash report that consists of 289 pages. We have enclosed 162 pages of the report which is responsive to your request with certain redactions. The redacted information from the report and the remaining 127 pages are being withheld pursuant to 5 U.S.C.§ 552(b)(6) and (7)(C). Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. The phrase "similar files" covers any agency records containing information about a particular individual that can be identified as applying to that individual. To determine whether releasing records containing information about a particular individual would constitute a clearly unwarranted invasion of personal privacy, we are required to balance the privacy interest that would be affected by disclosure against any public interest in the information. Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes" if the records fall within one or more of six specific bases for withholding set forth in subparts (A) through (F). 5 U.S.C.§ 552(b)(7) (A)-(F).

Under the FOIA, the only relevant public interest to consider under the exemption is the extent to which the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens 'know what their government is up to. The burden is on the requester to establish that disclosure would serve the public interest. When the privacy interest at stake and the public interest in disclosure have been determined, the two competing interests must be weighed against one another to determine which is the greater result of disclosure: the harm to personal privacy or the benefit to the public. The purposes for which the request for information is made do not impact this balancing test, as a release of information requested under the FOIA constitutes a release to the general public.

The information that has been withheld under Exemptions (b)(6) and 7(C) consists of personal information, including names, dates of births, driver's license numbers, telephone numbers, social security numbers, home addresses, email addresses, passport information, Eric Stuarts hospital records, and autopsy information for HyoJung Kim and Amoah Gyimah, and we have determined that the

1

JA283



(b) (6), (b) (7)(C)

JA284



(b) (6), (b) (7)(C)

9

JA285



JA286

| | |
|---|---|
| **1. CASE NUMBER** 19-03225 | |

**2. NATURE OF INVESTIGATION** MV CRASH -F

**3. DATE OF INCIDENT** 4/29

**4. STATEMENT OF:** (Last, First, Middle) Oscroft Roger Dan

**5. DOB** (b) (6), (b) (7)(C)

**6. SEX** M

**7. HOME ADDRESS** (b) (6), (b) (7)(C)

**8. HOME PHONE** (b) (6), (b) (7)(C)

**9. EMPLOYMENT** (Occupation and Location)

**10. BUSINESS PHONE**

**11. LOCATION STATEMENT TAKEN** Outside

**12. NAME OF OFFICER TAKING STATEMENT** (if other than block 18 include signature) Moriro #73

**13. DATE/TIME STARTED** 1640 4/29/19

**14. STATEMENT**

Traveling Southbound on GW Parkway. Saw Blue Beetle & RT Cab hit each other head on. I could not tell the speed. I was in Right lane. I live here and travel this road everyday so I only drive in right Lane. It appeared that Both cars were very close to Center. I could Not say who crossed the line.

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION
(b) (6), (b) (7)(C)
SIGNATURE OF PERSON GIVING STATEMENT

**16. DATE/TIME ENDED** 1647 4/29/19

**17. PAGE** 1 **OF** 1 **PAGES**

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:** #375 (Name and Signature)

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:** 375 (Name and Signature)

USDI,NPS,USPP FORM 44-02, REV. 10/82

JA287

# UNITED STATES PARK POLICE
## COMPLAINANT/WITNESS STATEMENT

| | |
|---|---|
| **1. CASE NUMBER** | 19-32225 |

**2. NATURE OF INVESTIGATION**
MVC-F

**3. DATE OF INCIDENT**
4/29/19

**4. STATEMENT OF: (Last, First, Middle)**
Hulsman Kyle Theodore

**5. DOB** (b) (6), (b) (7)(C)

**6. SEX** m

**7. HOME ADDRESS** (b) (6), (b) (7)(C) ▮▮▮▮ (b) (6), (b) (7)(C)

**8. HOME PHONE** (b) (6), (b) (7)(C)

**9. EMPLOYMENT (Occupation and Location)** (b) (6), (b) (7)

**10. BUSINESS PHONE**

**11. LOCATION STATEMENT TAKEN**
SCENE

**12. NAME OF OFFICER TAKING STATEMENT (if other than block 18 include signature)** #375

**13. DATE/TIME STARTED**
17:00 4/29/19

**14. STATEMENT**

I was driving southbound in right lane. Saw blue volkswagon swerve into oncoming traffic from the left lane on southbound. Volkswagon struck the taxi cab that was traveling northbound in left lane.

Volkswagon was in left lane going southbound.

I was traveling aproximatly 45 mph. The other traffic was traveling around same speed.

I was about ~~R~~ 10 car lengths behind the volkswagon.

Driving / white - Red.
(b) (6), (b) (7)(C)

▮▮▮▮▮▮▮▮ (b) (6), (b) (7)(C)

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION
(b) (6), (b) (7)(C)

SIGNATURE OF PERSON GIVING STATEMENT

**16. DATE/TIME ENDED**
17:06 4/29/19

**17. PAGE** 1 **OF** 1 **PAGES**

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:**
Morin 35
*(Name and Signature)*

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**
375
*(Name and Signature)*

USDI, NPS, USPP FORM 44-02, REV. 10/82

JA288

# UNITED STATES PARK POLICE
## COMPLAINANT/WITNESS STATEMENT

| | |
|---|---|
| **1. CASE NUMBER** | 19-032225 |

**2. NATURE OF INVESTIGATION** 10-50 MV-CRASH F

**3. DATE OF INCIDENT** 04/20/19

**4. STATEMENT OF:** (Last, First, Middle) June Elizabeth Anne

**5. DOB** (b) (6), (b) (7)(C)

**6. SEX** F

**7. HOME ADDRESS** (b) (6), (b) (7)(C)

**8. HOME PHONE** (b) (6), (b) (7)(C)

**9. EMPLOYMENT** (Occupation and Location)

**10. BUSINESS PHONE**

**11. LOCATION STATEMENT TAKEN** ON SCENE

**12. NAME OF OFFICER TAKING STATEMENT** (if other than block 18 include signature)

**13. DATE/TIME STARTED** 1635 4/20/19

**14. STATEMENT**

I was traveling southbound. Saw the light blue bug cross over the double intersection striking the taxi going northbound. Both cars spun.

Cab-northbound left lane
Blue Bug - Left lane Southbound

(b) (6), (b) (7)(C)

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION.
(b) (6), (b) (7)(C)

SIGNATURE (b) PERSON GIVING STATEMENT

**16. DATE/TIME ENDED** 1640 4/20/19

**17. PAGE** 1 **OF** 1 **PAGES**

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:** (6), (b) #375 (b)
(Name and Signature)

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:** #375
(Name and Signature)

USDI, NPS, USPP FORM 44-02, REV. 10/82

JA289

# UNITED STATES PARK POLICE
## COMPLAINANT/WITNESS STATEMENT

**1. CASE NUMBER**

**2. NATURE OF INVESTIGATION** Car Crash on GW Parkway

**3. DATE OF INCIDENT** 4-29-19

**4. STATEMENT OF: (Last, First, Middle)** Bumbac, Ray M

**5. DOB**

**6. SEX**

**7. HOME ADDRESS** (b) (6), (b) (7)(C)    (b) (6), (b) (7)(C)

**8. HOME PHONE** (b) (6), (b) (7)(C)    (b) (6), (b) (7)(C)

**9. EMPLOYMENT (Occupation and Location)** (b) (6), (b) (7)(C)

**10. BUSINESS PHONE** Same

**11. LOCATION STATEMENT TAKEN** GW-Parkway

**12. NAME OF OFFICER TAKING STATEMENT (if other than block 18 include signature)**

**13. DATE/TIME STARTED** 4-29-19

**14. STATEMENT**

I was two cars behind accident. Blue VW heading south clipped Red Top cab heading north. I called 911 and tried to assist.

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE H (b) (6), (b) (7)(C) (b) EAD TO ME I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE OLLECTION

(b) (6), (b) OF PERSON GIVING STATEMENT

**16. DATE/TIME ENDED** 4-29-19

**17. PAGE ___ OF ___ PAGES**

**18. OFFICER OBTAINING THE SIGN (b)(7)(C) OCK 15:**

(Name and Signature)

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**

(Name and Signature)

USDI, NPS, USPP FORM 44-02, REV. 10/82

JA290

# UNITED STATES PARK POLICE
## COMPLAINANT/WITNESS STATEMENT

**1. CASE NUMBER** 19-032225

**2. NATURE OF INVESTIGATION**
Accident on GW south I Tulane Drive

**3. DATE OF INCIDENT** 4/29/19

**4. STATEMENT OF:** (Last, First, Middle)
McDonald, John C

**5. DOB** (b) (6), (b) (7)(C)

**6. SEX** M

**7. HOME ADDRESS** (b) (6), (b) (7)(C)

**8. HOME PHONE** (b) (6), (b) (7)(C)

**9. EMPLOYMENT** (Occupation and Location) (b) (6), (b) (7)(C)

**10. BUSINESS PHONE** (b) (6), (b) (7)(C)

**11. LOCATION STATEMENT TAKEN** On Scene

**12. NAME OF OFFICER TAKING STATEMENT** (if other than block 18 include signature) Marino

**13. DATE/TIME STARTED** 4/29/19 1655

**14. STATEMENT**

While traveling S/B I witnessed a collision between a blue convertible VW beetle (S/B) and another vehicle. After the collision the VW veered to the west side of the roadway and the black car, now identified as a Red Top cab, peviower to the east side and come to vear facing southbound. (I called 911 which went to PG county and they directed/routed the call to USPB) I immediatly ran to the cab and saw the driver pinned with severe (what appeared to be) chest and face trauma. He was bleeding presiously from the nose, mouth to the degure that I thought the srachelt had severed his carotid artery. He was also bleeding from the ears. I am unsure if I could detect if he was breath but was able to find a faint pulse. He gave what I believe to be an agonal gasp and I was unable to locate a pulse in his neck of wrist.

The rear passenger side passenger was in convulsions and breathg and began to stabilize.

There was a rear driver side passenger immediatly not visible. I was able to detect a pulse and breathg. I did not try to move her/him as the body was extremely bent/folded over.

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION
(b) (6), (b) (7)(C)
SIGNATURE OF PERSON GIVING STATEMENT

**16. DATE/TIME ENDED** 4/29/19 1705

**17.** PAGE 1 OF 1 PAGES

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:** #32
(Name and Signature)

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:** 33
(Name and Signature)

USDI,NPS,USPP FORM 44-02, REV. 10/82

JA291

**DEPARTMENT OF**
**THE INTERIOR Mail**

freeman, robert <robert_freeman@nps.gov>

## Fwd: 4/29 fatal accident GW Parkway

1 message

---

**Hilsher, Frank** <frank_hilsher@nps.gov>          Wed, May 1, 2019 at 10:24 AM
To: NPS USPP Tip-Line <uspp_tipline@nps.gov>, "External-robert_freeman@nps.gov" <robert_freeman@nps.gov>

Hey Bob,

This just came in this morning.

Frank

---------- Forwarded message ----------
From: (b) (6), (b) (7)(C)   via NPS USPP Tip-Line <uspp_tipline@nps.gov>
Date: Wed, May 1, 2019 at 10:10 AM
Subject: 4/29 fatal accident GW Parkway
To: <USPP_tipline@nps.gov>


I was three cars back headed southbound and assisted the driver of the Volkswagen who was severely injured. Just prior to the accident I was passed by a reckless driver in what I believe may have been a flat black four-door Honda Accord older model that was weaving in and out of heavy traffic also going southbound. I was directly behind a white work van that also stopped at the accident scene. I did not see the actual accident other than the flying debris. I wonder if the rear of the Volkswagen or right rear corner of the Volkswagen was clipped by this dark colored Car That almost hit me weaving in and out of traffic moments prior to the accident. Might inspect rear of Volkswagen.

I was in the Blue 2007 Lexus rx350 SUV
Thanks
(b) (6), (b) (7)(C)
Cell (b) (6), (b) (7)


Sent from my iPhone


--
Lieutenant Frank Hilsher
Assistant Commander, Criminal Investigations
United States Park Police
c: (b) (6), (b) (7)
o: (202) 610-8766

5/10/2019    IMG_9624.jpg



(b) (6), (b) (7)(C)

JA293

5/13/2019    IMG_9621.JPG



18



JA295

**1. CASE NUMBER**

**2. NATURE OF INVESTIGATION**
Fernandez Cristina

**3. DATE OF INCIDENT** 4/29/19

**4. STATEMENT OF:** (Last, First, Middle)

**5. DOB** (b) (6), (b) (7)(C)   **S. SEX** F

**7. HOME ADDRESS** (b) (6), (b) (7)(C)
(b) (6), (b) (7)(C)

**8. HOME PHONE** (b) (6), (b) (7)(C)

**9. EMPLOYMENT** (occupation and Location)

**10. BUSINESS PHONE**

**11. LOCATION STATEMENT TAKEN** GW Pkwy

**12. NAME OF OFFICER TAKING STATEMENT** (If other than block 18 include signature) Gillspie

**13. DATE/TIME STARTED** 4/29/19

**14. STATEMENT**

Red car heading towards Old town
Blue car heading towards MT. Vernon

We were driving south bond looked up and
Saw the blue car "explode" and start spinning out to the
right, and red car spin out to the left. Immedetly
pulled over, called 911 and tried to check on evrybody
until Medical arried. Army guys tried to help and figure
out who is breathing.

Thank you

(b) (6), (b) (7)(C)

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS T (b) (6), (b) (7)(C) EDGE AND RECOLLECTION.

SIGNATURE OF PERSON GIVING STATEMENT

**16. DATE/TIME ENDED**

**17.** PAGE 1 OFF PAGES

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:**
(Name and Signature) 4/0 4/29/19

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**
(Name and Signature)

USDI,NPS,USPP FORM 44-02,REV. 10/82

JA296

# UNITED STATES PARK POLICE
## COMPLAINANT/WITNESS STATEMENT

**1. CASE NUMBER** 19-032225

**2. NATURE OF INVESTIGATION** ACCIDENT ON GW PARKWAY

**3. DATE OF INCIDENT** 29 APR 19

**4. STATEMENT OF:** (Last, First, Middle) WILLIAMS, GRACIE JD

**5. DOB** (b) (6), (b) (7)(C)

**6. SEX** F

**7. HOME ADDRESS** (b) (6), (b) (7)(C)

**8. HOME PHONE** (b) (6), (b) (7)(C)

**9. EMPLOYMENT** (Occupation and Location) (b) (6), (b) (7)(C)

**10. BUSINESS PHONE** (b) (6), (b) (7)(C)

**11. LOCATION STATEMENT TAKEN** GW PARKWAY

**12. NAME OF OFFICER TAKING STATEMENT** (if other than block 18 include signature)

**13. DATE/TIME STARTED** 1713 / 29 APR 19

**14. STATEMENT**

AT APPROXIMATELY 1630, I WAS DRIVING SOUTH BOUND ON GW PARKWAY. I CAME UP ON AN ACCIDENT BETWEEN A RED TAXI AND A ~~HOT~~ ~~BLU~~ LIGHT BLUE VW BEETLE. I WITNESS OTHER PASSENGERS GETTING OUT OF THEIR CARS TO ASSIST THE PASSENGERS. I PARKED MY VEHICLE AND RAN TO SEE IF I COULD ASSIST AS WELL. WHEN I ARRIVED TO THE TAXI, I NOTICED IMMEDIATELY THAT THE DRIVER WAS SEVERELY INJURED. I TOOK MY JACKET OFF TO SHIELD HIM FROM THE VIEW OF ON LOOKERS. I RAN TO ASSIST IN DIVERTING NORTH BOUND TRAFFIC SO THE EMERGENCY VEHICLES COULD HAVE A CLEAR PATH TO GET TO THE ACCIDENT VICTIMS. THERE WAS 3 PASSENGERS IN THE RED TAXI (1 AFRICAN AMERICAN DRIVER, 2 ASIAN/ORENTIAL PASSENGERS: MALE/FEMALE). VW BEETLE HAD 1 CAUCAUSIAN MALE DRIVER. I DID NOT WITNESS THE ACCIDENT HAPPEN. NOTHING FOLLOWS ON END

**15.** I HAVE (b) (6), (b) (7)(C) CERTIF... ULLY UNDERSTAND IT AND RECOLLECTION

SIGNATURE OF PERSON GIVING STATEMENT

**16. DATE/TIME ENDED** 29 APR 19

**17.** PAGE 1 OF 1 PAGES

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:**
(Name and Signature)

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**
(Name and Signature)

USDI,NPS,USPP FORM 44-02, REV. 10/82

JA297

# UNITED STATES PARK POLICE
## COMPLAINANT/WITNESS STATEMENT

| | |
|---|---|
| **1. CASE NUMBER** | 19-032225 |

**2. NATURE OF INVESTIGATION** MV-CRASH-F

**3. DATE OF INCIDENT** 29 April 201

**4. STATEMENT OF: (Last, First, Middle)** Brecken, Timothy J

**5. DOB** (b) (6), (b) (7)(C) **6. SEX** (b) (6), (b) (7)(C)

**7. HOME ADDRESS** (b) (6), (b) (7)(C)

**8. HOME PHONE** (b) (6), (b) (7)(C)

**9. EMPLOYMENT (Occupation and Location)** (b) (6), (b) (7)(C)

**10. BUSINESS PHONE**

**11. LOCATION STATEMENT TAKEN** GW PRKWAY

**12. NAME OF OFFICER TAKING STATEMENT (if other than block 18 include signature)**

**13. DATE/TIME STARTED** 4/29/19

**14. STATEMENT**

On Noth bound lane, I saw crash site and smoke. All vehicles were stopped. I attempted first aid on driver of Red Top cab. Nothing follows.

AT APPROX. 1736 HRS, I CONTACTED (b) (6), (b) (7)(C) AT THE ABOVE PHONE NUMBER AND CONDUCTED A TELEPHONIC INTERVIEW. BRACKEN STATES THAT HE DID NOT WITNESS THIS ACCIDENT. BRACKEN STATED THAT WHEN HE CAME UPON THE ACCIDENT HE COULD STILL SEE THE SMOKE FROM THE AIRBAGS. BRACKEN STATED THAT HE ATTEMPTED TO RENDER FIRST AID. BRACKEN WAS ADVISED HE MAY BE CONTACTED AT A LATER TIME BY PARK POLICE DETECTIVES.

SGT. FANSTL 1044 4/29/19

**15.** I HAVE READ THIS STATEMENT GIVEN BY ME OR HAVE HAD IT READ TO ME. I FULLY UNDERSTAND IT AND CERTIFY THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND RECOLLECTION

(b) (6), (b) (7)(C)

(b) (6), (b) (7)(C) SIGNATURE OF PERSON GIVING STATEMENT

**16. DATE/TIME ENDED** 4/29/19

**17.** PAGE 1 OF 1 PAGES

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:**

(Name and Signature)

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**

(Name and Signature)

USDI,NPS,USPP FORM 44-02, REV. 10/82

JA298

# UNITED STATES PARK POLICE
## COMPLAINANT/WITNESS STATEMENT

**1. CASE NUMBER**

**2. NATURE OF INVESTIGATION**

**3. DATE OF INCIDENT** 29 APR 2019

**4. STATEMENT OF:** (Last, First, Middle) AHLERS, ROBERT MICHAEL WAYNE

**5. DOB** (b) (6), (b) (7)(C)

**6. SEX** M

**7. HOME ADDRESS** (b) (6), (b) (7)(C)

**8. HOME PHONE**

**9. EMPLOYMENT** (Occupation and Location) (b) (6), (b) (7)(C)

**10. BUSINESS PHONE**

**11. LOCATION STATEMENT TAKEN** GWMP/TULANE DR

**12. NAME OF OFFICER TAKING STATEMENT** (if other than block 18 include signature)

**13. DATE/TIME STARTED** 29 APR 1630

**14. STATEMENT**

WHILE TRAVELING HOME FROM WORK SOUTH ON GWMP, I OBSERVED A BLUE VW BUG W/ LICENSE PLATE TO THE EFFECT OF 3GIRRLYZ OR SIMILAR DRIVING IN AN AGGRESSIVE MANNER. THE VEHICLE WOULD LEAVE SPACE IN FRONT LIKE THEY WERE NOT PAYING ATTENTION THEN SPEED UP TO CLOSE THE GAP AND STOP FAST. THIS WAS OBSERVED BEFORE WEST ABINGDON SHOT OFF THE GWMP. I WAS IN LEFT LANE, THEY WERE IN RIGHT LANE.

I REMEMBER SEEING THE SAME CAR AGAIN ON THE GWMP AROUND JEFFERSON ST. AGAIN I WAS IN LEFT LANE, THEY WERE IN RIGHT LANE. I OBSERVED A USPP CRUISER IN THE BELLE HAVEN PARK PARKING LOT FACING NORTH AS I DROVE SOUTH ON GWMP. IN/AROUND TULANE DR I NOTICED TRAFFIC GOING SOUTH MAKING A U-TURN. I OBSERVED DEBRIS IN THE ROADWAY AND SAW THE SUBJECT VW CRASHED IN THE SOUTH BOUND LANES. I PULLED OVER TO ADMINISTER AID. THERE WERE 3 VICS IN THE TAXI, I STAYED WITH THE PASSENGER REAR SEAT RIGHT SIDE WHILE OTHERS TRIED TO STABILIZE THE OTHER 2 PAX. NOTHING FOLLOWS.

**15.** I HAVE READ [(b) (6), (b) (7)(C)] IT READ TO ME I FULLY UNDERSTAND IT AND CERTIFY (b) (6), (b) (7)(C) OWLEDGE AND RECOLLECTION

SIGNATURE OF PERSON GIVING STATEMENT

**16. DATE/TIME ENDED** 29 APR 1730

**17.** PAGE 1 OF 1 PAGES

**18. OFFICER OBTAINING THE SIGNATURE IN BLOCK 15:**

(Name and Signature)

**19. PERSON WITNESSING THE SIGNATURE IN BLOCK 15:**

(Name and Signature)

USDI,NPS,USPP FORM 44-02, REV. 10/82

JA299

 

United States Department of the Interior

NATIONAL PARK SERVICE
**UNITED STATES PARK POLICE**
Headquarters
1100 Ohio Drive, S.W.
Washington, D.C. 20024

IN REPLY REFER TO:

Monday, June 10, 2019

To: Office of the Chief Medical Examiner
Northern Virginia District
Commonwealth of Virginia
10850 Pyramid Place, Suite 121
Manassas, VA 20110
Attention: Records

From: Detective Robert Freeman
Criminal Investigations
U.S. Park Police
1100 Ohio Drive, SW
Washington, DC 20024

Dear Records Section Personnel,

As part of our ongoing investigation pertaining to the death of the following individual, we respectfully request a copy of the autopsy report, medical examiner report and toxicology report for:

Amoah Gyimah
DOB: (b) (6) 1963
OCME Case # N19-00692

Gyimah died on April 29, 2019.

Please contact Detective Freeman at 202-610-8760 if you have any questions reference this request and please mail a copy of the autopsy, toxicology and medical examiner report to the above address upon it becoming available. Thank you in advance for your continued cooperation.

Sincerely,

Robert Freeman
Detective
Criminal Investigation
U.S. Park Police

JA300

```
**********************
*** FAX TX REPORT ***
**********************

            TRANSMISSION OK

    JOB NO.                1962
    DESTINATION ADDRESS    917035300509
    SUBADDRESS
    DESTINATION ID
    ST. TIME               06/10 12:47
    TX/RX TIME             00'23
    PGS.                   2
    RESULT                 OK
```



**UNITED STATES PARK POLICE**
Criminal Investigations Branch
Major Crimes Unit
1901 Anacostia Drive SE
Washington, DC 20020
T   202-610-8730
F   202-610-5382

TO: *VA OCME RECORDS*   FROM: *6/10/19*

FAX:                      PAGES: *2*

PHONE:                    DATE:

RE: *REPORT REQUEST*      CASE #: *N19-00692*

☐ Urgent      ☐ For review    ☐ Please        ☐ Please reply    ☐ Please recycle
                                comment

Comments:

**JA301**



38

FORM 10-344B
(3/83)

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO | DAY | YR | 4 YEAR | | CASE/INCIDENT NUMBER | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U.S. Park Police | | 0 4 | 2 9 | 1 9 | 1 9 | ● | 0 | 3 | 2 | 2 | 2 | 5 |
| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT | | | | | | | | | | | |
| MVC-F X2 | | | | | | | | | | | | |

| ITEM | 7 RESULTS OF INVESTIGATION: |
|---|---|

On June 19, 2019, Gyimah's Ford taxi cab was released to ANA Towing. The undersigned Detective made notification to both the insurance company and next of kin.

On July 10, 2019, the undersigned Detective received a copy of the Virginia OCME Autopsy report for Gyimah reference this investigation. This report cites the cause of death to be multiple blunt force injuries and the manner of death to be accident. A check of the toxicology report revealed that Gyimah was not under the influence of any drugs or alcohol at the time of this crash. A copy of this report will be incorporated into this case jacket.

After consultation with the Eastern District of Virginia USAO, who elected to decline any prosecution reference this investigation, the undersigned Detective recommends that this case be closed by exception- USAO Declination.

Closed by Exception- USAO Declination

Concur-
Capt S. Brecht
S3
7/15/19

Concur-
MAJ. Michal Wada
7-16-19

| 8 WARRANT(S) | 9 | | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | | 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ YES ☐ NO | ☐ LATENTS ☐ PHOTOS | | | | Freeman | | | PAGE 1 | OF | 1 | PAGES |
| 13 STATUS | ☐ OPEN | ☐ SUSPENDED | | CLOSED BY | ☐ ARREST | ☑ EXCEPTION | | ☐ UNFOUNDED | | | |
| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR Det R L Freeman | | BADGE/ID 410 | DATE 7-10-19 | 16 SUPERVISOR | | BADGE/ID 813 | DATE 7/16/19 | |

JA303

FORM 10-344B
(3/83)

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO | DAY | YR | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| U.S. Park Police | | 0 4 | 2 9 | 1 9 | 1 9 . 0 3 2 2 2 5 | |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| MVC-F X2 | |

**ITEM** | **7 RESULTS OF INVESTIGATION:**

On June 10, 2019, the undersigned Detective met with AUSA Heather Call and AUSA Bill Fitzpatrick reference this investigation. Upon reviewing the status of this investigation, both AUSA's agreed that no criminal case existed and that this case would be resolved by having traffic citations issued. Upon the undersigned Detective advising them of Jewett's medical condition, they agreed that they would decline to press any charges reference this investigation. The undersigned Detective advised that this case would be closed with our findings that Jewett was at fault for crossing into oncoming traffic striking Gyimah's vehicle causing his and Kim's death.

On June 19, 2019, the undersigned Detective received a copy of the DC OCME external Examination Report for Hyo Jung Kim reference this investigation. This report cites the cause of death to be multiple blunt force injuries and the manner of death to be accident. A copy of this report will be incorporated into this case jacket.

Investigation Continues

| 8 WARRANT(S) | 9 | 10 ID TECH NOTIFIED | 11 INVESTIGATOR NOTIFIED | 12 |
|---|---|---|---|---|
| ☐ YES ☐ NO | ☐ LATENTS ☐ PHOTOS | | Freeman | PAGE OF PAGES |

| 13 STATUS | ☑ OPEN | ☐ SUSPENDED | CLOSED BY | ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED |
|---|---|---|---|---|---|---|

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | BADGE/ID | DATE |
|---|---|---|---|---|---|---|---|---|
| | | | Det. R. L. Freeman | 410 | 6-19-19 | | 813 | 7/19/19 |

JA304

FORM 10-344B
(3/83)

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE

| 2 SYSTEM AREA | 6 WHEN DID IT OCCUR? | MO. | DAY | YR. | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 4 | 2 9 | 1 9 | 1 9 • | 0 3 2 2 2 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| 2 Car MVC – 2 Fatalities | |

ITEM    7 RESULTS OF INVESTIGATION:

### LOCATION:

Southbound GWMP s/o Tulane Dr.

### DATE/TIME:

Monday
April 29, 2019
4:31 pm /16:31 hours

### COLLISION TYPE:

2 Vehicles/ 2 Fatalities

### ASSIGNED PERSONNEL:

Case Officer: Ofc. C. Nuygen #291
Assigned Detective: Det. R. Freeman #410
Mapping and Reconstructionist: Ofc. P. Gillespie #285

### WEATHER

Temp: 60F
Humidity: 47%
Visibility: 10 miles but overcast

### ROAD TYPE:

The George Washington Parkway in the area south of Tulane drive has 4 lanes, 2 going south and 2 coming north. The Northbound and Southbound lanes are dived by a double yellow line. The road is paved with Asphalt and has concrete curb in both directions with no paved shoulder in either direction. There were no visible defects or obstructions in or on the roadway

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | 12 PAGE OF PAGES |
|---|---|---|---|---|---|---|
| 13 STATUS ☐ OPEN | ☐ SUSPENDED | | CLOSED BY: ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |
| 14 REPORTING OFFICER P Gillespie | BADGE/ID 0285 | DATE 6/13/19 | 15 INVESTIGATOR Det Freeman | BADGE/ID | DATE | 16 SUPERVISOR Sgt. A. Zielinski | BADGE/ID | DATE 6/3/9 |

JA305

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE [ ]

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO | DAY | YR. | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 4 | 2 9 | 1 9 | 1 9 | 0 3 2 2 2 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| 2 Car MVC – 2 Fatalities | |

ITEM    7 RESULTS OF INVESTIGATION:

### SITE EXAMINATION:

On Monday, April 29, 2019 at approximately 1631 hours I was called into work from home for a 2 car crash on the GWMP south of Tulane Dr. I arrived on the scene at approximately 16:55 hours and made the following observations:

- ➢ Roadway as described in Road Type
- ➢ Multiple police and fire vehicles in the roadway, blocking traffic from traveling north or south on the GWMP
- ➢ A blue VW Beetle sitting in the middle of the right southbound lane facing south
- ➢ A red and black Ford sedan sitting in the grass on the northbound side, facing south with a sheet covering the driver's side door and top

### MEASUREMENT:

Scaled measurements of the crash site were taken using a Sokkia 530R3 Total Station and Trimble TDS Recon data collector. A reference measurement was taken at the beginning and another at the end to confirm the accuracy and precision of the instrument. The data collector was later downloaded onto a computer to obtain a Scale diagram.

### VEHICLE 1:

Make: Volkswagen
Model: Beetle
Body Type: Convertible
Year: 2013
Color: Blue
VIN: 3VW5X7AT7DM832518
Tag: 3GIRLYZ, Virginia 09/19

Registered Owner:   VW Credit Leasing Ltd
                    C/O JEWITT, Eric Stuart
                    1704 Jamestown Rd.
                    Alexandria, VA 22308

Driver:   JEWITT, Eric Stuart
          8913 Linton Lane
          Alexandria, VA 22308
          DOB: (b) /1972, W/M
          VA DL #A60087338

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | 12 PAGE OF PAGES |
|---|---|---|---|---|---|---|
| 13 STATUS: ☐ OPEN | ☐ SUSPENDED | | CLOSED BY: ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |
| 14 REPORTING OFFICER P Gillespie | BADGE/ID 0285 | DATE 6/13/ | 15 INVESTIGATOR Det. Freeman | BADGE/ID | DATE | 16 SUPERVISOR Sgt. A. Zielinski |

JA306

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE [

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO. | DAY | YR. | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 4 | 2 9 | 1 9 | 1 9 • | 0 3 2 2 2 |

5 NATURE OF INCIDENT

2 Car MVC – 2 Fatalities

6 RECLASSIFICATION OF INCIDENT

ITEM    7 RESULTS OF INVESTIGATION:

### VEHICLE 2:

Make: Ford

Model: Fusion

Body Type: Sedan

Year: 2014

Color: Red/Black

VIN: 3FA6P0UU4ER394408

Tag: H126429, Virginia 03/21

**Registered Owner/Decedent:**   **GYIMAH, Amoah**
7013 Solomon Seal Ct.
Springfield, VA 22152
DOB: (b) (6),/1963

**Rear Passengers:**   JUNG, Sung Chul                         **Decedent: KIM, Hyojung**
DOB: 10/21/1964                                        DOB: (b) (6), (b) (7)
South Korea Passport #M39669728                 South Korea Passport (b) (6), (b) (7)(C)
Seated on passenger side rear seat              Seated behind driver

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | 12 PAGE OF PAGES |
|---|---|---|---|---|---|---|
| 13 STATUS ☐ OPEN | ☐ SUSPENDED | | CLOSED BY: ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |
| 14 REPORTING OFFICER P Gillespie | BADGE/ID 0285 | DATE 6/13/19 | 15 INVESTIGATOR Det. Freeman | BADGE/ID | DATE | 16 SUPERVISOR Sgt. A. Zielinski   BADGE/ID   DATE 6/13/19 |

JA307

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO. | DAY | YR. | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 4 | 2 9 | 1 9 | 1 9 • | 0 3 2 2 2 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| 2 Car MVC – 2 Fatalities | |

ITEM    7 RESULTS OF INVESTIGATION:

### Vehicle Examination:

### Vehicle 1: Volkswagen Beetle

Vehicle 1 was in its final resting spot when I arrived on scene and was then moved to our seizure lot where it was inspected with the following observations:

Front:
  - ➤ Hood was crumpled and bent back, mostly on the drivers side
  - ➤ Bottom bumper and both headlights missing

Drivers side:
  - ➤ Front drivers side rim and axle were dangling from car
  - ➤ Front fender was crushed or missing from car
  - ➤ Engine compartment exposed
  - ➤ Drivers door crumpled or peeled back(possibly from extraction)
  - ➤ Rear tire intact and inflated

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | 12 PAGE OF PAGES |
|---|---|---|---|---|---|

| 13 STATUS ☐ OPEN | ☐ SUSPENDED | CLOSED BY: ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED |
|---|---|---|---|---|

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | BADGE/ID | DATE |
|---|---|---|---|---|---|---|---|---|
| P Gillespie | 0285 | 6/13/19 | Det. Freeman | | | Sgt. A. Zielinski | 870 | 6/13/1 |

86

JA308

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE [

| 2 SYSTEM AREA | 6 WHEN DID IT OCCUR? | MO. | DAY | YR. | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 4 | 2 9 | 1 9 | 1 9 • | 0 3 2 2 2 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| 2 Car MVC – 2 Fatalities | |

ITEM    7 RESULTS OF INVESTIGATION:

Rear:
  ➢ Intact with no damage
  ➢ There was red and black paint transfer on bottom of bumper

Passenger side:
  ➢ Intact from rear to A pillar
  ➢ Front fender dented over tire
  ➢ Front and rear tires inflated



| 8 WARRANT(S)  ☐ YES  ☐ NO | 9  ☐ LATENTS  ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | 12  PAGE  CF  PAGES |
|---|---|---|---|---|---|---|
| 13 STATUS ☐ OPEN | ☐ SUSPENDED | | CLOSED BY: ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |
| 14 REPORTING OFFICER  P. Gillespie | BADGE/ID  0285 | DATE  6/13/15 | 15 INVESTIGATOR  Det. Freeman | BADGE/ID | DATE | 16 SUPERVISOR  Sgt. A. Zielinski | BADGE/ID | DATE |

87

JA309

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | | 8 WHEN DID IT OCCUR? | MO. | DAY | YR. | | 4 YEAR | CASE/INCIDENT NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | | 0 4 | 2 9 | 1 9 | | 1 9 ● | 0 | 3 | 2 | 2 | 2 |
| 5 NATURE OF INCIDENT | | 6 RECLASSIFICATION OF INCIDENT | | | | | | | | | | |
| 2 Car MVC – 2 Fatalities | | | | | | | | | | | | |

ITEM     7 RESULTS OF INVESTIGATION:

Glass:
> Front windshield had diagonal cracks running from drivers side to passenger side
> Rear wind was plastic and intact
> No glass in any side windows

Interior:
> Driver side steering wheel airbag inflated
> Center console below radio pulled from molding
> Both drivers and passenger seat in the upright positions and locked in place



| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | 12 PAGE  OF  PAGES |
|---|---|---|---|---|---|---|
| 13 STATUS ☐ OPEN | ☐ SUSPENDED | CLOSED BY | ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | BADGE/ID | DATE |
|---|---|---|---|---|---|---|---|---|
| P. Gillespie | 0285 | 6/13/19 | Det. Freeman | | | Sgt. A. Zielinski | 870 | 6/13/19 |

88

JA310

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE [

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO. | DAY | YR. | 4 YEAR | | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 4 | 2 9 | 1 9 | 1 9 | • | 0 3 2 2 2 |
| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT | | | | | | |
| 2 Car MVC – 2 Fatalities | | | | | | | |

ITEM    7 RESULTS OF INVESTIGATION:

### Vehicle 2: Ford Fusion

Vehicle 2 was in its final resting spot when I arrived on scene and was then moved to our seizure lot where it was inspected with the following observations:

Front:
  - ➢ Crumpled and partially detached
  - ➢ Front bumper attached but bent and crumpled
  - ➢ Headlights missing on both sides

Driver Side:
  - ➢ Engine compartment exposed with fender missing and crumpled
  - ➢ Drivers side front tire and axle off car
  - ➢ Floor board crushed under drivers seat into interior
  - ➢ Front door missing and rear door crumpled
  - ➢ Behind rear door vehicle was intact

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | 12 PAGE   OF   PAGES |
|---|---|---|---|---|---|---|
| 13 STATUS: ☐ OPEN | ☐ SUSPENDED | | CLOSED BY: ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |
| 14 REPORTING OFFICER P Gillespie | BADGE/ID 0285 | DATE 6/13/15 | 15 INVESTIGATOR Det. Freeman | BADGE/ID    DATE | 16 SUPERVISOR Sgt. A. Zielinski | BADGE/ID 810   DATE 4/13/19 |

89

JA311

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

George Washington Memorial Parkway

| 8 WHEN DID IT OCCUR? | MO. | | DAY | | YR. | | 4 YEAR | | CASE/INCIDENT NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 4 | 2 | 9 | 1 | 9 | 1 | 9 | • | 0 | 3 | 2 | 2 | 2 |

5 NATURE OF INCIDENT

2 Car MVC – 2 Fatalities

6 RECLASSIFICATION OF INCIDENT

ITEM    7 RESULTS OF INVESTIGATION:

Rear:

➢ Intact with no damage from crash

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | | 12 | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | PAGE | OF | PAGES |

| 13 STATUS ☐ OPEN | | ☐ SUSPENDED | | CLOSED BY: | ☐ ARREST | | ☐ EXCEPTION | | ☐ UNFOUNDED | |
|---|---|---|---|---|---|---|---|---|---|---|

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | BADGE/ID | DATE |
|---|---|---|---|---|---|---|---|---|
| P Gillespie | 0285 | 6/13/19 | Det Freeman | | | Sgt. A. Zielinski | 810 | 6/13/1. |

90

JA312

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO. | | DAY | | YR. | | 4 YEAR | | CASE/INCIDENT NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 | 4 | 2 | 9 | 1 | 9 | 1 | 9 | 0 | 3 | 2 | 2 | 2 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| 2 Car MVC – 2 Fatalities | |

ITEM     7 RESULTS OF INVESTIGATION:

Passenger side:
- ➤ Intact from rear to A pillar
- ➤ Both tire intact and inflated
- ➤ Dents and scratches on front fender

Glass:
- ➤ Windshield shattered and peeled
- ➤ No drivers side glass but all rear and passenger glass intact

Interior:
- ➤ Engine compartment pushed into driver area
- ➤ Misc. items scattered throughout car
- ➤ Steering wheel, side curtain and foot area airbags deployed along with side curtain in rear.

| WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | 12 PAGE  OF  PAGES |
|---|---|---|---|---|---|---|
| 13 STATUS  ☐ OPEN | | ☐ SUSPENDED | CLOSED BY: | ☐ ARREST | ☐ EXCEPTION ☐ UNFOUNDED | |

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | BADGE/ID | DATE |
|---|---|---|---|---|---|---|---|---|
| P Gillespie | 0285 | 6/13/19 | Det Freeman | | | Sgt. A. Zielinski | 870 | 4/13/19 |

91

JA313

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO. | | DAY | | YR. | | 4 YEAR | | CASE/INCIDENT NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 | 4 | 2 | 9 | 1 | 9 | 1 | 9 • | 0 | 3 | 2 | 2 | 2 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| 2 Car MVC – 2 Fatalities | |

ITEM    7 RESULTS OF INVESTIGATION:

### INTERVIEWS:

No interviews were conducted by this officer.

### FORMULAS AND AIR BAG CONTROL MODULE IMAGE:

No formulas were used in this crash to determine speed.

### Air Bag Control (ACM) Imaging:

Vehicle 1 was not listed as compatible for imaging so no attempt was made to image the ACM.

On Wednesday, May 08, 2019, a search warrant was executed by Officer Gillespie on the Airbag Control Module (ACM) unit from the Ford Fusion (Vehicle 2). The module was successfully imaged by Officer Gillespie and was later printed out for reporting purposes and analysis.

Analysis:

The imaging of Vehicle 2, revealed one distinct events: "First Record." Based on the forces and speed recorded, it is evident that "First Record" is indicative of the primary collision between Vehicle 1 and Vehicle 2. Examining this data reveals the following:

| Times (sec) | Accelerator Pedal (% Full) | Engine (RPM) | Speed (MPH) | ABS Activity |
|---|---|---|---|---|
| -5.0 | 39.1 | 0 | 50 | No |
| -4.5 | 45.0 | 1236 | 50.5 | No |
| -4.0 | 41.7 | 2258 | 51.1 | No |
| -3.5 | 34.4 | 2312 | 51.9 | No |
| -3.0 | 36.3 | 2272 | 52.4 | No |
| -2.5 | 20.5 | 2324 | 52.9 | No |
| -2.0 | 0.0 | 1496 | 53 | No |
| -1.5 | 0.0 | 1152 | 53 | No |
| -1.0 | 0.0 | 266 | 52.4 | No |
| -0.5 | 30.4 | 0.0 | 52 | No |
| -0.0 | 58.5 | 1012 | 51.5 | No |

From the image we can see that Vehicle 1 was traveling between 50-53 mph in a posted 45 mph zone 5 seconds before the crash. This speed is within the realm of moving with traffic on the parkway and not excessive.

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED. | | 11 INVESTIGATOR NOTIFIED | | 12 PAGE    OF    PAGES |
|---|---|---|---|---|---|---|
| 13 STATUS ☐ OPEN | ☐ SUSPENDED | | CLOSED BY: ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |
| 14 REPORTING OFFICER _Gillespie_ | BADGE/ID 0285 | DATE 6/13/19 | 15 INVESTIGATOR Det Freeman | BADGE/ID    DATE | 16 SUPERVISOR Sgt. A. Zielinski | BADGE/ID 810   DATE 6/13/19 |

JA314

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO. | | DAY | | YR. | | 4 YEAR | | CASE/INCIDENT NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | | 0 | 4 | 2 | 9 | 1 | 9 | 1 | 9 | • 0 | 3 | 2 | 2 | 2 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| 2 Car MVC – 2 Fatalities | |

ITEM 7 RESULTS OF INVESTIGATION:

### SEQUENCE OF EVENTS:

Vehicle 1 was traveling southbound on the GWMP in the area just south of Tulane Drive. For an unknown reason, vehicle 1 crossed over the double yellow lines dividing the southbound lanes from the northbound lanes. When vehicle 1 crossed into the northbound lanes, it struck vehicle 2, which was traveling north, in the front drivers side. The 2 vehicles then rotated together for 180 degrees, vehicle 2 was released and vehicle 1 continued to rotate another 150 degrees (+/-). Vehicle 2 came to rest facing the opposite direction of its original path, now facing south, and vehicle 1 came to rest almost facing the direction it had been going originally(south).

### CONCLUSION:

An inspection of the roadway did not reveal any defects, debris or obstructions. The roadway is clearly marked and the speed limit is posted by signs. The afternoon was overcast and cool and the roadway was dry and clear.

There was no indication of any mechanical defects, excessive wear or disrepair present on the Volkswagen or Ford that could be determined from an inspection of the vehicles that would be considered contributory for this collision. All tires on the vehicles had sufficient tread depth.

An autopsy on GYIMAH revealed no drugs or alcohol in his system. JEWETT is said to have a medical problem but I was not shown any evidence to say this contributed to the crash. JEWETT was also clear of alcohol and drugs.

Based on the above stated facts, in conjunction with my training, education and experience as a Law Enforcement Officer and Crash Reconstructionist, I conclude that the primary cause of this motor vehicle collision was operator error on the part of JEWETT.

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | | 11 INVESTIGATOR NOTIFIED | | | 12 PAGE OF PAGES |
|---|---|---|---|---|---|---|---|

| 13 STATUS ☐ OPEN | | ☐ SUSPENDED | | CLOSED BY: | ☐ ARREST | ☐ EXCEPTION | | ☐ UNFOUNDED | |
|---|---|---|---|---|---|---|---|---|---|
| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | | BADGE/ID | DATE |
| P Gillespie | 0285 | 6/13/19 | Det Freeman | | | Sgt. A. Zielinski | | 870 | 4/13/19 |

JA315

FORM 10-344B
(3/83)

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO | DAY | YR | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| U.S. Park Police | | 0 4 | 2 9 | 1 9 | 1 9 | . 0 3 2 2 2 5 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| MVC-F X2 | |

| ITEM | 7 RESULTS OF INVESTIGATION |
|---|---|

On May 21, 2019, the undersigned Detective obtained consensual access to Eric Jewett's phone records from the family. Copies of the email exchange will be incorporated into this case jacket granting permission to access the phone records. The undersigned Detective was able to download the phone records and archive them onto a disk. This disk will be incorporated into this case jacket. These records corroborate the information from the family that the phone was broken and unable to be charged or used. The phone records show that the phone was not in use at the time of this crash.

Investigation Continues

| 8 WARRANT(S) | | 10 ID. TECH NOTIFIED | 11 INVESTIGATOR NOTIFIED | 12 | | |
|---|---|---|---|---|---|---|
| ☐ YES | ☐ LATENTS | | Freeman | PAGE 1 OF 1 PAGES | | |
| ☐ NC | ☐ PHOTOS | | | | | |

| 13 STATUS | ☑ OPEN | ☐ SUSPENDED | CLOSED BY | ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED |
|---|---|---|---|---|---|---|

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | BADGE/ID | DATE |
|---|---|---|---|---|---|---|---|---|
| | | | Det R L Freeman | 410 | 5/22/19 | | | |

JA316

FORM 10-344B
(3/83)

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | | 8 WHEN DID IT OCCUR? | MO | DAY | YR | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|---|
| U.S. Park Police | | | 0 4 | 2 9 | 1 9 | 1 9 | . 0 3 2 2 5 |
| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT | | | | | | |
| MVC-F X2 | | | | | | | |

ITEM | 7 RESULTS OF INVESTIGATION:

Interview

John McDonald, (b) (6), (b) (7)(C)

On May 13, 2019 at 1025 hours, the undersigned Detective made phone contact with McDonald reference this investigation. McDonald stated he was driving directly behind a white van with the flow of traffic and observed the van make a sharp evasive maneuver to the right to avoid a blue convertible that was stopped in the right lane. The van drove onto the right shoulder and stopped. McDonald stated he also drove onto the right shoulder to avoid striking the blue Volkswagen stopped in the right lane. McDonald stated he rendered aid and called 911. McDonald stated he did not see the crash as the van was blocking his view and that he did not see any aggressive or recklessly operated vehicles in the area immediately prior to the crash. McDonald also completed a witness statement on scene which will be incorporated into this case jacket.

Andrew Wallace, (b) (6), (b) (7)(C)

On May 13, 2019 at 1045 hours, the undersigned Detective made phone contact with Wallace reference this investigation. Wallace had emailed the USPP Tip-line and a copy of that email will be incorporated into this case jacket. Wallace stated he was driving southbound three vehicles behind the white van and observed a black Honda come up behind him and weaving in traffic. Wallace was unsure if he observed this vehicle 30 seconds before the crash or 3 minutes before the crash. Wallace stated he did not see the crash, however he stopped and rendered aid to the operator of the Volkswagen. Wallace stated the operator did not have his seatbelt on.

Ray Bombac, (b) (6), (b) (7)(C)

On May 13, 2019 at 1048 hours, the undersigned Detective made phone contact with Bombac reference this investigation. Bombac also completed a witness statement which will be incorporated into this case jacket. Bombac stated that the Volkswagen had passed him prior to the crash. Bombac advised other witnesses on the scene stated the Volkswagen was swerving and speeding prior to the crash. Bombac could not identify those other witnesses. Bombac stated that no other car was in the area when the Volkswagen crossed into the northbound lane and struck the cab.

Elizabeth Jones, (b) (6), (b) (7)(C)

On May 13, 2019 at 1050 hours, the undersigned Detective made phone contact with Jones reference this investigation. Jones provided a witness statement which will be incorporated into this case jacket. Jones stated she was driving 30 feet behind the Volkswagen. Jones stated the Volkswagen drifted over into the northbound lanes for no reason. Jones stated she did not observe any aggressive or reckless driving immediately prior to the crash.

Investigation Continues

| 8 WARRANT(S) | 9 | 10 ID TECH NOTIFIED | 11 INVESTIGATOR NOTIFIED | 12 | | |
|---|---|---|---|---|---|---|
| ☐ YES | ☐ LATENTS | | Freeman | PAGE | OF | PAGES |
| ☐ NO | ☐ PHOTOS | | | | | |

| 13 STATUS | ☑ OPEN | ☐ SUSPENDED | CLOSED BY | ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |
|---|---|---|---|---|---|---|---|
| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR Det R L Freeman | BADGE/ID 410 | DATE 5-20-19 | 16 SUPERVISOR | BADGE/ID 813 DATE 7/10/19 |

JA317

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO | DAY | YR | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| U.S. Park Police | | 0 4 | 2 9 | 1 9 | 1 9 | . 0 3 2 2 5 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| Mvc-F | |

**ITEM** | **7 RESULTS OF INVESTIGATION:**

On May 4, 2019, the undersigned Detective received an email from (b) (6), (b) (7)(C) brother of Eric Jewett, containing images and a report for a seat issue in the Volkswagen at a car wash that (b) (6), (b) (7) experienced on April 22, 2019. This email was forwarded to Ofc. Gillespie and Ofc. Weisbaum reference this investigation. A copy of this email will be incorporated into this case jacket.

On May 5, 2019 at 1430 hours, the undersigned Detective met (b) (6), (b) (7)(C) First Secretary and Consul for the Embassy of the Republic of Korea, and (b) (6), (b) sister of Hyo Jung Kim, at Medstar reference this investigation. The undersigned Detective turned over the personal property of Hyo Jung Kim and provided contact information reference this investigation.

On May 5, 2019 at 1512 hours, the undersigned Detective met with (b) (6), (b) (7)(C) brother of Amoah Gyimah, reference this investigation. The undersigned Detective turned over the personal property of Gyimah and obtained signed consent to download and search the EDR/ACM from Gyimah's Ford. A copy of this consent for will be incorporated into this case jacket.

Investigation Continues

| 8 WARRANT(S) | 9 | 10 ID TECH NOTIFIED | 11 INVESTIGATOR NOTIFIED | 12 |
|---|---|---|---|---|
| ☐ YES ☐ NO | ☐ LATENTS ☐ PHOTOS | | Freeman | PAGE 1 OF 1 PAGES |

| 13 STATUS | ☑ OPEN | ☐ SUSPENDED | CLOSED BY | ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED |
|---|---|---|---|---|---|---|

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | BADGE/ID | DATE |
|---|---|---|---|---|---|---|---|---|
| | | | Det R L Freeman | 410 | 5-13-19 | | 813 | 7/10/19 |

FORM 10-344B
(3/83)

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 3 WHEN DID IT OCCUR? | MO. | DAY | YR. | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| United States Park Police - District – 2 | | 0 4 | 2 9 | 1 9 | 1 9 • | 0 3 2 2 5 |

5 NATURE OF INCIDENT

2 Car MVC - Fatal

6 RECLASSIFICATION OF INCIDENT

ITEM | 7 RESULTS OF INVESTIGATION:

**INTERVIEW OF JUNG**: (Continued -2 of 3)

JUNG told detectives that he resides in Seoul South Korea and was visiting the United States on a business trip with 6 coworkers. Jung said that he was leaving a conference in the Mount Vernon area and was taking a taxi with his friend, Hyo Jung KIM, to his hotel in Bethesda Maryland.

JUNG said he was in the backseat of the taxi behind the passenger's seat. JUNG said that his friend KIM was in the backseat behind the driver.

JUNG told investigators that the driver of the taxi was talking on the cellphone while driving down the road. Jung also told investigators that the taxi appeared to be travelling fast. JUNG said that he does not remember anything about the crash and does not remember the collision or what happened following the collision.

JUNG stated that Min Ho SHIM is a close friend who lives in the area and can be contacted to relay information to JUNG for further information. Contact information was left with JUNG. JUNG is in stable condition and currently being held for observation.

**DRIVER OF VOLKSWAGEN:**

**JEWETT, Eric Stuart**
(b) ████ 1972, W/M
VA DL ████████████
████████████████████
██████████(c)
(b) (6), ██@gmail.com (shared email account with wife)

Injuries: Severe head trauma - hospital still administering tests to determine other injuries.
Charge Nurse: (b) (6), ██ 703-776-3274 - Main Trauma ICU
Condition: LIFE THREATENING - CRITICAL
Location: Trauma ICU – Room 318
Trauma Name: Sierra 891A

**NEXT OF KIN:**

(b) (6), (b) (7)(C) ████████ - (Wife)
(b) (6), (b) ██ W/F
VA DL (b) (6), (b) (7) ████████
(b) (6), (b) (7)(C) ████████████
██████████████████

(b) (6), ██@gmail.com (shared email account with husband)

-Continued – 2 of 3 -

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | 11 INVESTIGATOR NOTIFIED | 12 PAGE 2 OF 3 PAGES |
|---|---|---|---|---|

13 STATUS: ☒ OPEN  ☐ SUSPENDED  CLOSED BY  ☒ ARREST  ☐ EXCEPTION  ☐ UNFOUNDED

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR Det. Lawston, C. | BADGE/ID #209 | DATE 04/29/2019 | 16 SUPERVISOR | BADGE/ID 520 | DATE 6/1/1 |
|---|---|---|---|---|---|---|---|---|

117

JA319

FORM 10-344B
(3/83)

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 6 WHEN DID IT OCCUR? | MO. | DAY | YR. | | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|---|
| United States Park Police - District – 2 | | 0 4 | 2 9 | 1 9 | | 1 9 ● | 0 3 2 2 5 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| 2 Car MVC - Fatal | |

| ITEM | 7 RESULTS OF INVESTIGATION: |
|---|---|

**INVESTIGATION:**

On Monday April 29, 2019 at approximately 1758 hours the undersigned arrived at Fairfax INOVA Hospital, located at 3300 Gallows Road, Falls Church, Virginia, to interview and check on the condition of individuals transported from the crash on the George Washington Parkway.

Two individuals were transported to Fairfax INOVA hospital. The driver of the Volkswagen, later identified by a copy of his Virginia driver's license as Eric Stuart JEWETT, was transported by Fairfax Aviation and was located in Trauma-Intensive Care Unit 318 under the Trauma name of "Sierra 891A" and was reported as being in critical condition.

The passenger sitting in the rear passenger's seat of the taxi, later identified by his South Korea Passport as Sung Chul JUNG, was transported by ground in Fairfax County EMS Penn Daw 411B and was located in the Emergency Room Department in Room #12, in stable condition.

**INTERVIEW OF JUNG:** (Passenger – Rear passenger seat of taxi)

**JUNG, Sung Chul**
█████████ W/A/M
South Korean Passport # █████████
International cellphone - █████████
█████████ kr
█████████████████████████████

Staying at The Hilton Garden Inn Room #517
7301 Waverly Street, Bethesda, Maryland 20814
(301) 654-8111
***Returning to residence in South Korea – Thursday – May 2, 2019***

**LOCAL AUTHORIZED POINT OF CONTACT FOR JUNG:**
SHIM, Min Ho - (Close Friend)
█████████ W/A/M

█████████████████████████████

**Injuries:** Facial fracture, nose and orbital bones
**Attending Physician:** Dr. Grausz
**Condition:** STABLE
**Location:** ER Room #12

Detective Humberson and the undersigned interviewed JUNG. JUNG stated that he had pain in his head and face and throughout his lower left leg. The undersigned observed dried blood, swelling and bruising throughout JUNG's face. JUNG also had a large bruise on his left foot. Other areas of the body were not visibly inspected by the undersigned.

-Continued - 1 of 3 -

| 8 WARRANT(S) ☐ YES ☐ NO | 9 ☐ LATENTS ☐ PHOTOS | 10 ID TECH NOTIFIED | 11 INVESTIGATOR NOTIFIED | 12 PAGE 1 OF 3 PAGES |
|---|---|---|---|---|

| 13 STATUS: ☒ OPEN | ☐ SUSPENDED | CLOSED BY: ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED |
|---|---|---|---|---|

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR Det. Lawston, C. | BADGE/ID #209 | DATE 04/29/2019 | 16 SUPERVISOR Etna Johnson | BADGE/ID 820 | DATE 5/1/19 |
|---|---|---|---|---|---|---|---|---|

118

JA320

UNITED STATES DEPARTMENT OF THE INTERIOR

NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO | DAY | YR | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| U.S. Park Police | | 0 4 | 2 9 | 1 9 | 1 9 • 0 | 3 2 2 5 |
| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT | | | | | |
| Mvc-F | | | | | | |

ITEM | 7 RESULTS OF INVESTIGATION

**Deceased**

Amoah Gyimah was pronounced on scene by (b) (6), (b) (7)(C) with the Fairfax County Fire Department. Gyimah remained trapped within the driver seat of the vehicle. The undersigned Detective was able to positively identify Gyimah via his VA driver license and his County of Fairfax Department of Cable and Consumer Services Hacker's License which depicted his name and digital image.

**OCME**

On scene, the undersigned Detective made contact with (b) (6), (b) (7)(C) with the VA OCME reference this investigation. She directed the undersigned Detective to have Gyimah to the Fairfax Hospital morgue via Metropolitan Funeral Homes. This investigation was assigned OCME case number N2019-00692.

Upon Ofc. Gillespie and Ofc. Weisbaum advising they had completed their reconstruction with Gyimah's vehicle, the undersigned Detective requested a Fairfax County Fire Rescue Squad respond to remove Gyimah from the vehicle at 1813 hours. The undersigned Detective also contacted Metropolitan Funeral Homes to respond to transport Gyimah to Fairfax Hospital per (b) (6), (b) with the VA OCME.

**Next of Kin**

On April 29, 2019 at approximately 2010 hours, Det. Sgt. Holmberg and the undersigned Detective responded to Gyimah residence at 7013 Solomon Seal Court, Springfield, VA 22152. We were met by family members to include his wife and children. They advised they were waiting for Gyimah to return home. The undersigned Detective advised them of Gyimah's death. All the family members immediately became distraught and unable to communicate. One of the children contacted other family members who responded to the residence. Upon their arrival, the undersigned Detective was able to explain the details of the crash and provide contact information.

**Gyimah family Point of Contact**

(b) (6), (b) (7)(C) -Brother of Gyimah, (b) (6), (b) (7)(C) Cell Phone- (b) (6), (b) (7)(C)

**South Korea Embassy Point of Contact**

Both passengers in Gyimah's vehicle are visiting the United States for business from South Korea. On April 30, 2019, the undersigned Detective was contacted by (b) (6), (b) (7)(C) from the South Korean embassy, his cell phone number is (b) (6), (b) (7)(C) He advised that the sister of Hyo Jung Kim is enroute to the United States.

**Investigation Continues**

| 8 WARRANT(S) | 9 | 10 ID TECH NOTIFIED | 11 INVESTIGATOR NOTIFIED | 12 |
|---|---|---|---|---|
| ☐ YES | ☐ LATENTS | | Freeman | PAGE 2 OF 2 PAGES |
| ☐ NO | ☐ PHOTOS | | | |

| 13 STATUS | ☑ OPEN | ☐ SUSPENDED | CLOSED BY | ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED | |
|---|---|---|---|---|---|---|---|
| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR Det. R.L Freeman | BADGE/ID 410 | DATE 4-29-19 | 16 SUPERVISOR | BADGE/ID 820 | DATE 5/1/19 |

UNITED STATES DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE

## SUPPLEMENTAL CRIMINAL INCIDENT RECORD

1 JUVENILE CASE ☐

| 2 SYSTEM AREA | 8 WHEN DID IT OCCUR? | MO | DAY | YR | 4 YEAR | CASE/INCIDENT NUMBER |
|---|---|---|---|---|---|---|
| U.S. Park Police | | 0 4 | 2 9 | 1 9 | 1 9 . | 0 3 2 2 2 5 |

| 5 NATURE OF INCIDENT | 6 RECLASSIFICATION OF INCIDENT |
|---|---|
| Mvc-F | |

| ITEM | 7 RESULTS OF INVESTIGATION: |
|---|---|

Notification

On April 29, 2019 at approximately 1630 hours, the undersigned Detective monitored a transmission for a crash southbound on the George Washington Memorial Parkway south of Tulane Drive with life threatening injuries. The officers on scene requested CI, ID and TSU respond.

Scene

The scene was located southbound George Washington Memorial Parkway south of Tulane Drive. A blue Volkswagen convertible was in the right lane of the southbound lanes with extensive driver front passenger side damage. A black and red Ford Red Top Cab was in the grass on the right shoulder of the northbound lanes facing southbound with extensive front and driver side damage. The roadway was dry and the temperature was approximately 65 degrees.

Initial Investigation

Ofc. Marino advised witnesses reported the blue Volkswagen was in the left lane of the southbound lanes and crossed into the left lane of the northbound lanes and struck the black and red Ford. The operator of the Ford was pronounced deceased on scene. One passenger from the Ford was flown to Medstar with life threatening injuries, the other passenger was transported to Fairfax Hospital with non-life threatening injuries and the operator of the Volkswagen was transported to Fairfax Hospital with life threatening injuries.

Involved Vehicles

Vehicle 1: 2013 blue Volkswagen convertible with Virginia tag 3GIRLYZ expiring 9/19 with VIN# 3VW5X7AT7DM832518

Registered owner/Operator: Eric Stuart Jewett, 8913 Linton Lane, Alexandria, VA 22309, DOB: (b)(6) /72

Vehicle 2: 2014 black/red Ford Fusion Hybrid with Virginia tag H126429 expiring 3/21 with VIN# 3FA6P0UU4ER394408, this is a Red Top Cab vehicle

Registered Owner/Operator: Amoah Gyimah, 7013 Solomon Seal Court, Springfield, VA 22152, DOB: (b)(6) 63

Passengers: Hyo Jung Kim and Sung Chul Jung

| 8 WARRANT(S) | 9 | 10 ID TECH NOTIFIED | 11 INVESTIGATOR NOTIFIED | 12 |
|---|---|---|---|---|
| ☐ YES ☐ NO | ☐ LATENTS ☐ PHOTOS | | Freeman | PAGE 1 OF 2 PAGES |

| 13 STATUS | ☒ OPEN | ☐ SUSPENDED | CLOSED BY | ☐ ARREST | ☐ EXCEPTION | ☐ UNFOUNDED |
|---|---|---|---|---|---|---|

| 14 REPORTING OFFICER | BADGE/ID | DATE | 15 INVESTIGATOR | BADGE/ID | DATE | 16 SUPERVISOR | BADGE/ID | DATE |
|---|---|---|---|---|---|---|---|---|
| | | | Det R L Freeman | 410 | 4-29-19 | | 820 | 5/1/19 |

JA322



# EDVA CRIMINAL INTAKE FORM

*Form feedback? Contact Antoine.J.Thomas@usdoj.gov*

United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA
703-299-3700

## Section 1: For Lead Case Agent

### Agency Information

Agent: Detective — Robert Freeman — Agency: NPS-USPP — Field Office:

Agency File No.: — Cell Phone: (b) (6), (b) (7)(C) — Office Phone: (202) 610-8760 — E-mail: Robert_Freeman@nps.gov

Add Agency/Agent — Remove Agency/Agent

### Defendant Information

Name: Eric — Stuart — Jewett — Sex: Male — DOB: (b) -72 — SSN:

Alias(es): — Address: 8913 Linton Lane, Alexandria, VA 22308 — FBI No.: — USMS No.:

Citizenship Status: — "A" File No.: — Country of Origin:

Criminal History:

Add Defendant — Remove Defendant

### Case Information

Dates: April 29, 2019 — Location: GW Parkway, Alexandria, VA — Operation Name:

Brief Case Description: Jewett driving southbound left lane on GW Parkway s/o Tulane Drive crossed into the northbound GW left lane and struck Gyimah's Red Top Taxi head on with two passengers. Gyimah was pronounced on scene. Hyo Jung Kim flown to Medstar life threatening, Sung Chul Jung treated released. Jewett flown to Fairfax Hospital life threatening.

### Additional Case Information

Related Defendants:

Est. Loss Amount: — Asset Forfeiture?:

Federal Monetary Interest?: — Est. No. of Victims: 3 — Type of Victim(s): Individual(s)

Controlled Substance: — Est. Drug Quantity/Weight:

Additional Details:

JA323

WALLACE (b) (6), (b) (7)(C) MT. VERNON

(b) (6), (b) (7)(C)

5/13
1025

McDONALD

W/ FLOW OF TRAFFIC THRU ALEX

W/ VAN → SHARP TURN TO AVOID UW INTO
SHOULDER
— NO OTHER VEHICLES AGGRESSIVE/RECKLESS

WALLACE — EMAIL
— CAME UP FROM BEHIND
— BLK HONDA WEAVING PULLED CLOSE
5/13    TO WHT VAN TO AVOID HONDA CUT HIM OFF
1045 — UNSURE IF 30 SEC OR 3 MIN BEFORE CRASH
— 45ish IN RT. LANE
.— BEING PASSED 60ish
— RENDERED AID @ UW
< NO SEATBELT ON DRIVER
— DID NOT WITNESS CRASH

(b) (6), (b) (7)(C)

JA324

5/13  BOMBAC
W48 - VW PASSED HIM
    - VW SWERVING / SPEEDING PRIOR PER OTHER WITNESS @ SCENE
    - NO OTHER CAR IN AREA
        CAUSED VW TO CROSS

JONES
    - 30 FT BEHIND VW
    - DRIFTED OVER INTO N/B - NO REASON
    - NO AGGRESSIVE DRIVING PRIOR
    -

JA325



148

JA326

Room # 517

FACE, LOWER Rt LEG, CONTUSIO:

- R/ BEHIND PASS.

GROUND, BLU DRIVER.

CELL THERAPY MEETING, BACK TO HOTEL

FLY OUT THURSDAY.

[REDACTED: (b) (6), (b) (7)(C)]

- TAXI DRIVER ON PHONE, DRIVING. UP RIPD
TALKING ON PHONE, AFFLUENT TAXI, WAS
DRIVING. FAST

ZIP CODE - 06712

[REDACTED: (b) (6), (b) (7)(C)]

[REDACTED: (b) (6), (b) (7)(C)]    - VA DC    [REDACTED: (b) (6), (b) (7)(C)]

[REDACTED: (b) (6), (b) (7)(C)]

6 of 7

158

JA327

# EXHIBIT C

# Extracted pages Deposition of Dr. Sun-Chul Jung

JA328



# Transcript of Sung-Chul Jung

**Date:** June 16, 2023
**Case:** Sung-Chul Jung -v- Red Top Cab, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

JA329

VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

--------------------------x

SUNG-CHUL JUNG,                    :

        Plaintiff,                 :

  -v-                              :   Case No.: CL-2020-0013314

RED TOP CAB, LLC, et al., :

        Defendant.                 :

--------------------------x


        Remote Deposition of SUNG-CHUL JUNG

      Witness located in Seoul, South Korea

              Friday, June 16, 2023

                  7:58 a.m. KST


Job No.:  495467

Pages:  1 - 64

Reported by:  Susan Wasilewski, RPR, CRR, CMRS, CRC, FPR

APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY


ON BEHALF OF THE PLAINTIFF:

     STEVEN M. GARVER, ESQUIRE

     DEBORAH E. MAYER, ESQUIRE

     GARVER LAW OFFICES

     11702 Bowman Green Drive, Suite 100

     Reston, Virginia 20190

     Telephone:  (703) 471-1090



ON BEHALF OF DEFENDANT RED TOP CAB, LLC:

     GIFFORD HAMPSHIRE, ESQUIRE

     McGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C.

     9990 Fairfax Boulevard, Suite 400

     Fairfax, Virginia 22030

     Telephone:  (703) 385-1000



ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

     CHRISTIE JEON, Zoom Media Technician

JA331

front of you right now?

A.   No.

Q.   Okay.

MR. GARVER:  I think he has them available if need be.

MR. HAMPSHIRE:  Yeah, and I will be actually probably using it as an exhibit if we need to talk about it.

BY MR. HAMPSHIRE:

Q.   So just to confirm, you won't be relying on anything that's in front of you, any documents, correct?

A.   No.  No, there is no documents here.

Q.   Okay.  So we're here today to talk about the motor vehicle accident that happened on April 29th, 2019.

A.   Yes.  Okay.

Q.   So isn't it true that you don't have any specific memory of the actual collision?

A.   I don't have any specific memory at the time.

Q.   Meaning you don't remember the collision?

JA332

A.   I don't remember the collision.

Q.   Okay.  And you were injured in the accident with a direct blow to your face; is that correct?

A.   Yes, face here, yeah, this area.

Q.   And the -- isn't it true that the blow to your face rendered you unconscious?

A.   Pardon?

Q.   Did the -- isn't it true that the blow to your face or your head rendered you unconscious?

Let me put it to --

A.   Yeah, I -- yeah, I don't exactly understand the -- you know, what you are meaning.

Q.   That's fine.  I'll rephrase the question.

A.   Okay.

Q.   When you hit your head, that made you unconscious, correct?

A.   I think so.

Q.   Okay.  Because you don't have any direct memory of the accident, so you don't actually know one way or the other if you were conscious?

A.   No.

Q.   You don't know how long you don't -- your

JA333

memory -- you don't know long the gap in your memory is, correct?

A.    I waked up in hospital and they said "1, 2, 3" and I transferred from one bed to another bed, and that was my first memory after collision.

Q.    Okay.  So your first memory after the collision was waking up at the hospital?

A.    Yes.

Q.    Okay.  But you don't know when your memory -- when the loss of your memory began, correct?

A.    Yeah, the last thing, I was in taxi.  Yeah, taxi was going through the road.

Q.    What was going through the road?  I'm sorry.

A.    Yeah, taxi.

Q.    Oh, taxi.

A.    Taxi was going through the -- yeah, through the roads, yeah, the way.

Q.    So the last thing you remember was being in a taxi?

A.    Yes.

Q.    And then you -- the first thing you remember

JA334

after that is waking up in a hospital?

A.   Yes.

Q.   And you don't have any idea how long that gap was?

A.   Maybe it's more than four hours or six hours; about six hours.

Q.   But you don't --

A.   Yeah, it's my --

Q.   You don't yourself know that, you are relying upon what people have told you or what information you've gathered after the fact?  You can't -- you have no way to gauge that time frame; is that correct?

A.   Yeah.  Actually, I did not exactly time and just -- or when I realized I was in hospital, and then all treatment and the diagnosis process has been completed, and then I notified my situation to my friends in United States, it -- yeah, the night of that day.

Q.   When you were unconscious, you didn't know what was happening around you?

MR. GARVER:  Let me just interject an

JA335

objection.  When you say he was unconscious, I
think he said he thinks so but he didn't say he
necessarily knows he was unconscious.

MR. HAMPSHIRE:  And that's -- I take your
point and I agree, so I will rephrase.

Q.   Mr. -- or Dr. Jung, excuse me, during this
loss of memory, you also don't have any knowledge or
memory of what was happening around you, correct?

A.   Yes, correct.

Q.   Okay.  And you don't have any memory of
seeing the vehicle that hit the taxi cab; is that
correct?

A.   I don't have any memory, yeah.

Q.   Could you -- and you said the first thing
you remember is waking up in the hospital.  Do you
even have any -- did you ever even see the vehicle
after the accident, before the accident or
otherwise, that hit your car?

A.   No.

Q.   No?  Is that a no?

A.   No.

Q.   Okay.  Do you have any memory of what speed

JA336

the taxi cab was going when the collision occurred?

A.    You mean the speed?

Q.    Correct.

A.    You mean the speed of taxi?

Q.    The speed of the taxi at the time of the collision.

A.    Yeah.  Yeah, you already know I was no memory at the time of collision, but before collision or my last memory, the taxi speed is usual speed.  That's all -- there was no interruptions.

Q.    (Garbled audio.)

        MR. GARVER:  I couldn't hear that, Giff.

        (Recess from 8:17 a.m. until 8:19 a.m.)

BY MR. HAMPSHIRE:

Q.    So, Dr. Jung, I believe you just said that the taxi cab, before the collision, was going around norm -- usual speed without interruption.  Can you explain what "usual speed" means?

A.    Yeah.  Because I like the scenery of a riverside, and then, yeah, I saw the scenery of the right side, the riverside, scenes of river and the trees, and then it passed -- it passed normally, you

JA337

know, without any abnormalities; because I also

driving, and then the speed was usual, meaning

normal.

Q.    Was it going with the speed of traffic?

A.    I mean the speed was of the taxi, yeah.

MR. GARVER:  Wait a second, Dr. Jung.  I'd

like to object.  There's no foundation that there

was more traffic going in the same direction,

so...

MR. HAMPSHIRE:  Okay.

BY MR. HAMPSHIRE:

Q.    Dr. Jung, was there cars traveling next to

you or around you when you were in the taxi cab?

A.    I don't remember.

Q.    Okay.

A.    I don't know.

Q.    Were there any cars on the road when you

were traveling on Mt. Vernon Parkway on April --

A.    Yeah, several cars, several cars passed

over, but I did not remember exactly.

Q.    Okay.

MR. GARVER:  Objection in that I think it's

JA338

George Washington Parkway.  Is it not?

MR. HAMPSHIRE:  Is that not what I said?

MR. GARVER:  No.

MR. HAMPSHIRE:  Okay.  Sorry.  It's been a long day.

BY MR. HAMPSHIRE:

Q.   So you don't remember if there were other cars around you at the time of the -- or when you were on George Washington Parkway?

MR. GARVER:  Do you mean going in the same direction?

Q.   Yes, going in the same direction.

A.   Yeah.  Actually, I did not remember, yeah, because I was focused on the -- yeah, one weird thing of the driver, and then I was enjoying the scenery of the riverside, and so, yeah, I did not realize there was -- there were any cars in the street.

Q.   Okay.  What was the weather conditions like when you were in the taxi cab?

A.   Yeah, I mean weather that I -- I just meant weird thing.

JA339

Q.    Okay.  Do you remember what his name was?

A.    I don't know.

Q.    Okay.  I know you said the first thing you remember was waking up in the hospital, but just to confirm, you never spoke with Mr. Gyimah after the collision; is that correct?

A.    Yes, correct.

Q.    And Mr. Gyimah never made any statement to you about how the accident happened; is that correct?

A.    I did not meet him, yeah, after collision.

Q.    Right.  So you mentioned the unusual things the cab driver was doing.  Those things were call -- talking on the phone and typing on a device; is that correct?

A.    Yeah.  The first unusual thing was there was an iPad-like device in the middle of the front seat facing the driver.  That was first thing.  And the second thing was my last memory, he was on the phone.  That was my answer.  I just said to Detective "he was on the phone."  And then he asked me and then I don't know what was happening.

JA340

Q.   But the last thing he was doing was being on the phone; is that correct?

A.   Yes, yes.  Yeah, he was on the phone on the right hand.

Q.   And what do you mean by being on the phone? Did he have -- was he holding it with one hand?

A.   No, no, no.  Just down, down -- his hand was down, yeah, and then he hold his phone and his phone was not -- yeah, that upside; the downside.

Q.   Okay.  Was it connected to a Bluetooth device?

A.   I don't know.  I don't know.

Q.   How was he speaking into it?  Was it on speakerphone?

A.   No.  I don't know.  I did not realize he was -- he used the speakerphone.  I did not realize.

Q.   Was he on a call or was he holding the phone?

A.   Holding the phone.

Q.   Okay.  But was he on a call?

A.   Actually, I don't know but he speak something, but at that time my English was not good

JA341

and so he talking is on conversation or speak himself or speak to me.  At that time I did not realize and still I don't know.

Q.    You don't know what he was talking about?

A.    Yeah, I don't know what exactly he says at that time.

Q.    Okay.  But was he on a phone call?

A.    Yeah, he was just on the phone.  I am not saying phone call; just on the phone.

Q.    Was there somebody else he was on the phone with?

A.    No, no, just he hold his phone.

Q.    He was just holding it?

A.    Yes.

Q.    Okay.  So he -- did he have one hand on the steering wheel?

A.    Yes.

Q.    And one hand on the phone?

A.    Yes, yes.

Q.    Okay.  And other than that, that -- you don't remember anything else?

A.    I don't know.  I don't know.  I don't

JA342

remember anything else like that that was facts.

Q.    So please correct me if I'm wrong here.  The last thing you remember, you're in the taxi cab, Mr. Gyimah has one hand on the steering wheel, one hand on the phone, and then you wake up in the hospital?

A.    Yes.

Q.    And there's nothing in between those two events?

A.    No, there was no -- yeah, there was -- yeah, in my head.

Q.    Okay.  And so how do you know that Mr. Gyimah was distracted when the accident occurred?

MR. GARVER:  Objection as to the conclusion, but go ahead and answer as best you can.

A.    Yeah, yeah.  What's the meaning of distracted?

Q.    Excuse me?

A.    What's the meaning of distracted?  You say distracted.  I'm sorry.

Q.    Okay.

JA343

time of the accident.  I'm not talking about prior to the accident.

        MR. GARVER:  He's already -- objection then as to foundation.  He's already said he doesn't remember the accident itself.

        MR. HAMPSHIRE:  Okay.

BY MR. HAMPSHIRE:

Q.    Dr. Jung, do you remem -- do you have any basis for knowing how long between when you lost your memory and when the accident occurred was?

A.    At least more than four hours.

Q.    Sorry.  Let me rephrase.  Do you know how long it was between you having no memory and when the accident occurred was?  Not when -- not when you spoke up in the hospital but when the accident --

A.    Yeah, okay.  Okay, okay.  I understand, yeah.  I don't know.

Q.    You don't know.  Okay.  Do you know what lane the taxi cab was right before you lost your memory?

A.    No, there was no -- none of those things, stayed forward.

JA344

Q.    Do you know which lane you were in?

A.    Yeah, right lane, and then -- yeah.

Q.    Which lane was it?

A.    The right lane.

Q.    Right lane?

A.    Yeah.

Q.    Okay.  Do you know how many lanes the George Washington Memorial Parkway has going southbound or northbound?

MR. GARVER:  At that location at that time, I assume is what you mean?

MR. HAMPSHIRE:  Correct.

MR. GARVER:  The highway is different now.

MR. HAMPSHIRE:  Correct.

BY MR. HAMPSHIRE:

Q.    Do you want me to ask again, Dr. Jung?  I'm sorry.

A.    Oh, yeah, yeah, yeah.

Q.    Do you know at the time of or around the time of the accident, when you were traveling on the George Washington Memorial Parkway, how many lanes did you -- were there going the direction you were

JA345

going?

A.    Yeah, I don't exactly --

Q.    You don't know?

A.    I don't know.

Q.    Do you know what the surrounding landscape appeared as?

A.    Yes.

Q.    What was that?

A.    Yeah, yeah.  My last memory is the right side there was a forest and, yeah, some river scenes were viewed a little bit between the woods, and then forest and -- yeah.

Q.    Okay.  Do you remember the kind of vehicle the taxi cab was?

A.    No.

Q.    Okay.  Do you remember if it was a sedan or a truck or a van?

A.    Yeah, I know it was a sedan.

Q.    A sedan.  Okay.  Do you remember if there was a median?

A.    You mean the sides?

Q.    The middle, in the middle was there a

JA346

hand and spoke to someone for about 30 seconds.

About a minute or two later, the cab driver began typing into this same handheld device with his right hand. I remember him texting for about 30 seconds and then I do not remember anything.

My next memory was that I was at the hospital, which I now realize was INOVA Fairfax Hospital.

Q. Okay. And please take a minute, if you need to, to answer this question, but based on that answer that you just read into the record, is that the most accurate version of what happened that day?

A. Yeah, to the I am wearing -- yeah, from the past and then, yeah, I was wearing -- Mrs. Kim fell asleep, right, and that was, yeah, correct. Yeah, from -- actually, I don't remember I was wearing my seat belt in then.

And then cab driver received phone call or he spoke by himself. I don't know what was it exactly, but he spoke to someone, somebody, or if he had a phone call, or he spoke by himself or spoke to me. I don't realize still now.

JA347

Q.   Okay.  So let's take these one at a time.
So you mentioned a seat belt statement.  You don't
know -- sitting here today, you cannot remember
definitively if you were wearing your seat belt?

A.   I don't -- yeah, I don't remember.

Q.   You don't have a --

A.   Actually, I don't remember, yeah.

Q.   But you assume you wore a seat belt based
upon your behavior with wearing seat belts?

A.   Yes, yes, I am assuming.

Q.   And regarding the phone call statement, you
don't know if he was talking to somebody on the
phone, if he was talking to himself, if he was
talking to you, you don't know which one it was?

A.   Yeah, it's correct.

Q.   Okay.  What about typing on the iPad, do you
remember that?

A.   No, no, no, he not type iPad -- on the iPad.
He just type on the phone, he looks like type on the
phone.

Q.   He typed on the phone?

A.   Yes.

JA348

Q.    Okay.  Did he type anything on any other device?

A.    No, no, no.  No, I did not, yeah, see -- yeah, see his typing on the iPad like device.  He did not.

Q.    He did not?

A.    He did not.  Yeah, he just touched his phone on his right side, right hand.

Q.    And you say texting, but is that to mean -- you don't know if he was sending a text message, you just saw him typing on the phone?

A.    Yeah, just the typing.

Q.    Okay.  And then you don't remember anything?

A.    I don't remember anything.

Q.    Okay.  And you prepared this answer, correct?

A.    Yes, I prepared, yeah, the first document, first draft, yeah, and then it was --

MR. GARVER:  Dr. Jung, just wait a second.

THE WITNESS:  Okay.

MR. GARVER:  I'll direct you not to answer anything about your communication with your

JA349

ERRATA SHEET

| CASE NAME: | Sung-Chul Jung v. RED TOP CAB, LLC  et al Fairfax Cir. Ct. Case No. CL-2020-13314; and<br>BRIAN M. O'CONNOR, Administrator for the  Estate of HYO JUNG KIM, deceased, v. RED TOP CAB, LLC  et al. Fairfax Cir. Ct. Case No. CL-2020-13315 |
|---|---|
| DEPOSITION OF: | Sung Chul Jung |
| DATE TAKEN: | June 16, 2023, 7:58 a.m. KST |
| REPORTER: | Susan Wasilewski, RPR, CRR, CMRS, CRC, FPR, Planet Depos |

I have read the foregoing deposition and I wish to make the following changes:

| Page | Line | Correction | Reason |
|---|---|---|---|
| 25 | 7-9 | Change to "The phone was in his hand, and he held it down and moved it up, and it looked like he was typing something." | Clarification-Language barrier consistency with later testimony |
| 32 | 2 | Change to I am not sure, but I could clearly see the scenery on the right—the trees and the river. My view to the right was not blocked by cars. | Clarification-Language barrier consistency with later testimony |
| 32 | 4 | Change to I am not sure, but I could clearly see the scenery on the right—the trees and the river without obstruction of cars. | Clarification-Language barrier consistency with later testimony |
| 32 | 6 | Change to I am not sure, but I could clearly see the scenery on the right—the trees and the river, without obstruction of cars. | Clarification-Language barrier consistency with later testimony |
| 36 | 15-16 | Add "But I routinely wear a seatbelt and I had injuries consistent with wearing a seatbelt. I had a hematoma on my left iliac and lacerations on my liver. | Clarification—language barrier |
| 45 | 16-17 | Add, to "I routinely wear a seatbelt and I had injuries consistent with wearing a seatbelt. I had a hematoma on my left iliac and lacerations  on my liver." | Clarification-language barrier |
| 47 | 10 | Add "Because I routinely wear a seatbelt and I had injuries consistent with wearing a seatbelt. I had a hematoma on my left iliac and  lacerations on my liver." | Clarification—language barrier |
| 54 | 17 | Add. "I did tell the Park Police Officer that the cabdriver was using his cellphone." | Clarification—language barrier |

1

JA350

| Page | Line | Correction | Reason |
|------|------|-----------|--------|
| 55 | 10 | Add. "I know that he was using his phone with his right hand and was paying attention to the phone, not the road. I also know there was nothing to our right except the river and he could have moved to the right to avoid the collision. Also, from what I have since learned there is no evidence he ever braked to avoid the collision so he evidently was not watching the road very well and should have been able to avoid the collision." | Clarification—language barrier. Consistency with prior testimony. |
| 56 | 1 | Add "I also had a hematoma on my left iliac and lacerations on my liver and abrasions on my left lower leg. Too, I had cracked ribs which was very painful for a couple of months. | Clarification-language barrier. |
| 57 | 21 | Add, "I was unable to work for at least a month and then was only able to work part time for several months. A colleague of mine took over my lectures from the time of collision until the end of the semester in June. I was not scheduled to lecture over the summer, and I made every effort to return to lecturing my students when they returned in September. I missed a month of being in the lab, and my office. When I am not in the lab, my research and that of my students does not occur. I made strident efforts to return to the lab and my office as quickly as possible. After the month, I returned part time working as much as was possible in any given week. Usually this meant working 3 to 4 days a week." | Clarification-language barrier-cultural differences. |
| 59 | 18 | Change RIS US [sic] medicine to "RIS US/ Alliance for Regenerative Medicine" | Clarification |

I hereby certify that I have read my deposition and made those changes and/or corrections I deem necessary, and approve the same as now written.

Executed this _5_ day of July, 2023.

By: _____
Sung-Chul Jung

2

JA351

# EXHIBIT D

# Extracted pages Deposition of Mr. Timothy Bracken

JA352

**In the Matter of:**

**Sung-Chui Jung**
**v.**
**Red Top Cab, LLC**

**Timothy Bracken**

June 16, 2023



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

JA353

COMMONWEALTH OF VIRGINIA:

   IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

- - - - - - - - - - - - - - - - x

SUNG-CHUL JUNG,                    :

          Plaintiff,              :


vs.                                : Case No.
                                     CL-2020-13314
RED TOP CAB, LLC,                  :
ET AL.,

          Defendants.             :

                                   and

BRIAN M. O'CONNOR,
ADMINISTRATOR FOR THE ESTATE      :
OF HYO JUNG KIM,
DECEASED,                          :

          Plaintiff               :


vs.                                : Case No.
                                     CL-2020-13315
RED TOP CAB, LLC                   :
ET AL.,

          Defendants.             :

- - - - - - - - - - - - - - - - x
                     June 16, 2023

                     Via Zoom

VIDEO DEPOSITION OF:

                     TIMOTHY BRACKEN

JA354

Was called for examination by counsel for the Plaintiff, pursuant to notice,  Via Zoom, commencing at 1:14 p.m., before Carolyn Friend, a Notary Public in and for the State of Maryland, when were present on behalf of the respective parties:

APPEARANCES:

        STEVEN M. GARVER, ESQ. (VIA ZOOM)
        DEBORAH E. MAYER, ESQ. (VIA ZOOM)
        Garver Law Offices, P.C.
        11702 Bowman Green Drive, Suite 100
        Reston, Virginia 20190
        (703) 471-1090 STEVE@GARVERLAW.COM
        COUNSEL FOR THE PLAINTIFF

        GIFFORD HAMPSHIRE, ESQ. (VIA ZOOM)
        McGavin, Boyce, Bardot, Thorsen & Katz
        9990 Fairfax Boulevard, Suite 400
        Fairfax, Virginia 22030
        (703) 385-1000
        ghampshire@mbbtklaw.com
        COUNSEL FOR THE DEFENDANTS

ALSO PRESENT:  Joe Townsend, Video Operator

C O N T E N T S

WITNESS:                EXAMINATION BY:              PAGE:

Timothy Bracken                    Mr. Garver            4

                    Mr. Hampshire       26

                    Mr. Garver          34

JA355

Timothy Bracken                                    6/16/2023

A      Correct, yeah.

Q      And -- and did you stay in the military when you moved down to Huntsville?

A      No, no.  I retired out of DC.

Q      Okay.  And can you tell us a little bit about -- well, first of all, let me ask you a question.  In Huntsville, Alabama, you're more than a hundred miles from Fairfax, Virginia; is that true and correct?

A      Yeah --

Q      And --

A      -- more than a hundred miles.

Q      And -- and do I understand that you're unable to be present at trial on July 17th of this year in Fairfax?

A      No, I won't -- I won't be able to be at the trial, no.

Q      Okay.  And can you tell us a little bit about your background and experience in the military and your rank?

A      Yeah.  I entered the Army in 1991 as a Infantry Soldier and I served until 1998 and I got

JA356

out and went to college at the University of Tennessee, Knoxville, where I secured a commission and I went as a lieutenant to flight school and after flight school or during flight school 911 happened and for the next several years I served in various units flying helicopters and got out in 2008, went to graduate school in North Carolina to pursue academia.

That changed.  I moved to DC and got accepted to Howard Law.  I was going to go to law school.  That changed, and my calling just kept pulling me back to the Army, and I went back in the Army in 2011 as a acquisition officer doing contracts, material acquisitions, cost schedule pro forma, and I served in that role for about 11 years between Huntsville, Alabama and Washington, DC until I retired in July of 2022.

Q     When you were engaged as a pilot, what -- what did you fly?

A     The Kiowa Warrior, OH-58 Delta Kiowa Warrior.  It's a -- it's a lightly armed Scout Reconnaissance Helicopter.

JA357

Timothy Bracken                                    6/16/2023

Q    And were you engaged in -- in military zones or war zones?

A    Yep.

Q    And --

A    I spent time in Baghdad and East Iraq.

Q    And during that time, did you come in contact with people that suffered various trauma?

A    Oh, yeah, all the time.

Q    And did you get any training or experience in how to treat trauma?

A    Oh, yeah, lots.

Q    Can you explain that a little bit?

A    Everything from A -- the ABCs, airway, breathing, circulation to J tubes to fixing compound -- or setting compound fractures to immobilizing to prioritizing casualties or mass casualty event, calling in ambulance, whether vehicle -- or ground vehicle or aerial ambulatory to extract wounded or -- yeah, that's -- that's -- that's the gamut, from the -- a little cut to needing an airway opened manually.  No skill identifier, but it was just years of the -- the

first aid -- first aid training.

Q    I'm getting to this particular incident. You were traveling on the George Washington Parkway in Fairfax County on or about April 29th, 2019; is that accurate?

A    I -- I thought it was the 19th, but I -- I guess you're right.  I -- I might have confused the years, but yes.

Q    And -- and do you recall coming -- where were you traveling, northbound or southbound?

A    I was traveling northbound on the GW Parkway --

Q    Approximately --

A    -- George Washington Parkway.

Q    Approximately what time?

A    It was about four in the afternoon, about four.

Q    And -- and what happened that was unusual?

A    It -- it -- I saw some pretty significant movement in the road, probably 200 meters in front of me, about 600 feet, 5, 600 feet in front of me.

JA359

Timothy Bracken                                              6/16/2023

And I thought initially that a tree had fallen in the road just because it -- it -- it appeared to be a lot of dust and movement that was -- I didn't know.  It looked like just a lot of violent movement and dust.

I got closer and that's when I saw it -- it was smoke.  It was like a gray smoke and then I started seeing -- picking up the two vehicles, the red -- the red -- red cab and then the white Volkswagen and then the debris field.

Q    While you were traveling northbound, were you -- can you -- well, first of all, can you describe how many lanes northbound there were at that location back in that time frame?

A    Yeah.  There -- it was a -- it was a four-lane, and I know that, you know, now if you went there, they closed off -- it took them long enough to -- to realize how -- you know, they -- they finally put a -- a median in there and I think it's -- it's probably a two-way now, single lane north, single lane south.

But at that time it was two lanes north,

JA360

two lanes south separated by the yellow paint, the double -- double yellow paint line.

Q    Okay.  And --

A    So it was -- was a four-lane at that -- at that time.

Q    So there were two -- two lanes southbound and two lanes northbound?

A    Yes, sir.  Yep.

Q    And the area where this incident took place, what area on GW Parkway?  Do you recall a cross street or near cross street?

A    I do not.

Q    Okay.

A    I do not.  It -- it was after -- it was north of the bend in the river where -- now, if you're going -- the -- the bend in the river by where -- just north of Mount Vernon, say, a half a mile.  It was north of that area and south of the -- of the golf course there --

Q    Okay.

A    -- and yeah, I -- I -- I've tried to -- you know, exact where it was, I -- I don't remember

JA361

Timothy Bracken                                                      6/16/2023

the road or anything.  It was, I mean, you know,

it's a beautiful drive, but it all looks alike,

though.

     Q     So were you traveling in the left

northbound lane or the right northbound lane?

     A     I think I was in the left northbound

lane.

     Q     All right.  Had you noticed the cab prior

to that and --

     A     Had I noticed the what?

     Q     Had you noticed the Red Top Cab while

driving prior to coming upon it?

     A     No, no.  Traffic was -- was fairly light

in that there was no one in front of me.  I didn't

see anybody in front of me and there was maybe one

or two cars behind me.  It was -- it was quite

light.

     Q     And when you say it was quite light,

you're talking about northbound?

     A     Yes, northbound.  Southbound I can't

speak to, but northbound there was no one in front

of me.  I didn't see anybody in front of me.

JA362

Timothy Bracken                                6/16/2023

Q      All right.  Did you have your windows up or down?

A      I believe they -- they were -- they were probably up.

Q      Okay.  Did you hear a collision or -- or not?

A      I did not hear anything.

Q      All right.  So you came upon this scene and tell us what you saw and what you did.

A      When I saw that it was an accident, I stopped my vehicle, put my hazards on and exited the vehicle and I -- I knew what happened at that point, that this accident had -- what I thought was a tree was an accident.  I could tell that it was -- you know, this is Tim Bracken talking here -- I could tell it was -- it was not two cars in the same lane and they, you know, went bumping in the night.

No.  This was a catastrophic, head-on collision by the debris field and the -- the energies involved at two machines.  It was -- it was -- it was bad.

And for whatever reason I ran -- I do not

JA363

know why I ran to the red cab.  Maybe because it was red.  I don't know.  I ran to the red Prius and focused on the driver and I saw he was in bad shape and -- in that he was nonresponsive and he was bleeding from his mouth.  And at that point, I ran back -- I tried to get him out of the vehicle.  I know you're not suppose to move people, but he was bleeding out of his mouth.

And actually I think it was he started to -- the blood started to foam and I knew that was -- he was either drowning in his own blood and not able to breathe or -- or both.  His lungs were not working.

It seemed like he came to there for a second.  He had a -- he had an okay pulse and I started talking to him and I could tell he was -- he was slipping.  So I ran back to my vehicle to get something to pry him out of the vehicle.  He was a big guy and there was no way I was going to get him out of there out -- out through that window.

I ran back to my truck and ran back to the cab with an asp and --

JA364

THE REPORTER:  With a what?  I'm sorry.
With a what?

THE WITNESS:  It's -- it's an asp, A-S-P.
It's a collapsible billy club, if you will.  I
went -- geez, I think I went back to the driver
seat, checked his pulse again.

By then people were congregating, and I
went over to the -- the passenger side, tried to
break the window.  It wouldn't get -- that -- that
window was not breaking.  I just wanted to give the
guy a chance.  Went back to the driver seat, checked
his pulse again, started talking to him, kind of
resolved that it was just no way I was going to get
him out of there.  He expired shortly thereafter, I
think, within two and a half minutes.

BY MR. GARVER:

Q     Was the driver window open?

A     Yes, it was.  It was open.

Q     Had it broken open or --

A     Either -- either that -- either that,
Counsel, either that or it blew out, but there was
no -- there was nothing stopping me from leaning in

JA365

Timothy Bracken                                                    6/16/2023

there and doing my assessment of this gentleman.

Q     But you couldn't open the door?

A     No.  The door would not open.

Q     Did you see anyone else in the vehicle?

A     I saw -- in the back seat I saw a gentleman.  He -- he, you know, in my assessment of where I put my energies and my attention, he did not look like he was as bad off as the -- the driver and by the time I noticed him, other people were on the scene, and I resolved to focus my energies on the driver, but I did see a gentleman in the back initially.

And he had blood on his face like he was -- I -- you know, just to use an analogy, it looked like he had gotten hit with -- it didn't seem like the blood was coming down on his face, but he just looked like he got splattered with blood in his face, and I saw him in the back seat.  They had gotten him out and the next thing I knew he was sitting against a tree by the time the driver expired.

Q     Did --

Timothy Bracken

was from Nigeria.

Q     So when you spoke to him, did he respond to you at all?

A     He didn't respond to me directly, but I think he came to, he came around twice, coming around, you know, that's -- that's in the context of he didn't say anything.  He opened his eyes, looked around.  I -- I honestly -- I hoped he did not come around because he bit off his tongue.  He would have been in a lot of pain and I hoped he did not come around.

Q     Did --

A     But he opened his eyes and kind of looked around a little bit, and I kept talking to him, but he did not acknowledge me in the least.

Q     Did you see a -- a phone or a tablet of any kind or anything like that in the car?

A     Yeah.  I saw a -- a phone -- it was a bigger phone.  I think it was an Android -- on his -- on his right leg, I believe it was.

Q     Whose right leg?

A     It was in his lap.  It was the driver's

JA367

20
Timothy Bracken 6/16/2023

right leg.

Q Okay. It was in the lap of the driver?

A Yeah.

Q And could you tell if the phone was operating or any -- working or anything?

A I didn't -- I don't remember seeing any light on the screen or anything like that. I don't know. It could have been a brick. I have no idea. I know it was a phone.

Q When -- when you got to the cab, to where the driver was, were you the first person who got there or did you see others there ahead of you?

A No. I was the first person there.

Q And did you stay with the driver until emergency personnel showed up?

A I -- I did. The only time I -- I went back to my truck, I think, twice to get a seatbelt cutter and asp, but I think I went back twice, but I -- I -- I came back to him. He -- he was my focus until the emergency folks came around.

Q Could you tell in any way which vehicles had crossed the double yellow line or if they both

JA368

had?

A     No.  I -- there was no -- there was no telling.  I -- I -- I didn't even know -- I don't even know -- honestly, right now, I don't even know -- I haven't heard.  It's not in my internal lobe anywhere of --

THE REPORTER:  It's not what?  I'm sorry. I didn't understand.  It's not what?

THE WITNESS:  I'm sorry.

THE REPORTER:  You said it's not, and I didn't understand what you said.

THE WITNESS:  It's not in my internal lobe anywhere.  I don't even know which direction anybody was.  And I definitely couldn't tell by the way the vehicles were oriented at the time that -- you know, at -- at the scene, at the crash site.

There was debris everywhere, and the vehicles were -- I know the Volkswagen was facing -- no, I don't.  I don't know.  I did -- I do know -- the only thing that I know is that the -- the cab was facing south in the northbound lane.

Q     And where had you pulled your vehicle to

JA369

Timothy Bracken                                6/16/2023

stop it?

A    I stopped it in the road.

Q    Okay.  And did --

A    I stopped it in the -- which I --

Q    Did there come a time you moved it?

A    I'm sorry.

Q    Did there come a time that you moved your vehicle before you left the scene?

A    Yes.  Yeah, I was -- I stayed -- I stayed -- out of respect, I stayed with the driver for quite a while even after they covered his body. I think I was the last non-emergency first responder to leave.

Q    And -- and how long were you there?

A    Geez, I was there probably a total of -- I -- I would -- I would say 45 minutes, total, maybe an hour.

Q    Was there another military person who had stopped to give assistance that you identified as --

A    Yeah.  Yeah, there was a -- a female sergeant first class who -- who showed up and she did exactly what she was supposed to do.  She

JA370

# EXHIBIT E

# Extracted pages Deposition of Mr. Kyle Summers

JA371

# In the Matter of:

## Brian M. O'Connor
## v.
## Red Top Cab, LLC, et al

## Kyle Summers

February 28, 2023



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

Court Reporting
Videography
Videoconferencing

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

JA372

VIRGINIA

      IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

- - - - - - - - - - - - - x

BRIAN M. O'CONNOR,
Administrator for the
Estate of HYO JUNG KIM,
deceased,

       Plaintiff,

    - vs -            CASE NO. CL2020-13315

RED TOP CAB, LLC, et al.,

       Defendants.

- - - - - - - - - - - - - x

                 Reston, Virginia

                 Tuesday, February 28, 2023

Deposition of

              KYLE SUMMERS

a witness, was called for examination by counsel

on behalf of the Plaintiff, pursuant to notice,

taken at GARVER LAW OFFICES, P.C., 11702 Bowman

Green Drive, Suite 100, Reston, Virginia,

beginning at 3:00 o'clock p.m., before MICHELLE

L. DONATH, a Verbatim Reporter and Notary Public

in and for the State of Virginia, at large, when

there were present on behalf of the respective

parties:

JA373

APPEARANCES:

On Behalf of the Plaintiff:

     Steven M. Garver, Esquire
     Deborah E. Mayer, Esquire
     GARVER LAW OFFICES, P.C.
     11702 Bowman Green Drive, Suite 100
     Reston, Virginia 20190
     (703) 471-1090
     steve@garverlaw.com
     debmayer@garverlaw.com

On Behalf of the Defendants, Red Top Cab, LLC, Fairfax Taxi, Inc. & Evelyn Kenin, Administrator of the Estate of Amoah Gyimah, Deceased:

     Gifford V. Hampshire, Esquire
     MCGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C.
     9990 Fairfax Boulevard, Suite 400
     Fairfax, Virginia 22030
     (703) 385-1000
     ghampshire@mbbtklaw.com

On Behalf of the Witness, Kyle Summers:

     Ralph E. Kipp, Esquire
     THE LAW OFFICES OF RALPH E. KIPP, P.L.C.
     10615 Judicial Drive, Suite 501
     Fairfax, Virginia 22030
     (703) 352-8080
     rkipp@kipp-law.com

JA374

Kyle Summers                                                2/28/2023

by driver in order of some sort?

A    Correct.

Q    Based on something the program does?

A    Proximity.

Q    Proximity?  Okay.  And so a driver could turn it down, and then it goes to the other, the next driver in line.

A    Correct.

Q    And does that information come to the driver over a screen or something?

A    Correct.

Q    Each one has a screen in their vehicle?

A    Correct.

Q    And it's kind of like a text message kind of thing or something?

A    It's a tablet, and it's just a screen where they can press a button to accept or decline.

Q    When you say a tablet, is it usually mounted in the vehicle?

A    Correct.

Q    And are they able to communicate back

JA375

Kyle Summers                                              2/28/2023

with the dispatcher through that tablet?

    A    Yes.

    Q    Do they log into it to do that, or do
they talk to it, or what are they doing?

    A    They can do both.

    Q    And was that system that we just talked
about, the computer program, was that in
existence at the time of the collision in this
case, 2019?

    A    Yes.

    Q    And the tablets, was that in existence
in 2019?

    A    Yes.

    Q    Would Mr. Gyimah have had one of those
tablets?

    A    Yes.

    Q    Is the tablet owned by the company?

    A    Yes.

    Q    Is there any other equipment in the car
that Mr. Gyimah had that would have been owned by
the company?

    A    I believe he elected to use our credit

JA376

Kyle Summers                                               2/28/2023

card hardware.

Q    All right.  And so there's something where he would put a card in and charge the commuter fare?

A    Correct.

Q    Anything else in the vehicle?

A    No.

Q    A radio?

MR. HAMPSHIRE:  Objection, calls for speculation.  Please answer if you can.

THE WITNESS:  There was no radio.

BY MR. GARVER:

Q    Any kind of phone?

A    We did not provide phones to the drivers.

Q    But would you communicate with the drivers by phone?

A    By phone call occasionally.

Q    The program you were just referring to that's used for dispatch, what is the name of that program, if you recall?

A    iCabbi.

JA377

# EXHIBIT F

# Extracted pages Deposition of Mr. John McDonald

JA378

# In the Matter of:

## Sung-Chui Jung
## v.
## Red Top Cab, LLC

## John McDonald

June 16, 2023



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

JA379

COMMONWEALTH OF VIRGINIA:

    IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

- - - - - - - - - - - - - - - - x

SUNG-CHUL JUNG,                        :

          Plaintiff,                   :


vs.                                    : Case No.
                                         CL-2020-13314
RED TOP CAB, LLC,                      :
ET AL.,

          Defendants.                  :

                                   and

BRIAN M. O'CONNOR,
ADMINISTRATOR FOR THE ESTATE    :
OF HYO JUNG KIM,
DECEASED,                              :

          Plaintiff                    :


vs.                                    : Case No.
                                         CL-2020-13315
RED TOP CAB, LLC                       :
ET AL.,

          Defendants.           :

- - - - - - - - - - - - - - - - x
                    June 16, 2023

                    Via Zoom

VIDEO DEPOSITION OF:

                    JOHN MCDONALD

JA380

Was called for examination by counsel for the Plaintiff, pursuant to notice, Via Zoom, commencing at 2:29 p.m., before Carolyn Friend, a Notary Public in and for the State of Maryland, when were present on behalf of the respective parties:

APPEARANCES:

STEVEN M. GARVER, ESQ. (VIA ZOOM)
DEBORAH E. MAYER, ESQ. (VIA ZOOM)
Garver Law Offices, P.C.
11702 Bowman Green Drive, Suite 100
Reston, Virginia 20190
(703) 471-1090 STEVE@GARVERLAW.COM
COUNSEL FOR THE PLAINTIFF

GIFFORD HAMPSHIRE, ESQ. (VIA ZOOM)
McGavin, Boyce, Bardot, Thorsen & Katz
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
(703) 385-1000
ghampshire@mbbtklaw.com
COUNSEL FOR THE DEFENDANTS

ALSO PRESENT:  Joe Townsend, Video Operator

## C O N T E N T S

| WITNESS: | EXAMINATION BY: | PAGE: |
|---|---|---|
| John McDonald | Mr. Garver | 4 |
| | Mr. Hampshire | 25 |
| | Mr. Garver | 39 |
| | Mr. Hampshire | 40 |

JA381

state your name?

    A    Yes.  My name is John McDonald, M-C-D-O-N-A-L-D.

    Q    And, Mr. McDonald, where do you currently reside?

    A    I reside in Aberdeen, North Carolina.

    Q    And is that more than a hundred miles from Fairfax County, Virginia?

    A    Yes, it is.

    Q    All right.  And do I understand that you are going to be unable to attend trial on July 17th, 2023 in Fairfax County, Virginia?

    A    Yes, that is correct.

    Q    Okay.  And that's because of the distance?

    A    Yes, it is.

    Q    All right.  Mr. McDonald, could you tell us a little bit about your background and experience, how you were employed?  I assume you're retired now.  Is that right?

    A    Yes, I am, happily retired.

    Q    Okay.  Can you give us a little bit about

JA382

7

John McDonald                                          6/16/2023

your background and how you were employed previously?

A     I retired after 25 year with -- 25 years with Washington, DC Police Department.

Q     All right.

A     And during that --

Q     Go ahead.

A     During that time, I served multiple functions, multiple roles and multiple ranks.

Q     And did you have occasion to investigate and be familiar with automobile collisions back then?

A     Automobile collisions as well as trauma, both from dynamic events such as an accident as well as shootings.

Q     All right.  And did you have specific training in those -- in those areas?

A     I have first aid training.  I have shooting training, active life-saving training and at one point in time I was everything but a paramedic.

Q     All right.  And what was your highest

JA383

rank in the department?

A    Captain.

Q    And you -- you were traveling on April 29th, 2019 on the George Washington Parkway in Fairfax County, Virginia; is that right?

A    That is correct.

Q    Could you tell us what direction you were headed in?

A    South.  I was going southbound.

Q    Approximately what time was it?

A    I have no idea, but I know early afternoon, I'm imagining.  I had gotten off work.  I think I got off work about 2 or 2:30 that day.

Q    Okay.  How was traffic going southbound?

A    Regular traffic.  I don't recall it being heavy.  Regular traffic, you can say that.

Q    I had some problem with the sound.  I don't know if the court reporter was able to hear you.

THE REPORTER:  Yeah, I did.  If you could repeat that, please.

THE WITNESS:  Yeah, regular traffic.  I

JA384

John McDonald                                    6/16/2023

do you remember how many lanes there were back then?

A     I want to say there were two lanes southbound, but I'm not certain.  It may have just been one lane.  I -- I don't recall, I don't.

Q     Do you know how many -- do you remember how many lanes there were in northbound?

A     I'm sorry.  I don't.

Q     Okay.  You were headed southbound, so you don't know if you were in the left lane or the right lane or if there was -- if there was only one lane, is that --

A     I don't -- I don't recall.

Q     Okay.  So tell us what you first saw when you came upon this incident.

A     As I remember, as I'm traveling southbound, I'm going with the flow of traffic.  All of a sudden, I hear a huge explosion.  I recognize it immediately as an accident.  I look up and I -- I see cars going to the -- to the right to get off the roadway.  I see a cloud of dust.  I see a car spinning to my left.

            I pull to the shoulder.  There is a

JA385

16
John McDonald                                                    6/16/2023

Q       -- or the cab?

A       I had seen the Volkswagen, the blue and white Volkswagen Bug as we were going to Old Town. I don't recall where we kind of met up, if that makes sense.  But as we were going through traffic, he would be ahead of me -- it would be ahead of me, I'd be ahead of it, just kind of back and forth, not racing, just a natural flow of traffic.  He wasn't zooming in and out.  I wasn't zooming in and out.

Q       Were you in different lanes?  Does that help refresh your recollection as to how many lanes there were?

A       Well, through Old Town it's at least two lanes.

Q       Right.

A       At -- at the time of the accident I don't recall because the parkway does neck down from two to one lane.  I just don't -- I don't recall if we were to that point yet.  I just don't remember.

Q       Well, the park -- the road today is not as it appeared back then, if that's of any assistance.

JA386

17
John McDonald                                          6/16/2023

A      It won't do me any good.

Q      Yeah.  Okay.  As you were driving, did you have your windows up or down?

A      I think I had them down because I believe it was a very nice day and I was enjoying the day, if I remember correctly.  And I -- the top was down on the -- on the Volkswagen Bug.  It was a convertible, so I'm going to make the assumption that it was a rather decent day.

Q      The northbound lanes and the southbound lanes were separated by double yellow lines or was there a median or what?

A      Double yellow lines.

Q      And were you able to ascertain which car if -- if either had -- or both crossed over the double yellow line?

A      I don't know.

Q      Do you --

A      It appeared to -- appeared to me that both vehicles met right about the driver side of both vehicles.  I don't know who crossed over.  I don't know if they both crossed over.  I have no

JA387

18
John McDonald                                           6/16/2023

idea.  I was not there to do an on-scene

investigation.  That was not -- not my --

Q    Right.

A    -- not my wheelhouse there.

Q    Did you hear any skidding by anyone just

be -- prior to the collision?

A    I did not.

Q    Okay.  Would you have recognized that

sound?

A    Yes.

Q    I mean, did you see any skid marks?

A    Not that I recall, but -- but, again, I

was not doing an actual investigation.

Q    You weren't looking for them, sure?

A    I was not.

Q    But you would have recognized a skidding

sound if it had occurred?

A    Yes.

Q    You just heard the big explosion; is that

fair?

A    Correct, yes.

THE REPORTER:  Excuse me one second,

JA388

please.

(Thereupon, a brief recess was taken.)

THE REPORTER:  Okay.  Sorry about that.

BY MR. GARVER:

Q     All right.  So this person who you think was a -- did you say you think he was a major?

A     Yes.

Q     And he was also providing assistance to -- to the cab driver?

A     Yes, correct.

Q     Did you ever go over to the Volkswagen?

A     I did not.

Q     Did you hear anybody from the Volkswagen?

A     I heard what I believed to be a male's voice giving a very primal scream as in severe pain. And when I did glance up, I did see folks was around the Volkswagen and it appeared to me that someone was trying to help him.

Q     All right.  The traffic northbound at the time do you recall whether that was heavy, light, medium?

JA389

# EXHIBIT G

# Extracted pages Deposition of Mr. Roger Daven Oswalt

JA390

In the Matter of:

**Sung-Chui Jung**
v.
**Red Top Cab, LLC**

**Roger Daven Oswalt**

June 16, 2023



Phone: 703-837-0076
Fax: 703-837-8118
Toll Free: 877-837-0077

1010 Cameron Street
Alexandria, VA 22310
transcript@casamo.com

JA391

COMMONWEALTH OF VIRGINIA:

   IN THE CIRCUIT COURT FOR THE COUNTY OF FAIRFAX

- - - - - - - - - - - - - - - - x

SUNG-CHUL JUNG,                          :

       Plaintiff,                    :

vs.                                      : Case No.
                                           CL-2020-13314
RED TOP CAB, LLC,                        :
ET AL.,

       Defendants.                   :

                                      and

BRIAN M. O'CONNOR,
ADMINISTRATOR FOR THE ESTATE             :
OF HYO JUNG KIM,
DECEASED,                                :

       Plaintiff                     :

vs.                                      : Case No.
                                           CL-2020-13315
RED TOP CAB, LLC                         :
ET AL.,

       Defendants.                   :

- - - - - - - - - - - - - - - - x
                    June 16, 2023

                    Via Zoom

VIDEO DEPOSITION OF:

                    ROGER DAVEN OSWALT

JA392

Was called for examination by counsel for the Plaintiffs, pursuant to notice, Via Zoom, commencing at 3:45 p.m., before Carolyn Friend, a Notary Public in and for the State of Maryland, when were present on behalf of the respective parties:

APPEARANCES:

       STEVEN M. GARVER, ESQ. (VIA ZOOM)
       DEBORAH E. MAYER, ESQ. (VIA ZOOM)
       Garver Law Offices, P.C.
       11702 Bowman Green Drive, Suite 100
       Reston, Virginia 20190
       (703) 471-1090 STEVE@GARVERLAW.COM
       COUNSEL FOR THE PLAINTIFFS

       GIFFORD HAMPSHIRE, ESQ. (VIA ZOOM)
       McGavin, Boyce, Bardot, Thorsen & Katz
       9990 Fairfax Boulevard, Suite 400
       Fairfax, Virginia 22030
       (703) 385-1000
       ghampshire@mbbtklaw.com
       COUNSEL FOR THE DEFENDANTS

ALSO PRESENT:  Joe Townsend, Video Operator

C O N T E N T S

WITNESS:              EXAMINATION BY:            PAGE:

Roger Daven Oswalt          Mr. Garver          4

                       Mr. Hampshire      28

                       Mr. Garver        40

JA393

Roger Daven Oswalt                                    6/16/2023

we'll be moving, and that's a virtual close as well.

We'll be in California.

Q    Okay.  And if I could draw your attention

back again to April 29th, 2019, sometime in the late

afternoon.  Did you come across some event on the

George Washington Parkway in Fairfax County

Virginia?

A    Yes.

Q    Okay.  Can you tell us -- first of all,

why don't you tell us around what time was it in --

in the afternoon?  Do you recall?

A    I want to say it was around 4:30 to 5 in

the afternoon.  It was --

Q    Okay.

A    -- would be my -- be my guess.

Q    All right.  And -- and were you traveling

southbound or northbound?

A    I was traveling southbound towards Mount

Vernon.

Q    Okay.  And where had you been coming

from?

A    Coming from the AECOM Arlington office.

JA394

Roger Daven Oswalt                                              6/16/2023

area -- so there's a -- a median, and then once you get to -- past two-lane there's -- there's just no median.  It's just a -- it's just a double yellow line.

Q    Okay.

A    So I looked in the -- looked in the mirror, did not pass and I stayed -- the -- the car passed me and was in the accident.

Q    So as I understand it, the area where the collision took place, there were two lanes going southbound.  Were there also two lanes going northbound?

A    Yes.

Q    And was there any divider in between or was there just a double yellow line?

A    There's no divider, just a double yellow line.

Q    Okay.  And the Volkswagen and the cab hit each other?

A    Yes.

Q    Do you recall where they collided, where -- where on each vehicle they hit?

JA395

13

Roger Daven Oswalt                          6/16/2023

A      No, I could not -- I could not see that. I mean, they -- they were out in front of me and I -- I said before, I don't know who hit you. There's, you know, whatever the yellow line --

Q      That's --

A      Go ahead.

Q      Well, that's not what I'm asking.

A      Okay.

Q      What I'm trying to focus -- they were hit in the front of the vehicles, right; it was a head-on type collision?

A      Correct, right.

MR. HAMPSHIRE:  Objection.  Leading.

BY MR. GARVER:

Q      Okay.  That's what I'm trying to find out about, Mr. Oswalt.  Can you tell me where the damage was on each vehicle or the apparent -- most of the damage to the vehicles?

A      Answering that question, the damage that I saw was on both fronts of the -- of the vehicle. I specifically focused my energies on the cab, the -- the folks in the Red -- in the Red Top Cab

JA396

Roger Daven Oswalt                                                6/16/2023

and the driver.  A military personnel also coming

northbound had jumped out and he went to the Beetle,

to the Bug.  I ran straight to the -- to the Red Top

Cab that was closest to me.

    Q    Did -- how many cars behind the

Volkswagen were you -- do you believe you were when

the collision occurred?

    A    I was only one car behind the Volkswagen.

    Q    Okay.  And so were you able to see

whether one or both cars crossed the double yellow

line?

    A    I -- I -- I was not able to see that.

    Q    Okay.  And did you see any indication

that either car braked before the collision?

    A    I did not see -- I -- I did not see that,

no.

    Q    Okay.  When you say you did not see that,

what do you mean by that?  Did -- did --

    A    I could not tell you if anybody braked

or -- or, you know, I didn't see that part of it.

    Q    Okay.  The -- but it's clear that one or

the other or both crossed the double yellow line?

Casamo & Associates            703 837 0076            www.casamo.com

JA397

MR. HAMPSHIRE:  Objection.  Leading.

THE WITNESS:  Yeah.  I -- I don't know who crossed the line.  I --

BY MR. GARVER:

Q    I didn't ask you that, sir.  I'm not asking who crossed the line.  I'm asking did somebody or both cross the line?

MR. HAMPSHIRE:  Objection.  Leading.  He said he doesn't --

THE WITNESS:  I don't -- I don't -- I don't know.  I have no idea.  I mean, for that -- to have an accident with this -- 12-inch yellow lines, somebody was either --

MR. HAMPSHIRE:  Objection.  Speculation.

THE WITNESS:  -- over the line.  I have no idea.

THE REPORTER:  Did you say something, Mr. Hampshire, because he was speaking and you said --

MR. HAMPSHIRE:  I objected as to speculation.

THE REPORTER:  Yeah.  Let -- you know, one at a time.

JA398

16
Roger Daven Oswalt                                          6/16/2023

BY MR. GARVER:

Q    So Mr. Oswalt, can you tell us relative -- just calmly what -- what you did observe -- from what you did observe, it was apparent that two vehicles -- unless I misunderstood your testimony -- they hit -- the front of the vehicles hit each other; is that right?

MR. HAMPSHIRE:  Same objection.

THE WITNESS:  That -- (connection interruption.)

THE REPORTER:  Did you say that's correct?

BY MR. GARVER:

Q    Go ahead and answer, Mr. Oswalt, if you would.

A    What I -- what I -- what I observed was the accident, two cars colliding and crashed. That's -- that's -- that's what I saw.  I did not, you know, see who hit who.

Q    I -- again, when you say colliding, they didn't hit each other on the side of the vehicles did they?  They hit each other, as I understand your

JA399

testimony -- where did they hit?

A    Well, I don't know.  I was behind the cars, is all -- is all I saw was the -- the accident, so I'm assuming that they hit each other head-on.  That's the only way they could have hit each other.

MR. HAMPSHIRE:  Objection.  Speculation.

BY MR. GARVER:

Q    And the vehicles -- when you say the vehicles hit each other, what you're saying, if I understand you correctly, is that you don't know who, if either, crossed any lines?  Is that what you're telling me?

A    That's exactly what I told the police.  I said I did not see who hit who.  I just saw the -- the collision and the aftermath, yeah.

Q    Now, do you remember talking -- or writing a statement out for the police?

A    I do.  I do.  The -- the police showed up, you know, 10 to 15 minutes after and -- and I wrote a very short statement on the trunk of the police car.

JA400

Q    Okay.  And have you seen that statement recently to review it?

A    Yes.

Q    Okay.  And -- and what's in that statement do you believe to be accurate?

A    Everything in the statement is accurate. I mean, it's not a lot of detail in it.  I mean, he didn't ask me for much detail.  I -- I talked to the police quite a bit there and actually the next day in -- I -- I live by Fort Hunt Park, and I had another long conversation with -- with one of the Fort Hunt Park Police officers as well about the whole accident.

Q    Right.  So it says at the end of the statement:  It appeared that both cars were very close to the center.

A    Yeah.

Q    I could not say who crossed the line.  Is that accurate?

A    That's accurate, sir.

Q    Okay.  Is it also possible they both crossed the line?

JA401

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

BRIAN M. O'CONNOR            )
Administrator for the Estate )
of Hyo Jung Kim, deceased,   )
                             )
        Plaintiff,           )
                             )
                             )
v.                           ) Civil Action No. 1:23-cv-01756
                             )
                             )
FAIRFAX TAXI, INC., et al.   )
                             )
        Defendants.          )

## ORDER

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment. The Court is of the opinion that Defendant's Motion should be granted. It is hereby

ORDERED that this case is removed from the Court's trial docket; a memorandum opinion and order will be forthcoming.

_Claude M. Hilton_
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
April _10_, 2025

1

JA402

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| BRIAN M. O'CONNOR<br>Administrator for the Estate<br>of Hyo Jung Kim, deceased,<br><br>    Plaintiff,<br><br><br>v.<br><br><br>FAIRFAX TAXI, INC., et al.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:23-cv-01756<br>)<br>)<br>)<br>)<br>) |

### ORDER

THIS MATTER comes before the Court on Plaintiff's Motion for Leave to File Attachments to Expert Designation Out of Time.

This case arises from a car accident, which occurred on April 29, 2019, on the George Washington Parkway. That afternoon, Plaintiffs Hyo Jung Kim and Sung-Chul Jung requested a taxicab from Defendant Fairfax Taxi. Defendant Amoah Gyimah drove the taxicab dispatched to pick up the Plaintiffs. While driving northbound on the parkway with the Plaintiffs, Gyimah collided head-on with a vehicle traveling southbound. The collision killed Gyimah and Kim, and Jung sustained serious injuries. Though filed as separate cases, Plaintiffs' claims are identical.

1

JA403

Parties were required to designate experts and file attachments required by Fed. R. Civ. P. 26 no later than September 16, 2024. Plaintiffs filed a timely document titled "Designation of Expert Witnesses." That document designated Mark Miller as an expert; however, Plaintiffs did not file any of the required attachments. On February 24, 2025, Plaintiffs filed a Motion for Leave to File Attachments to Expert Designation Out of Time. Defendant argues allowing the late filing is harmful to their case and not substantially justified. In addition, Defendant argues Miller's opinion should be excluded on evidentiary grounds, is speculative, and is inadmissible on the merits.

Rule 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Fed. R. Civ. P. 702, 703, or 705 of the Federal Rules of Evidence." Rule 26(a)(2)(B) imposes additional requirements for witnesses "retained or specially employed to provide expert testimony in the case." Specifically,

> a complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; any exhibits that will be used to summarize or support them; the witness's qualifications, including a list of all publications authored in the previous 10 years; a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and a statement of the compensation to be paid for the study and testimony in the case.

2

JA404

Fed. R. Civ. P. 26(a)(2)(B).

Under Rule 37(c)(1), a party who fails to comply with Rule 26 is barred from using that expert's testimony at trial unless the nondisclosure was substantially justified or harmless. See <u>S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.</u>, 318 F.3d 592, 596 (4th Cir. 2003). To determine whether a nondisclosure of evidence is substantially justified or harmless, a district court considers:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

<u>Id.</u> at 597. The first four factors relate to the harmlessness exception; the fifth factor relates to the substantial justification exception. See <u>id.</u> Finally, the fourth factor must be viewed from both parties' prospectives. See <u>id.</u> at 598-99.

First, Defendant was surprised by the opinions of Mr. Milner's testimony as it was five months after the deadline. Second, Defendant will not be able to cure the late filing as they will be unable to depose Mr. Miller or designate a rebuttal witness. Third, Plaintiffs argue that allowing the evidence will necessitate a continuation of the trial to conduct discovery on the expert. As the trial is not till June 23, 2025, this is unlikely to delay trial and favors Plaintiffs.

JA405

Fourth, the expert testimony of Mr. Miller is essential for Plaintiffs to succeed at trial. There are no living witnesses who have memory of the crash; as such, Plaintiffs must rely on expert witnesses to prove their case. As the importance of the evidence must consider both parties' perspectives, the testimony would be harmful to the Defendant and points to why the evidence should have been disclosed in a timely manner. Thus, the fourth factor is in favor of Defendant. As three of the four harmlessness factors weigh in favor of the Plaintiff, their nondisclosure is not harmless.

Fifth, the sole substantial justification factor is not met. While unintentional, a clerical error by Counsel is not a substantial justification to not file Rule 26 attachments on time.

Even if the filing was not late, the expert testimony would be excluded on its merits. Expert testimony must have "a reliable foundation[,]" be "relevant to the task at hand[,]" and must be "more than subjective belief or unsupported speculation." <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589-590, 597 (2015). Mr. Miller claims that Gymiah was not paying attention while driving and that if he was paying attention, he could have avoided the crash. But there is nothing in the record to support Miller's claim that Gymiah was not paying attention. Further, it is speculative to say Gymiah would have been able to avoid the crash.

4

JA406

Virginia Code § 46.2-880 sets out an average driver reaction time of 1.5 seconds. Assuming that both cars were travelling at the speed limit (50 mph), and considering that the vehicles were travelling towards each other, the cars closing distance would have been 146.6 feet per second. Thus, it is speculative to say that Gyimah would have been able to take any action to prevent the crash. Finally, there is no information in the record to support Miller's claim that Gyimah could have moved one lane to the right to prevent the crash.

In sum, the filling was late, and Plaintiff has failed to show the filing was substantially justified or harmless. Even if it were, the filing would be excluded on the merits. Accordingly, it is hereby

ORDERED that Plaintiff's Motion for Leave to File Attachments to Expert Designation Out of Time is DENIED.

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
May 19, 2025

5

JA407

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

BRIAN O'CONNOR                    )
Administrator for the estate      )
of Hyo Jung kim, deceased,        )
                                  )
        Plaintiff,                )
                                  )
                                  )
v.                                )  Civil Action No. 1:23-cv-01756
                                  )
                                  )
FAIRFAX TAXI, INC., et al.        )
                                  )
        Defendants.               )

## MEMORANDUM

THIS MATTER comes before the Court on Defendant Evelyn Kenin's (administrator of the estate of Amoah Gyimah, deceased) Motion for Summary Judgment.

This case arises from a car accident, which occurred on April 29, 2019, on the George Washington ("GW") Parkway. That afternoon, Plaintiffs Hyo Jung Kim and Sung-Chul Jung requested a taxicab from Defendant Fairfax Taxi. Defendant Amoah Gyimah drove the taxicab dispatched to pick up Plaintiffs. While driving northbound on the parkway with Plaintiffs, Gyimah collided head-on with a vehicle traveling southbound. The collision killed Gyimah and Kim, and Jung sustained serious injuries. Dr. Jung, the only survivor, has no memory of the crash and there are no other witnesses to the crash. Plaintiffs filed suit against Fairfax Taxi Inc., Evelyn

1

JA408

Kenin (administrator of the estate of Amoah Gyimah, deceased), and Red Top Cab, LLC. Though filed as separate cases, Plaintiffs' claims are identical.

Plaintiffs first pursued this cause of action in Fairfax County Circuit Court. That case concluded when Plaintiffs took a nonsuit on July 13, 2023. On June 28, 2024, this Court granted in part and denied in part Defendants' Motion for Judgment on the Pleadings. On July 02, 2024, Plaintiffs filed a Motion for Reconsideration, which was subsequently denied by this Court on July 26, 2024. On August 02, 2024, Plaintiffs filed a Motion for Leave to Appeal the June 28, 2024, ruling. That too was denied. And on September 12, 2024, Plaintiffs moved for reconsideration of that denial, which this Court also denied. Leaving the only remaining issue as whether Amoah Gyimah was negligent leading up to and during the accident. Now, Gyimah's estate has filed this Motion for Summary Judgment.

Summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. While the Court views the facts and inferences drawn in the light most favorable to the nonmoving party, the party opposing the motion for summary judgment must put forth specific facts showing a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden of the moving party may be

2

JA409

discharged by simply pointing out "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Plaintiff alleges that Gyimah was negligent by (1) "exceed[ing] the safe speed limit for the conditions then and there existing; (2) looking at using, and/or typing on an electronic cell phone or similar device just before the collision, (3) failing to maintain his vehicle in the correct lane of traffic; [and] (4) failing to recognize the risk of collision from a vehicle driven by Eric S. Jewett." Each theory has the same deficiency: there is no evidence.

First, there are no witnesses to the crash. Gyimah and Kim both died before they had an opportunity to testify. Plaintiff Jung is the only surviving witness. However, Jung has no memory of the crash. He remembers being in the taxi; then, waking up in the hospital. And no witnesses saw the crash. In short, Plaintiff is unable to identify any witness testimony that Gyimah acted negligently. Testimony Plaintiff relies on—such as Jung, John McDonald, Timothy Bracken, and Roger Oswalt—all falls short. Jung testified that Gyimah "spoke to someone, somebody, or if he had a phone call, or he spoke by himself or spoke to me. I don't realize still now." Jung does not affirmatively state Gyimah was talking on his cell phone. Even if he did, Jung cannot identify when Gyimah

3

JA410

was speaking, only that it was sometime before the crash. But he does not know if it was ten minutes before the crash or ten seconds.

Similarly, McDonald's testimony does not support Plaintiff's allegations. McDonald, a retired police captain, testified he was driving southbound on the GW Parkway when he heard the crash. McDonald testified that he did not hear skidding noises, which he would expect to hear if a car braked quickly. Plaintiff argues this shows Gyimah did not attempt to stop to avoid the crash. But McDonald did not see the crash. In fact, he testified that he did not know who crossed over the double yellow line. McDonald only testified that he did not hear skidding noises. A lack of skidding noises is not evidence of which driver caused the accident, or that Gyimah was negligent by not avoiding the crash.

Moreover, Roger Oswalt could also not state who crossed the double yellow line or make any allegations that Gyimah was driving negligently. Oswalt testified he was a "good hundred yards" behind the crash, and that he did not see the crash. Oswalt's testimony that prior to the crash "it appeared that both cars were very close to the center" does not suggest who, if anyone, was negligent. In addition, Timothy Bracken, a former military officer who was one of the first people to arrive after the crash, testified he did not see the crash. Bracken testified he saw a phone in Gyimah's lap when he came upon the crash. But a phone on Gyimah's leg after a violent car crash is not evidence Gyimah was using the phone

4

JA411

before the accident. Bracken never testified that Gyimah engaged in any negligent behavior because Bracken, like every other witness, did not see the crash.

Second, there is no evidence that Gyimah would have been able to avoid the crash. It is undisputed that the vehicles involved in this collision were traveling in opposite directions in a posted speed limit zone of 45 mph, creating a lawful closing speed of 90 mph at the time of the collision. Va Code § 46.2-880 directs "[a]ll courts [to] take notice . . . of speed and stopping distances of motor vehicles." A car traveling 90 mph create a driver perception-reaction time of 198 feet, and a "total stopping distance of 584" feet for automobiles. Id. Plaintiffs identify no evidence that there was 198 feet of room for Gyimah to avoid the crash. Plaintiff attempts to overcome their deficiency in two ways: expert testimony and a park police investigation. Both fail.

To begin, the Court ruled that the expert testimony was both untimely filed and excluded on the merits. See Order Denying Motion for Leave to File Attachments to Expert Designation Out of Time. Thus, it cannot be relied on here. Next, Plaintiff argues that the U.S. Park Police investigation shows there were no tire marks on the road and photographs showing the cars hit head-to-head are evidence that "Gyimah made no attempt to avoid the collision by braking at the last minute." That too fails. A lack of tire marks is not evidence Gyimah was negligent. And photographic evidence

JA412

that a head-on crash happened does not show *how* the crash happened or that Gyimah was negligent.

Finally, Plaintiff purports that the jury could find both parties liable and Gyimah to be a joint tortfeasor. This too fails. Even under a theory of joint tortfeasors, Plaintiff must be able to show that there is a genuine dispute of material fact to survive summary judgment. He cannot. As stated above, there are no eyewitnesses who can testify that Gyimah was negligent or could have avoided the crash; there is no admissible expert testimony that Gyimah was negligent; and the police reports only show that an accident happened, not which driver caused the accident. In sum, Plaintiff has failed to provide evidence that there is a genuine dispute of material fact for the jury to decide.

For the forgoing reasons, Defendant Evelyn Kenin's (administrator of the estate of Amoah Gyimah, deceased) Motion for Summary Judgment should be GRANTED; this case should be DISMISSED.

An appropriate Order shall issue.

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
May 19, 2025

6

JA413

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

BRIAN O'CONNOR )
Administrator for the estate )
of Hyo Jung kim, deceased, )
)
    Plaintiff, )
)
)
v. ) Civil Action No. 1:23-cv-01756
)
)
FAIRFAX TAXI, INC., et al. )
)
    Defendants. )

## ORDER

In accordance with the accompanying Memorandum Opinion, it is hereby

ORDERED that Defendant Evelyn Kenin's (administrator of the estate of Amoah Gyimah, deceased) Motion for Summary Judgment is GRANTED; this case is DISMISSED.

CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
May 19, 2025

1

JA414

United States District Court for the <u>Eastern District of Virginia</u>

District of <u>Alexandria Division</u>

Docket Number <u>1:23-cv-01756</u>

BRIAN M. O'CONNOR
Administrator for the Estate of
Hyo Jung Kim, deceased

|   |   |   |
|---|---|---|
|   | ) |   |
| v. | ) | Notice of Appeal |
|   | ) |   |
| Fairfax Taxi, Inc. et. al. | ) |   |

<u>Brian M. O'Connor, Admin. Estate of Hyo Jung Kim</u> (name all parties taking the appeal)*
appeal to the United States Court of Appeals for the <u>Fourth</u> Circuit from the final judgment
entered on <u>May 19, 2025</u> (state the date the judgment was entered)

(s)_____

Attorney for <u>Brian M. O'Connor, Admin</u>

Address: <u>11702 Bowman Green Dr.</u>

<u>Reston, VA 20190</u>

[***Note to inmate filers:*** *If you are an inmate confined in an institution and you seek the timing benefit of Fed. R. App. P. 4(c)(1), complete the Declaration of Inmate Filing and file that declaration along with this Notice of Appeal]*

_____

* See Rule 3(c) for permissible ways of identifying appellants.

12/01/2021  SCC

JA415

United States District Court for the <u>Eastern District of Virginia</u>

District of <u>Alexandria Division</u>

Docket Number <u>1:23-cv-01758</u>

Sung-Chul Jung

)
v.                                    )        Notice of Appeal
                                      )
Fairfax Taxi, Inc. et. al.            )
                                      )

<u>Sung-Chul Jung</u>_____(name all parties taking the appeal)*
appeal to the United States Court of Appeals for the <u>Fourth</u> Circuit from the final judgment
entered on _____<u>May 19, 2025</u>_____ (state the date the judgment was entered).

(s)_____

Attorney for <u>Sung-Chul Jung</u>

Address: <u>11702 Bowman Green Dr.</u>

<u>Reston, VA 20190</u>

[***Note to inmate filers:*** *If you are an inmate confined in an institution and you seek the timing benefit of Fed. R. App. P. 4(c)(1), complete the Declaration of Inmate Filing and file that declaration along with this Notice of Appeal]*

_____

\* See Rule 3(c) for permissible ways of identifying appellants.

12/01/2021  SCC

JA416

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BRIAN M. O'CONNOR | ) | |
| Administrator for the Estate of | ) | |
| Hyo Jung Kim, deceased | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. 1:23-cv-01756-CMH-WEF |
| | ) | |
| FAIRFAX TAXI, INC., *et al* | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| SUNG-CHUL JUNG | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-01758-CMH-WEF |
| | ) | |
| FAIRFAX TAXI, INC., *et. al.* | ) | |
| | ) | |
| Defendants. | ) | |

**AGREED STATEMENT OF FACTS FROM PRE-TRIAL HEARING
FEBRUARY 20, 2025**

Comes now the Plaintiffs, BRIAN M. O'CONNOR, Administrator for the Estate

of Hyo Jung Kim, deceased, and Sung-Chul Jung, and files this a statement of facts from the

Pre-Trial hearing of February 20, 2025, where there the Court Reporter did not take and record

the hearing. This statement of facts has been agreed to by the Defendants.

Counsel appeared on February 20, 2025, for the pre-trial hearing. Due to conflicts of

schedules of the Counsel and the Court, the Court scheduled the trial in the matters for June 23,

2025, for 4 days. Counsel requested the ability to have witnesses who were not locally available

to testify at trial by video conference in real time (by Zoom or another similar program

acceptable to the Court or through the Courts remote system). Plaintiff's offered to have the

JA417

witnesses in a law office or in another Courthouse near the location of each of the witnesses. The Court denied the request. Counsel requested the ability to use video depositions at trial and the Court indicated on a limited basis it would permit it for non-local witnesses provided the video depositions were shortened to no more than ½ hour each and indicated that it would have to be within reason as the Court did not want numerous witnesses to testify by video. (Several of the depositions were from cases styled the same in the Circuit Court for the County of Fairfax, Virginia. These cases had been non-suited prior to the filing in the Eastern District of Virginia, but the discovery was incorporated by consent order into the U.S. District Court cases.) The Court then indicated that if witnesses were unavailable Counsel could use depositions by reading them to the jury. Since a number of witnesses were out of the Country and others were now more than 100 miles from the District and the Court, the Court indicated that Counsel could take additional depositions which were tailored to be used in lieu of live testimony. Particularly the Plaintiff wished to retake a deposition of Robert Ahler by videotape, which was originally noticed and taken by the Defendant and not videotaped, allowing the Plaintiff to conduct the deposition for the purposes of trial. The Court approved that particular video deposition. The Court indicated counsel could take additional depositions, in lieu of trial testimony, which they believed now necessary. The Court then acknowledged that trial was now set several months thereafter. The Court noted that counsel could work together to arrange the logistics of additional depositions Counsel believed necessary.

The Court also set a date to argue summary judgment and a briefing schedule for the summary judgment. A minute entry was entered (ECF 84 in case 1:23-cv-01756 and ECF 88 in case 1:23-cv-01758) which set the date for Summary Judgment hearing and the trial date.

JA418

Brian M. O'Connor, Administrator
   of the Estate of Hyo Jung Kim, and
Sung-Chul Jung,
By Counsel

_____
Steven M. Garver, Esquire, VSB#1514
Deborah E. Mayer, Esquire, VSB#51072
GarverLaw, P.L.L.C.
11702 Bowman Green Drive, Suite 100
P.O. Box 2430
Reston, Virginia 20190-2430
(703)471-1090
(703)471-1095 (Facsimile)
steve@garverlaw.com
demayer@garverlaw.com
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that I, on this 3rd day of July 2025, did cause a true copy of the foregoing *Pleading* to be delivered to:

| | | |
|---|---|---|
| John D. McGavin, Esq. | ____ | By First Class Mail |
| Gifford Hampshire, Esq | ____ | By Federal Express |
| McGavin, Boyce, Bardot, Thorsen & Katz, P.C. | ____ | By Hand Delivery |
| 9990 Fairfax Blvd, Suite 400 | _x__ | By Electronic Means |
| Fairfax, VA 22030 | ____ | By Facsimile |

703-385-1000
703-385-1555 (fax)
jmcgavin@mbbtklaw.com
ghampshire@mbbtklaw.com
Counsel for Defendants Fairfax Taxi, Inc., Evelyn
Kenin, Administrator of the Estate of Amoah Gyimah,
Deceased

_____

3

JA419